UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------------X
                                                      :
RAKESH CHAUHAN, individually and on behalf of all     :
others similarly situated,                            :
                                                      :
                              Plaintiff,              :
                                                      :
                -v-                                   :
                                                      :
INTERCEPT PHARMACEUTICALS, et al.,                    :
                                                      :
                              Defendants.             :
                                                      :
-----------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__1/25/2021__

21-cv-00036 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Before the Court are competing motions from movants seeking to be appointed lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").[1]  15 U.S.C. § 78u–4(a)(3)(B).  Each movant also proposes its respective retained counsel as class counsel.  The Court appoints Richard Rice as Trustee of the Richard E. and Melinda Rice Revocable Family Trust 5/9/90 as lead plaintiff and appoints his counsel, Glancy Prongay & Murray LLP, as class counsel.

## BACKGROUND

Plaintiffs bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder against Intercept Pharmaceuticals, Inc. ("Intercept" or the "Company"), Intercept's president, chief executive officer, and director Mark

---

[1] Movants are defined to include Peidong Wu ("Wu"), Trustees of Teamsters Union No. 142 Pension Fund ("Teamsters Union") and City of Cape Coral Municipal General Employees' Retirement Plan ("Cape Coral"), Margaret Neale ("Neale"), Paul Weller ("Weller"), City of Fort Lauderdale Police and Fire Retirement System ("Fort Lauderdale"), Paul Sapan ("Sapan") and Rony Awaida ("Awaida"), and Richard Rice ("Rice" or "Trustee") as Trustee of the Richard E. and Melinda Rice Revocable Family Trust 5/9/90 ("Trust").

Pruzanski, and Intercept's chief financial officer Sandip Kapadia (collectively, "Defendants"). The action is brought on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Intercept securities between September 28, 2019 and October 7, 2020, inclusive (the "Class Period").

Intercept is a biopharmaceutical company that focuses on the development and commercialization of therapeutics to treat progressive non-viral liver diseases in the United States.  Dkt. No. 1 ("Complaint" or "Compl.") ¶ 2.  Its lead product candidate is Ocaliva (obeticholic acid ("OCA")), used for the treatment of primary biliary cholangitis ("PBC"), a rare and chronic liver disease.  *Id.* ¶ 3.  Intercept is also developing OCA for various other indications, including nonalcoholic steatohepatitis ("NASH").  *Id.*

In 2016, the U.S. Food and Drug Administration ("FDA") granted accelerated approval of Ocaliva for treating PBC.  *Id.* ¶ 4.  In late 2017, both Intercept and the FDA issued warnings concerning the risk of overdosing patients with the drug and multiple reports of severe liver injuries and deaths linked with its use.  *Id.* ¶ 5.  The Complaint alleges that, despite these concerns, Defendants continued to tout Ocaliva sales and purported benefits and its potential indication for treating various other medical conditions.  *Id.* ¶ 6.  For example, just two years later, in September 2019, Intercept submitted a New Drug Application ("NDA") to the FDA for OCA to treat patients with liver fibrosis due to NASH.  *Id.*

Specifically, the Complaint alleges that during the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants downplayed the true scope and severity of safety concerns associated with Ocaliva's use in treating PBC; (ii) the foregoing increased the likelihood of an FDA investigation into Ocaliva's development, thereby jeopardizing Ocaliva's continued marketability and the sustainability of its sales; (iii) any

purported benefits associated with OCA's efficacy in treating NASH were outweighed by the risks of its use; (iv) as a result, the FDA was unlikely to approve the Company's NDA for OCA in treating patients with liver fibrosis due to NASH; and (v) as a result of all the foregoing, the Company's public statements were materially false and misleading at all relevant times.  *Id.* ¶ 7.

The trading price of Intercept's common stock fell substantially in the wake of partial disclosures made on May 22, 2020, June 29, 2020, and October 8, 2020.  *Id.* ¶¶ 8-13.

## PROCEDURAL HISTORY

The Complaint in this action was filed by Plaintiff Rakesh Chauhan ("Chauhan") in the Eastern District of New York on November 5, 2020 under the caption *Chauhan v. Intercept Pharmaceuticals, Inc.*, No. 20-cv-5377 (E.D.N.Y.).  It was transferred to the Southern District of New York, and this Court specifically, on January 4, 2021 after a joint motion to transfer filed by the parties on December 29, 2020.  Dkt. Nos. 9, 10.

