UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RAKESH CHAUHAN, individually
and on behalf of all others
similarly situated,

                  Plaintiff,

          v.                         21 CV 36 (LJL)

INTERCEPT PHARMACEUTICALS,
INC., MARK PRUZANSKI, and
SANDIP S. KAPADIA,

                  Defendants.        Telephone Conference

------------------------------x

                                     New York, N.Y.
                                     January 15, 2021
                                     4:00 p.m.

Before:

                  HON. LEWIS J. LIMAN,

                                     District Judge

APPEARANCES


THE ROSEN LAW FIRM
     Attorneys for Movant Peidong Wu
BY:  PHILLIP C. KIM

SCOTT + SCOTT, L.L.P.
     Attorneys for Movants Rony Awaida and Paul Sapan
BY:  RHIANA SWARTZ
     THOMAS L. LAUGHLIN, IV
     -and-
LEVI & KORSINSKY, LLP
BY:  NICHOLAS PORRITT

GLANCY PRONGAY & MURRAY LLP
     Attorneys for Movant Richard Rice
BY:  GREGORY B. LINKH
     CHARLES H. LINEHAN

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
     Attorneys for Defendants
BY:  SCOTT D. MUSOFF
     ALISHA Q. NANDA

(Case called)

THE COURT:  Good afternoon, counsel.

I understand that the following lawyers would like to argue today:  Mr. Porritt for the movants Awaida and Sapan; Mr. Linehan for the movant Mr. Rice; and Mr. Kim for Peidong Wu.

Is there any other counsel who would like to argue today?

I will hear argument on the motion from lead plaintiff in the order of the names that I just read out, which also is the order of the movant in size of financial interest, as I understand it.

Mr. Porritt will go first and Mr. Kim will go last.

At the conclusion of the argument today I would like Mr. Porritt to stay on and to order a copy of the transcript because I will not be rendering a decision today.  The transcript will be helpful to me as I think through the issues presented.

Mr. Porritt, you may go first.  You should all assume that I have read the papers.  You don't need to repeat everything that's in the papers.

MR. PORRITT:  Thank you very much, your Honor.  I'll keep my presentation short, your Honor, because I think this is a fairly straightforward motion.

The movants, Mr. Sapan and Dr. Awaida, have the

largest losses, both collectively and individually, here really under any way you calculate it.  Certainly on the basis of the transactions as presented in the papers, that's the case.

And as your Honor is aware, under the Private Securities Litigation Reform Act Of 1995, the movant or movants with the largest financial interest in the proceeding are presumed to be the most adequate lead plaintiff and, therefore, should be appointed as lead plaintiff.  We think that directs the Court's decision here under the statute.

The rival movants have only really raised two arguments against the appointment of Mr. Sapan and Dr. Awaida as lead plaintiff.  One is a general attack that no group, essentially, is permissible as appointment of lead plaintiff under the PSLRA.  I don't think that's supported by the case law, we would submit.  We submitted case law to that effect and the Court is well aware of that.

We have here a group that are being routinely appointed under the PSLRA, groups like this.  It's a small group, a group of two people.  They spoke before filing for leave plaintiff.  They have filed a joint declaration or affidavit outlining why they came together as a group, outlining their strategy for managing the case going forward, to effectively manage counsel, and in fact that effectiveness has been demonstrated today by their negotiating already a retainer agreement with a beneficial fee arrangement on behalf

of the class.

And then they also both answered, experienced investors with 18 years and 30 years of investing practices -- I'm sorry -- of investing history.  They have experience in -- Mr. Sapan has prior experience acting in litigation and as supervising counsel.

And we also submit that collectively they provide effective coverage for the class.  They both bought at different times throughout the class period, so there was coverage.  This is not a case where a lead plaintiff or class representative bought at one particular period in the class, and then -- after one representation, so it doesn't provide coverage throughout the entire class period.  And they both held shares throughout the class period right through to the end of the class period.