On January 4, 2021, seven parties timely moved for appointment of lead plaintiff under the PSLRA.  Dkt. Nos. 12, 15, 17, 20, 25, 29, 33.  On the same day, counsel for Plaintiff Chauhan informed the Court that he had made the requisite notice of the pendency of the action under the PSLRA on November 5, 2020 by press release in PRNewswire, a national business-oriented wire service.  Dkt. No. 28-2; *see* 15 U.S.C. § 78u–4(a)(3)(A)(i).

On January 5, 2021, the Court entered a scheduling order that provided for opposition to any motion for appointment of lead plaintiff to be filed by January 13, 2021.  Dkt. No. 36.  That order also scheduled a hearing on the motions for January 15, 2021.  *Id.*

Four movants, Neale, Fort Lauderdale, Teamsters Union and Cape Coral, and Weller, withdrew their motions for lead plaintiff.  Dkt. Nos. 39-41, 45.  Movants Wu, Sapan and Awaida, and Rice submitted opposition briefs on January 13, 2021.  Dkt. Nos. 46-48.  The Court held a hearing on the motions on January 15, 2021.

## LEGAL STANDARD

The PSLRA establishes the framework courts use to select a lead plaintiff in class actions brought under the federal securities laws.  First, the PSLRA requires any prospective lead plaintiff to file a motion for appointment as lead plaintiff within sixty days of the publication of notice of the securities class action.  15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(aa); *id.* § 78u–4(a)(3)(A)(i).

Next, the PSLRA lays out standards for choosing one lead plaintiff from among the candidates who file motions.  The PSLRA provides that:

> the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—
>
> (aa) has either filed the complaint or made a motion in response to a notice [of the complaint within sixty days of the publication of this notice];
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* § 78u–4(a)(3)(B)(iii)(I).  Once the Court identifies a presumptive lead plaintiff, this presumption:

> may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—
>
> (aa) will not fairly and adequately protect the interests of the class; or
>
> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

*Id.* § 78u–4(a)(3)(B)(iii)(II).  If the Court finds that the movant with the largest financial interest in the class action is otherwise ineligible for appointment as lead plaintiff, the Court applies the criteria of the PSLRA to the movant with the second-highest financial interest.  This

investigation continues until the Court identifies a suitable lead plaintiff.  *See, e.g.*, *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 396 n.7 (S.D.N.Y. 2008).

For purposes of choosing a lead plaintiff under the PSLRA, "[t]he parties moving for lead plaintiff are only required to make a prima facie showing that they meet Rule 23 [of the Federal Rules of Civil Procedure], and courts need only consider the typicality and adequacy requirements."  *Aude v. Kobe Steel, Ltd.*, 2018 WL 1634872, at *3 (S.D.N.Y. Apr. 4, 2018). Movants can demonstrate typicality by showing that their claims "arise from the same conduct from which the other class members' claims and injuries arise," *In re Crayfish Co. Sec. Litig.*, 2002 WL 1268013, at *5 (S.D.N.Y. June 6, 2002), and they can demonstrate adequacy if they "(1) [have] no conflict of interest with the other members of the class, (2) [have] sufficient interest in the outcome of the case, and (3) [have] selected counsel that is qualified, experienced, and generally able to conduct the litigation in question," *Aude*, 2018 WL 1634872, at *4.  The Court's determination of adequacy and typicality for purposes of appointing a lead plaintiff is not preclusive of a later challenge at the class certification stage with respect to those factors.  *See, e.g.*, *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 536 (S.D.N.Y. 2015) ("[I]n deciding a motion to serve as lead plaintiff, [t]he moving plaintiff must make only a preliminary showing that the adequacy and typicality requirements under Rule 23 have been met. . . . In fact, a wide ranging analysis under Rule 23 is not appropriate at this initial stage of the litigation and should be left for consideration of a motion for class certification.") (internal quotation marks, citations, and modifications omitted).

While the PSLRA permits a "group of persons" to serve as lead plaintiff, 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I), it does not specify what constitutes an acceptable grouping.  *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 99 (S.D.N.Y. 2005).  "The majority of courts, including

those in this District . . . permit[] unrelated investors to join together as a group seeking lead-plaintiff status on a case-by-case basis, if such a grouping would best serve the class." *Varghese*, 589 F. Supp. 2d at 392.

Finally, the PSLRA provides that, "[e]xcept as the court may otherwise permit . . . a person may be a lead plaintiff . . . in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period." 15 U.S.C. § 78u–4(a)(3)(B)(vi).