I think we would submit they would both be very effective lead plaintiff representatives here.  And we don't think the attack on them as a lawyer-driven, culled-together group is justified nor borne out by the facts here.  This is not a group where the losses are necessary to be the largest loss.  Both of them have losses larger than any other movant.

Some individual attacks on Dr. Awaida and Mr. Sapan on their trading, the attack on Dr. Awaida is based solely on the fact that he bought options as well as stock, as the class includes both people who purchased options or traded in options

as well as bought stock.  I think that makes Dr. Awaida more suitable, more adequate rather than a reason to disqualify him.

And courts have routinely appointed certified classes, including option traders and certified class representatives, of trading options as well as stock.  So that reason is not a basis to disqualify him or to attack his adequacy or typicality.

The same goes for the options traded by Mr. Sapan, and any other attack on Mr. Sapan is a suggestion that he is a high-frequency trader or day trader.  That's simply just not borne out by his trading history here.  He purchased shares and steadily increased his share holding throughout the class period.  He held a position over -- open over trading days, which is not what day traders do.  So really the attack is, he would occasionally buy and sell shares on the same day.  But throughout that time he maintained an interest, a position in Intercept.  That attack really doesn't hold water against Mr. Sapan.

We would submit that this is a very straightforward motion.  The attacks here really have no justification and some attacks have tried to play around with the calculation of damages.  It's unclear what the basis for those calculations are.  They weren't attached.  Their workings weren't shown, which in high school math gets you a fail, and we would submit gets that here as well.

Based on the loss charts as submitted and on the trading histories, Mr. Sapan and Dr. Awaida are entitled to the presumption under the PSLRA, and they should be appointed lead plaintiff.

THE COURT: Mr. Porritt, let me ask you a few questions. First, I take it that they decided to form this group on January 4, is that right?

MR. PORRITT: Well, I think there was discussions leading up to -- January 4 is when the conversation took place, the joint call, if you like, which sort of solidified the agreement. I mean, there was consideration of that beforehand, but it was concluded or consummated, if you like, on January 4, which was the day for moving. Yes, that would be correct.

THE COURT: And at the moment they decided to solidify the group, did Mr. Sapan or Mr. Awaida know who the other competitors would be to be lead plaintiff?

MR. PORRITT: Who the other movants would be, no.

THE COURT: What significance can I attribute to the fact that, as it turns out, one of them has the largest stake individually when neither of them knew who the other movants would be?

MR. PORRITT: Well, it's really -- there are cases where the courts have criticized groups where -- this largely happens when groups are constructed after the movants are known where it's -- more obviously, it would be criticized as a

numbers game where two movants have grouped together in order to feed a larger movant when they know the actual numbers that are involved in terms of the losses that they claimed.  That is not the case here.

Courts have appointed groups where the benefits of the groups are not necessarily just to get bigger numbers because that's not needed to be appointed lead plaintiff, as it turns out.  But also that other benefits of the group, which is to have two lead plaintiffs allow for collective discussion and decision making, allows for grouping -- you know, pooling of specialization and knowledge.

Dr. Awaida here, for instance, has specific knowledge about the drug that's at issue in this case, for instance, through his medical practice, so -- or through his medical knowledge.

Those are the reasons that we are really driving the idea to sort of team together, was that it would be helpful to have two lead plaintiffs to help supervise and manage this litigation.

THE COURT:  Mr. Porritt, what significance should I give to the fact that Mr. Sapan has filed approximately 75 lawsuits under the TCPA?  In my mind, looking at some of the provisions of the PSLRA, that might be a negative.  I am not sure how I see that that's a positive.  But maybe you will explain it to me.

MR. PORRITT:  I think it shows an appreciation of managing counsel under those circumstances.  I don't think it's a negative --

THE COURT:  Did any of those TCPA lawsuits proceed to a deposition or even to motion practice?