## DISCUSSION

### I.    The Applications

Seven putative class members filed motions to be lead plaintiff.

Sapan and Awaida suffered the largest loss in their investment in Intercept during the Class Period. They report a combined loss of $1,088,875.87 on a last-in, first-out ("LIFO") basis, of which $456,400.87 represents Sapan's losses and $632,475 represents Awaida's losses. Dkt. No. 24-2. Sapan resides in California where he works as a food chemist and chief executive officer of his food consulting company. Dkt. No. 24-4 ¶ 3. Awaida resides in Ohio where he is a physician partner at a pathology laboratory. In addition, Awaida is a shareholder at a surgery center, is co-founder and co-owner of a company providing anesthesia services to surgery centers, and has been chief of the gastrointestinal division at a hospital in Ohio for the past five years. *Id.* ¶ 4. Sapan and Awaida claim investing experience of 30 years and 18 years, respectively. They propose two law firms, Scott+Scott LLP and Levi & Korsinsky, LLP, as co-lead counsel. Sapan's declaration also states that "[i]n addition to the two firms we propose to be appointed co-lead counsel, I am also represented by The Schall Law Firm." *Id.* ¶ 3. The application does not explain the proposed role for The Schall Law Firm.

Claiming the next greatest financial interest is Rice on behalf of the Trust, which reports a loss of $384,567.76.  Dkt. No. 35-3.  Rice resides in Arizona where he is retired.  Prior to his retirement, he founded and was the president of a veterinary company.  Dkt. No. 34 at 8.  He has been managing his own investment portfolio for 50 years.  *Id.*  He proposes Glancy Prongay & Murray LLP as lead counsel.

Wu claims the third highest financial interest, with reported losses of $174,705.68.[2]  Dkt. No. 14 at 6; Dkt. No. 14-3.  Wu resides in California where he is retired.  Prior to his retirement, he was a chief financial officer.  Dkt. No. 14 at 8.  He proposes The Rosen Law Firm as lead counsel.

## II.    Lead Plaintiff

The movants here agree that the sixty-day window to move for appointment as lead plaintiff closed on January 4, 2021.  All seven eligible movants filed their motions within that window, and the Court therefore considers their filings timely.

In selecting a lead plaintiff, the PSLRA establishes a presumption in favor of the applicant with "the largest financial interest in the relief sought by the class."  5 U.S.C. § 78u–4(a)(3)(B)(iii)(I).  In determining the party with the largest financial interest, courts generally consider several factors, the most significant of which is the magnitude of the party's loss. *See Kaplan v. Gelfond*, 240 F.R.D. 88, 93 (S.D.N.Y. 2007).  The ranking, from largest to least, of loss by each candidate for lead plaintiff is as follows:

---

[2] Teamsters Union and Cape Coral together claim the third highest financial interest, with combined losses of $180,446, Dkt. No. 16 at 7; Dkt. No. 19-2, but have since withdrawn their motion for appointment as lead plaintiff, Dkt. No. 41.

1. Sapan and Awaida, with a claimed interest of $1,088,875.87 when calculated on a LIFO basis. That includes Sapan's losses of $456,400.87 and Awaida's losses of $632,475.[3] Dkt. No. 24-2.[4]

2. Rice as Trustee, with a claimed interest of $384,567.76. Dkt. No. 35-3.[5]

3. Teamsters Union and Cape Coral, with a claimed interest of $180,446 when calculated on a LIFO basis. Dkt. No. 16 at 7. That includes the Teamsters Union's losses of $102,215.32 and Cape Coral's losses of $78,230.28. Dkt. No. 16 at 7; Dkt. No. 19-2.

4. Wu, with a claimed interest of $174,705. Dkt. No. 14 at 6; Dkt. No. 14-3.

5. Paul Weller, with a claimed interest of $131,557 when calculated on a first-in, first-out ("FIFO") basis, or $99,656 when calculated on a LIFO basis. Dkt. No. 27 at 1, 7; Dkt. No. 28-1.

6. Fort Lauderdale, with a claimed interest of $57,448. Dkt. No. 30 at 4; Dkt. No. 31-3.

7. Neale, with a claimed interest of $56,562.56. Dkt. No. 18 at 1, 6; Dkt. No. 22-3.

## A.     Sapan and Awaida

There are several arguments made against the appointment of Sapan and Awaida as a group. The Court need not address all challenges as it finds that Sapan and Awaida are not a proper group and should not be considered individually.