MR. PORRITT:  I'm not aware that they did or did not, your Honor.  But I don't think it's a disqualifier --

THE COURT:  I don't know that there has ever been a TCPA lawsuit in history that's gone to a deposition.

VOICE:  I am on the line.  Would you like me to speak to that, your Honor?

THE COURT:  No.  I'm only going to speak to counsel.

MR. PORRITT:  I don't believe it disqualifies Mr. Sapan from serving as lead counsel here.  I don't think that's really what the PSLRA was really designed to do.  That is really aimed at the frequent filer restriction, which isn't really a restriction.  It's just a disclosure requirement if you filed more than five cases in the last three years.  That was really a frequent filer in the securities case and for companies -- for individual plaintiffs who had very minor stakes, so it was really a way of reinforcing their idea of the largest financial interest to encourage movants or lead plaintiff or appointment of lead plaintiff of investors who had lost a significant amount of money, and there is no question that Mr. Sapan qualifies here.

THE COURT: Can you explain to me, Mr. Porritt, what the thinking was of either of the putative lead plaintiffs as to why that lead plaintiff thought he would be in the interests of the class to have two law firms by their own acknowledgements and advertisements, each seemed to be quite competent on their own?

MR. PORRITT: I think that each had a comfort with their own counsel and confidence in their own counsel and each thought that counsel that had worked together before, I think they are confident in their ability to ensure that the case is litigated efficiently between those two law firms.

And that while both firms have the ability to litigate the -- the resources to litigate this case on their own, having two firms is not an excessive number or difficult to manage and it provides greater -- just a greater range of expertise and greater range of abilities that they can use, and they felt they were able to manage it effectively and it would not lead to undue duplication of effort.

THE COURT: All of that is very helpful. Let me now hear from Mr. Linehan.

Thank you, Mr. Porritt. Very well argued.

MR. LINEHAN: Good afternoon, your Honor. Mr. Rice, second only to the collective financial interests of the group, has the largest financial interest.

I think, as you identified, the group is exactly the

type of group that this Court, earlier in 2020, rejected in *Luckin*, which is kind of a cobbled-together-at-the-last-minute group of unrelated investors.  And it seems clear to me that the idea was, well, if there is a larger investor, it might be better to group up in the hopes of becoming appointed as lead plaintiff.

I also think the Court was correct to point out Mr. Sapan's history of TCPA cases.  One of the things that the PSLRA was designed to do was to kind of get rid of this issue of career plaintiffs, plaintiffs that would just continuously refile cases, and the idea is that such plaintiffs are more likely to be lawyer driven, and the PSLRA wanted to get rid of lawyer-driven litigation and focus more on investor-driven litigation.

While they were not PSLRA cases, I think they pretty clearly indicate that Mr. Sapan is a lawyer-directed plaintiff, which might be one of the contributing reasons as to why he decided to join a last-second ill-conceived group or, I should say, counsel was able to direct him to join the last-minute ill-conceived group with Mr. Awaida.

THE COURT:  Counsel, I am not going to draw the inference that his lawyer directed him to do anything.  I don't think that's a fair argument.  You can make all kinds of other arguments, but to say that his lawyer directed him to do something, when his declaration appears to the contrary, I

don't think, is fair.  But proceed, Mr. Linehan.

MR. LINEHAN:  I'll stop and say this is the type of grouping that this Court rejected in *Luckin*.

Moreover, no individual member of the group, in our opinion, should be appointed as lead plaintiff.  First, because this grouping is clearly in violation of this Court's own decision that's approximately seven months old.  And the kind of willingness to join such a last-minute, ill-conceived group, no investor that did that should be counted on at this point -- for the same reason you would reject such an ill-conceived group should reject the investor that joined that group.

Moreover, looking at the modified LIFO damages analysis, which has been growing in popularity, because it excludes nonrecoverable damages, Mr. Rice has a larger financial interest than Sapan, Mr. Sapan.