*Varghese* identifies factors for the Court to consider when assessing a proposed grouping of plaintiffs as lead plaintiff: "(1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa[.]" *Varghese*, 589 F. Supp. 2d at 392. The "overarching concern" is

---

[3] Awaida's losses of $632,475 includes common stock losses of $361,850 and options losses of $270,625. Dkt. No. 24-2.

[4] Rice challenges these calculations, but given the Court's conclusion that Sapan and Awaida are not a proper group and should not be considered individually, the Court need not reach Rice's challenges.

[5] Rice's losses of $384,567.76 consist of $564,151.76 in common stock losses offset by $179,584 in options gains. Dkt. No. 35-3.

"whether the related members of the group can function cohesively and effectively manage the litigation apart from their lawyers."  *Nakamura v. BRF S.A.*, 2018 WL 3217412, at *3 (S.D.N.Y. July 2, 2018).  Reviewing these factors together, Sapan and Awiada do not satisfy the relevant standards under *Varghese*.

Sapan and Awiada provide no evidence that they had a pre-litigation relationship and every indication is that they did not.  Sapan is a food chemist in California; Awiada is a physician partner in Ohio.  The joint declaration they filed provides no basis to believe that they had a relationship before they decided to file the application to serve as lead plaintiffs as a group.  This is "a negative factor but not disqualifying" by itself.  *Cohen v. Luckin Coffee Inc.*, 2020 WL 3127808, at *5 (S.D.N.Y. June 12, 2020).  Although the record is somewhat ambiguous, it appears from their declaration that they did not speak with one another and with counsel and decide to act as a group until January 4, 2021—the very date lead plaintiff applications were due.  The joint declaration they signed is also dated that day.  Dkt. No. 24-4 ¶ 7 (only "[u]pon learning of each other's interest in seeking appointment as a co-lead plaintiff in this matter through our counsel" did they "communicate[] with one another and counsel via conference call on January 4, 2021, and via email").[6]

As to their involvement in the litigation thus far and plans for cooperation, they provide only the following rote statement in their declaration:

---

[6] The joint declaration also states that they decided to retain Scott+Scott and Levi Korsinsky as counsel "after reviewing the complaints, discussing the merits of the allegations, and expressing our interest in recovering the losses we suffered," Dkt. No. 24-4 ¶ 6, but there is no concrete evidence that that occurred prior to January 4, 2021.

Upon learning of each other's interest in seeking appointment as a co-lead plaintiff in this matter through our counsel, we communicated with one another and counsel via conference call on January 4, 2021, and via e-mail, where we discussed among other things: the allegations and the strength of the claims against Defendants; a strategy for prosecuting the Action; the role of the lead plaintiff and lead counsel selection and litigation process; the benefits that the Class would receive from the leadership of a group of like-minded investors; a shared desire to achieve the best possible result for the Class; our interests in prosecuting the Action in a collaborative likeminded manner, including resolving any disputes; and the actions that we will take to continue to ensure that the claims will be zealously and efficiently litigated.

*Id.* ¶ 7.

This Court rejected similar boilerplate language in *Luckin Coffee*, where it stated that "[t]he Court would expect no less from *any* person or persons proposing to be lead counsel" and thus "[t]he rote recitation of those factors does not provide evidence that any member of the group—much less the group as a whole—has had significant involvement in the litigation thus far." *Luckin Coffee*, 2020 WL 3127808, at *4; *see Kniffin v. Micron Tech., Inc.*, 379 F. Supp. 3d 259, 263 (S.D.N.Y. 2019) ("Vague discussions of general communication protocols and status reports hashed out over preliminary conference calls do little to show the groups' involvement in the litigation."); *Pipefitters Loc. No. 636 Defined Benefit Plan v. Bank of Am. Corp.*, 275 F.R.D. 187, 191-92 (S.D.N.Y. 2011) (joint declaration stating that group members discussed "protocols for managing the litigation" were "conclusory assurances").

In fact, their conduct to date belies the notion that they would take an active role in the litigation supervising counsel and if necessary, restricting the role of counsel, in the best interest of efficiently prosecuting the case on behalf of the class. They provide no cogent explanation for why they propose two different law firms, each of which is independently competent, to handle this lawsuit. Sapan also makes reference to a third law firm but provides no explanation of what role that firm is to play.