And with respect to Awaida, there are issues in that a significant amount of his losses are attributable to options.  And there is an issue with options because some of the decline of value is attributable to just a time premium being worn away as the option approaches expiration, so not even all of these damages are recoverable.  It's unclear how much will be recoverable.  That will require expert testimony and that's going to become a major distraction for the class if he is appointed.

For these reasons and, additionally, for the reason

that neither of them requested individual appointment, which is a requirement of the PSLRA that one actually move for appointment, because that has not been done, neither of them should be appointed individually.

If I could just very briefly, there were some attacks on Mr. Rice in the opposition papers claiming that he's a short seller or day trader.  None of these are accurate.  Mr. Rice engaged in a covered-call investment strategy.

I guess, if I may ask, is the Court familiar with what a covered-call investment strategy is?

THE COURT:  I think I am.  But just to make sure that my understanding is the accurate one, you can explain to me what that strategy was.

MR. LINEHAN:  A covered call is where you buy stock in a company and then you sell a call, which covers that stock. And the strike price is more than your purchase price.  The idea is, you get a little bit of return on your investment immediately because when you sold the option you get a little bit of a premium on that.  If the stock price goes up, you will gain money.  Your investment will improve because you have the difference between the purchase price and strike price you will get, plus you'll get the premium from the option.

Now, if the stock price goes down, you are going to lose money, but, at the very least, you have -- and that stock will not be called.  At the very least, you still have a little

bit of cushion from the premium that you received for selling the call option.

So an investor that operates in this kind of trading strategy wants the stock price to up, wants to kind of step up nice and smoothly. In a way, it's just a more conservative and slightly more sophisticated way in investing in a company's stock. An investor that uses the strategy relies on the market price. They are actually hoping that there aren't major swings, but just a steady, gradual increase in the value of the investment. As happened here, the large negative swing downward, Mr. Rice lost a lot of money, so he was not selling short hoping that the stock would drop.

With respect to day trading, he is not day trading. He is not buying and selling hoping to make slight, slight gains just due to the volatility of the stock price. What's happening is, sometimes his shares are called, in which case he is obligated to sell them, but he wants to get back into the stock, so he purchases more stock. So sometimes he will have a sale and purchase on the same day, but it's just to replace or increase the position that he already had in the stock.

To be clear, not a short seller, not day trading, does have a loss. And there is no -- from what I've seen, there is no authority for the proposition that using cover calls would render a plaintiff atypical or inadequate.

There is a case in this district, kind of the most

on-point case I could find, *Imax* case in this district.  It's 2011 WL 1487090.  And that court rejected arguments that using a more sophisticated investment strategy would render a plaintiff atypical.

The issue would be, if he's not relying on a market price at all, such as if he was a true day trader or a true short seller, that would be an issue.  But as long as it's kind of a normal but slightly more sophisticated investment strategy, that does not present any type of unique defense.

THE COURT:  I think there is also an argument made about Mr. Rice's age and his ability to supervise counsel in this case.  Do you want to address that?

MR. LINEHAN:  Sure.  I actually called him today to specifically ask about that because I saw that one of the competing movants put in there that he was 88.  So I asked him specifically if he has any health or other issues that he would foresee being an issue to his representation of the class.  He said, no, he doesn't have any current health issues or expected health issues that would render him unable to represent the class.

Moreover, I point to the fact that he is selling covered calls kind of indicates a sophistication, mental acuity, and ability to represent the class, so there is no issue there.

THE COURT:  Anything else?

MR. LINEHAN:  No.  That is all from me.

THE COURT:  I'll hear from Mr. Kim.

MR. KIM:  Your Honor, I won't repeat any of the things said so far, but I think with respect to the group, the Court's decision in *Luckin Coffee*, I think, really provides a good framework in analyzing the group because in that case there was a group that the Court rejected, which was a group of unrelated individuals, but in that same decision the Court appointed a group of unrelated institutional investors.