10

Sapan and Awaida claim that "[t]his is simply not a case where a group of unrelated investors has been cobbled together as a 'group' to displace a single competing [] investor, or a smaller, closely-related group of investors," Dkt. No. 48 at 5 (quoting *Barnet v. Elan Corp.*, 236 F.R.D. 158, 163 (S.D.N.Y. 2005)), because as it turns out each of them has a larger loss than the other movants.  But as they admit, at the time they decided to form the group and submit their application on January 4, 2021, they had no idea who the other movants would be or the size of their losses.  *See* Hr'g Tr. (Jan. 15, 2021) at 7:14-8:19.  The facts thus contradict their contention that they were not "cobbled together" by counsel simply to win the position of lead plaintiff and lead counsel, and not because they believed as a group they could best serve the class.  *Varghese*, 589 F. Supp. 2d at 392; *see Khunt*, 102 F. Supp. 3d at 533 (rejecting a group whose members were introduced to each other through counsel and whose only involvement was "a single conference call").  In short, Sapan and Awaida are the paradigmatic example of the "random assemblage of unlike individuals" that this Court has previously rejected.  *Luckin Coffee*, 2020 WL 3127808, at *4.

Neither Sapan nor Awaiada have requested to be considered individually as lead plaintiff and the Court declines so to consider them.  The PSLRA requires a purported class member who wishes to be considered for the position of lead plaintiff to make a motion, and to make it within the sixty-day window.  Neither Sapan nor Awaida moved to be considered individually as an alternative if their group was rejected, which they should have done if they wished to be considered individually and which would have permitted orderly consideration of their applications viewed individually.  *See Jakobsen v. Aphria, Inc.*, 2019 WL 1522598, at *4 (S.D.N.Y. Mar. 27, 2019) (declining to consider individual members where there were no separate motions); *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 624 n.4 (S.D.N.Y. 2015)

(declining to appoint individual member of group because it "at no time sought to serve as individual lead plaintiff"): *cf. Kniffin*, 379 F. Supp. 3d at 265 n.1 (considering individual members because they "expressly requested" the court appoint them "individually if the group was disaggregated"). The Court might be prepared to dispense with that procedural nicety if there were a compelling reason to do so. But there is not. From all indications, their decision not to ask to be considered individually represented a considered choice. They emphasized that their grouping was particularly appropriate because of the "pooling of specialization and knowledge" and that they were "really driving the idea to . . . team together." Hr'g Tr. (Jan. 15, 2021) at 8:16-19. There are also other adequate lead plaintiff candidates.

### B.    Rice as Trustee

Rice is the movant with the next largest financial interest. Under the PSLRA, the presumption in favor of the party with the largest financial interest who otherwise satisfies Rule 23 may be rebutted upon "proof" that the presumptive lead plaintiff: (1) "will not fairly and adequately protect the interests of the class," or (2) "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). The statutory language of the PSLRA does not clearly establish what constitutes "proof." *See Schaffer v. Horizon Pharma Plc*, 2016 WL 3566238, at *2 (S.D.N.Y. June 27, 2016). Courts have made clear, however, that mere speculation is insufficient to rebut the presumption of adequacy. *See, e.g., Foley v. Transocean Ltd.*, 272 F.R.D. 126, 133 (S.D.N.Y. 2011) ("[T]he conflict of interest must be shown, not merely speculated, in order to rebut the presumption of the most adequate lead plaintiff.").

Competing movants for lead plaintiff argue that Rice is atypical of the class because he engaged in high frequency trading, substantial options trading, and material short sales. Such behavior would, competing movants argue, raise unique defenses for Rice regarding whether he

relied on the integrity of the stock price in purchasing his shares.  They point to Rice's behavior in purchasing and selling multiple sets of shares in a day or over a series of days.  For example, the Trust bought and sold sets of shares on the same day, on December 27, 2019.  Dkt. No. 46 at 6.  It also bought and sold sets of shares over a couple of days, such as on November 27 and 29, 2019, December 19 and 20, 2019, February 13 and 14, 2020, and February 20 and 21, 2020.  *Id.*

Rice responds that he is not a day trader or short seller but rather that he engaged in a "covered call" investment strategy.  A covered call is an options trading strategy designed to hedge against risk.  "Covering an option permits the writer to limit the downside risk associated with the transaction in exchange for diminished potential profits. The maximum loss for the writer of a covered call option that triggers, after accounting for the premium received, is the difference between the strike price and the purchase price. But the upside is lower because the writer of a covered call option must actually purchase the underlying asset, cutting against the profits if the option expires." *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 229 (E.D.N.Y. 2019); *see* Hr'g Tr. (Jan. 15, 2021) at 13:14-15:9.  The competing movants do not dispute that characterization of Rice's trading strategy, and they offer no evidence of high frequency trading, substantial options trading, or material short sales.