And I think if you weigh the factors of the group here, those facts are more akin to the group that was rejected than the group that was approved in *Luckin Coffee*.  Here is why, your Honor.  The group had a telephone call on the date the lead plaintiff motions were due.  The way that declaration was worded, that was the first time that they had talked personally, and it appears that the group members did not know their counsel until days before.  If you look at Mr. Sapan's certification, it is dated December 31.  That's New Year's' Eve.  If you look at Dr. Awaida's certification, it's dated December 29.

And, as noted in the papers, Mr. Sapan's certification is of a different form, presumably for one of the firms here, either the Levi firm or the Scott firm or perhaps even the Shaw firm.  That's another firm that's involved as additional counsel which no role has been explained what additional

counsel means in this context.

Mr. Awaida's certification is a different form.  If you look at the dates of these certifications, it appears that these individuals retained counsel days before their phone call and it wasn't until, I guess, from December 29 for Dr. Awaida and December 31 for Mr. Sapan, through January 4, over those four or five days is presumably when their lawyers introduced themselves to each other, right, because it's not disputed that the reason or the manner in which Mr. Sapan and Dr. Awaida learned of each other was through counsel.  That's very similar to the group that was rejected in the *Luckin Coffee* case.

Mr. Porritt was explaining earlier about, you know, what are the benefits of having these two individuals as lead plaintiff.  And it's eerily similar to the reasons the Court rejected in *Luckin Coffee*, such as having shared resources, having the ability to prosecute the action, very vague and general assertions that were set forth in their joint declaration.

And in the joint declaration there is no mention of a joint retainer agreement that Mr. Porritt just mentioned.  Perhaps that's something that these group members decided to agree to after they filed their motion papers.  Certainly, there is no mention in their joint declaration that they had agreed to a joint retainer agreement with a favorable fee, and certainly there is no mention of how the Shaw law firm fits

into it, who is a third law firm, as additional counsel.  I think these facts demonstrate this is the type of group that was brought together basically to create the largest financial interest.  There isn't a specific reason.

The group that the Court appointed in *Luckin Coffee* was an unrelated group of two institutions, one institution that had $60 billion in assets under management, another one, a public pension fund with $4 billion of assets under management. The Court noted that in that case those institutions had a longstanding relationship with their clients and, of course, their clients, being big large pension funds with a fiduciary obligation to oversee counsel and to maximize recovery.  So I think the facts here are more akin to the group that the Court rejected in *Luckin Coffee*, and the group should be rejected.

There is one other argument, and this is my fault, your Honor, which we neglected to include in the opposition because we misread Dr. Awaida's certification.  But Dr. Awaida's certification, which is document No. 241, page 7, lists four options transactions.

Two of those options transactions are short sales.  He sells call options, short call options, very similar to the ones that we have described.  It's not clear whether it's a covered call strategy, that the trust is for the first time mentioned in oral argument.  But certainly that's half his options transactions, two of the four transactions being

engaged in short sales. We cited cases in our papers that say where courts have rejected people engaging in short sales. Dr. Awaida also engaged in options transactions, so that adds a further level of complication. I think, given those reasons, this is the type of group that courts have rejected.

The joint declaration that was submitted, it's very similar to the joint declaration that was submitted by the *Luckin* group in the *Luckin Coffee* case. They cite two cases in their opposition to suggest that their joint declaration should be expected. The first case is the HEXO case. That's Judge Buchwald.

In that case the fact that the movant with the group was not challenged. There were only two remaining movants left. The first movant was rejected, which was an individual, because they did not provide enough background information about themselves or they didn't do it in a timely way. So they were rejected. And the only movant left standing was the unrelated group of investors, and Judge Buchwald appointed that group as the lead plaintiff.

THE COURT: Counsel, I don't mean to cut you off, but do you want to address Mr. Rice. I don't have unlimited time for your argument.