"Courts have rejected the argument that the use of sophisticated investment strategies disqualifies a party from serving as lead plaintiff or necessarily undermines reliance, particularly at this stage of the litigation." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2021 WL 148752, at *9 (S.D.N.Y. Jan. 15, 2021); *see also Woburn Ret. Sys. v. Salix Pharm., Ltd.*, 2015 WL 1311073, at *8 (S.D.N.Y. Mar. 23, 2015) (lead plaintiff was "not subject to unique defenses" when it "relied on [] valuation statements when it purchased [] stock, even if it did so as a hedge" because "[i]nvestment strategies intended to mitigate risk do not render a movant atypical or

inadequate"); *In re Imax Sec. Litig.*, 2011 WL 1487090, at *7 (S.D.N.Y. Apr. 15, 2011) (holding that the use of a merger arbitrage investment strategy does not subject a presumptive lead plaintiff to a unique defense and therefore does not rebut the presumption of adequacy); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 109 (S.D.N.Y. 2004) ("The fact that these traders have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof that price played no part whatsoever in their decision making.").  Absent evidence that Rice did not rely on the integrity of the market price, which has not been offered at this stage, there is no reason to disqualify Rice as lead plaintiff.

Competing movant Wu also argues that because Rice engaged in "significant options trades," he is "incapable of properly representing a class of stockholders given the fundamental differences between stocks and options."  Dkt. No. 46 at 7.  But as Wu notes, Rice does not claim any losses from options trading.  *See id.* ("[T]he Trust . . . actually made a significant profit—$179,584 from its options trading"); Dkt. No. 35-3 (loss summary listing $564,151.76 in common stock losses and $179,584 in options gains); Dkt. No. 45 at 5 n.3 (Rice stating he "does not have an options loss").  Nor is this a situation where the majority of Rice's losses, or trades, were through options.  *See Cook v. Allergan PLC*, 2019 WL 1510894, at *2 (S.D.N.Y. Mar. 21, 2019) (rejecting movant where 60% of claimed losses were the result of options trading, which included sales of both puts and calls); *Di Scala v. ProShares Ultra Bloomberg Crude Oil*, 2020 WL 7698321, at *4 (S.D.N.Y. Dec. 28, 2020) (rejecting movant where 82% of claimed losses were attributable to the sale of put options); *see also In re Elan Corp. Sec. Litig.*, 2009 WL 1321167, at *2 (S.D.N.Y. May 11, 2009) (rejecting movant who traded exclusively in call options); *Andrada v. Atherogenics, Inc.*, 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005) (same).

### III.   Class Counsel

Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u–4(a)(3)(B)(v).  The PSLRA "evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention."  *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2008 WL 4128702, at *2 (S.D.N.Y. Sept. 3, 2008) (quoting *Cendant*, 264 F.3d at 276); *see, e.g.*, *In re Ply Gem Holdings, Inc., Sec. Litig.*, 2014 WL 12772081, at *2 (S.D.N.Y. Oct. 14, 2014) (same).

Rice has selected Glancy Prongay & Murray LLP, a firm highly experienced in securities class action litigation.  The Court sees no reason why this firm would not adequately represent the class.

### CONCLUSION

For the foregoing reasons, the Court GRANTS the motion at Dkt. No. 33.  On the understandings set forth in this Opinion, the Court appoints Richard Rice as Trustee of the Richard E. and Melinda Rice Revocable Family Trust 5/9/90 as lead plaintiff and appoints his counsel, Glancy Prongay & Murray LLP, as class counsel.

The Court therefore DENIES the remaining motions for appointment as lead plaintiff. The Clerk of Court is respectfully directed to terminate Dkt. Nos. 12, 15, 17, 20, 25, 29.

IT IS FURTHER ORDERED that the newly-appointed lead plaintiff shall meet and confer with Defendants on a briefing schedule for a consolidated amended complaint and any motion to dismiss.  The parties shall jointly submit a proposed schedule on ECF no later than February 8, 2021.  If the parties are unable to agree on a proposed schedule, they may file separate proposals.

SO ORDERED.

Dated: January 25, 2021
     New York, New York

                           LEWIS J. LIMAN
                     United States District Judge