MR. KIM: Understood, your Honor.

As to Mr. Rice, they did engage in substantial options trading. Most of their options trading were part of selling

short calls, which is, by definition, a short selling position. They have --

THE COURT:  Counsel, you made allegations in your papers that Mr. Rice was engaged in day trading and selling short.  We just heard an argument that says you are wrong on the facts and because you are wrong on the facts, you are wrong on the law.  Do you have a response to that?

MR. KIM:  I do have a response to that.  If in fact he was engaged in this cover call strategy, they should have disclosed that with their opening papers.  The fact of the matter is, they are raising this issue now, the date of oral argument.  I am not an expert, your Honor, in the various trading strategies, but I've been doing this for 15 years.

And, generally speaking, I haven't seen a situation where a court -- I don't see there is a case out there that says that engaging in a covered-call strategy renders someone adequate and appropriate.  It's sort of like trying to prove the negative.  All I see from the transaction is that this individual was selling short calls, which is a bet that the price of the underlying security will lose value, and, secondly, this individual also sold short the common stock.

If you look at their certification form, Mr. Rice's certification form, which is 35-2, there are listings of short sales of the stock.  By definition, he was short-selling the securities, not only the stock, but the options.  And whether

in fact that's considered a covered call strategy or not, that will be a defense that's unique to him. That will be the focus of the litigation. If he is appointed lead plaintiff during class certification, the defendants here will focus on his trading patterns and his investment philosophy and those issues are unique to him and that's what a unique defense is. It doesn't have to be at the lead plaintiff stage, it doesn't have to be conclusively established. It's just a question of whether it will become the focus of the litigation, and it certainly will.

THE COURT: Anything else, Mr. Kim, that you have not otherwise said in your papers? I have read the papers very carefully.

MR. KIM: Nothing to add further, your Honor, unless the Court has any questions.

THE COURT: I don't for you.

I do have a question for Mr. Linehan, and then I think we can conclude, and I'll get you a decision shortly.

Mr. Linehan, Mr. Kim is right to point out that there are short sales of the common stock in the certification that's been presented to me. How are those sales consistent with the strategy that you described?

MR. LINEHAN: Can Mr. Kim or the Court point out the specific transactions at issue here? I don't recall. Maybe I missed it --

THE COURT:  Yes, I can.  Give me one moment.

If you look at Exhibit B to your declaration, which is what contains Mr. Rice's certification, the first table has common stock transactions in Count One.  Those reflect that on November 29, 2019, Mr. Rice sold short, it looks like a total of 3,000 shares of common stock.  On December 27, 2019, he also sold short 2,000 shares of common stock, as well as selling outright 2,000 shares of the common stock.  And then with respect to Count Two, in that same table, again on November 29, there are a large number of short sales.

MR. LINEHAN:  I think the short sales -- I think these reflect the fact that at certain points when there is -- I believe -- if you look at them, I think they are all at round numbers.  I believe that what was going on there is that a call option got called, and they were sold short.  I think if you look, though, in this account, there are also shares on hand. If you look at account 1, November 25 through 27, There is a purchase of 6,000 shares, and then there is the quote/unquote short sales on the 29th of November as to Count One in the amount of 3,000 shares.  So I think, obviously, he had these shares on hand.

It might just be kind of an accounting thing that because it's executed immediately, the shares will be sold short, but he did still have those shares on hand at the time. I could try to get a little bit more clarity on this, but I

think it's just kind of a matter of how the accounting done is in the account rather than reflecting the fact that his share of account went negative in that account.

THE COURT:  I don't know that I need a further declaration from you.  I am not sure that I need that at this stage.  I'll think about that.

I've got argument.  It's very helpful.  I'll get you a decision shortly.

Please order a copy of the transcript on an expedited basis.  Everybody, try to stay safe and healthy and thank you to the court reporter.  Have a good weekend, everybody.

(Adjourned)