# EXHIBIT 10

**S&P Global**
Market Intelligence

# Intercept Pharmaceuticals, Inc.
# NasdaqGS:ICPT
# FQ2 2020 Earnings Call Transcripts
## Monday, August 10, 2020 12:30 PM GMT
## S&P Global Market Intelligence Estimates

| | -FQ2 2020- | | | -FQ3 2020- | -FY 2020- | -FY 2021- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | (2.81) | (1.92) | NM | (2.63) | (10.58) | (9.07) |
| **Revenue (mm)** | 72.45 | 77.25 | ▲6.63 | 72.91 | 296.25 | 361.75 |

Currency: USD
Consensus as of Aug-03-2020 2:10 PM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

| | - EPS NORMALIZED - | | |
|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE |
| **FQ3 2019** | (2.34) | (2.59) | NM |
| **FQ4 2019** | (2.59) | (2.99) | NM |
| **FQ1 2020** | (2.87) | (2.86) | NM |
| **FQ2 2020** | (2.81) | (1.92) | NM |

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**Contents**

---

# Table of Contents

| | | |
|---|---|---|
| **Call Participants** | ....................................................................... | **3** |
| **Presentation** | ....................................................................... | **4** |
| **Question and Answer** | ....................................................................... | **8** |

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Jerome B. Durso**
*Chief Operating Officer*

**Lisa M. DeFrancesco**
*Vice President of Investor Relations*

**Mark Pruzanski**
*Founder, CEO, President & Director*

**Sandip S. Kapadia**
*CFO, Treasurer & Principal Accounting Officer*

**ANALYSTS**

**Alan Carr**
*Needham & Company, LLC, Research Division*

**Alethia Rene Young**
*Cantor Fitzgerald & Co., Research Division*

**Aspen Mori**

**Brian Corey Abrahams**
*RBC Capital Markets, Research Division*

**Jack Kilgannon Allen**
*Robert W. Baird & Co. Incorporated, Research Division*

**James William Birchenough**
*Wells Fargo Securities, LLC, Research Division*

**Jay Olson**
*Oppenheimer & Co. Inc., Research Division*

**Joel Lawrence Beatty**
*Citigroup Inc., Research Division*

**Jonathan Lim**
*UBS Investment Bank, Research Division*

**Mayank Mamtani**
*B. Riley FBR, Inc., Research Division*

**Michael Jonathan Yee**
*Jefferies LLC, Research Division*

**Michael Vincent Morabito**
*Chardan Capital Markets, LLC, Research Division*

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

**Steven James Seedhouse**
*Raymond James & Associates, Inc., Research Division*

**Yasmeen Rahimi**
*Piper Sandler & Co., Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good day, ladies and gentlemen, and thank you for standing by. Welcome to the Second Quarter 2020 Intercept Pharmaceuticals Earnings Conference Call. [Operator Instructions] At this time, I would like to turn the conference over to Ms. Lisa DeFrancesco. Ma'am, you may begin.

**Lisa M. DeFrancesco**
*Vice President of Investor Relations*

Thank you. Good morning, and thank you for joining us on today's call. This morning, we issued a press release announcing our second quarter 2020 results and financial position and also posted accompanying slides, which are available on our website at www.interceptpharma.com.

Before we begin our discussion, I'd like to note that during our call, we will be making forward-looking statements, including statements regarding our approved product and clinical development program; certain regulatory matters, including the potential approval of OCA for liver fibrosis due to NASH; and our strategy prospects, financial guidance and future commercial and financial performance. Listeners are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this call, and we undertake no obligation to update such statements, except as required by law. These forward-looking statements are based on estimates and assumptions that, although believed to be reasonable, are inherently uncertain, subject to a number of risks and uncertainties. Some but not necessarily all of the risk factors that could cause our actual results to differ materially from our historical results or those anticipated or predicted by our forward-looking statements are discussed in this morning's press release and in our periodic public filings with the SEC.

Today's call will begin with prepared remarks from our CEO, Dr. Mark Pruzanski; followed by those from our Chief Operating Officer, Jerry Durso; and our Chief Financial Officer, Sandip Kapadia. We'll then open the call to take your questions. [Operator Instructions]

Let me now turn the call over to our CEO, Dr. Mark Pruzanski.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Thanks, Lisa, and good morning, everyone. Thank you for joining us on our second quarter 2020 earnings conference call.

Following the receipt of the complete response letter for OCA in NASH, announced on June 29, we've been focused on 2 main objectives: first, to prepare for a Type A meeting with FDA; and second, to ensure that we remain in a strong financial position as we work to get the U.S. regulatory process supporting the approval of OCA for NASH back on track. Based on our latest review of our available data, together with the leading NASH experts in advance of our upcoming interactions with FDA, we've continued to reaffirm our strong conviction in the positive benefit-risk profile of OCA for the treatment of patients with fibrosis due to NASH, supporting our application for accelerated approval.

As you well know, REGENERATE remains the only Phase III NASH trial to produce positive interim data, meeting FDA's guidance for accelerated approval, and we continue to believe OCA has the potential to become a foundational treatment, particularly for patients with advanced fibrosis at highest risk of progressing to cirrhosis and its complications. In addition to achieving the complex composite primary fibrosis end point of REGENERATE with high statistical significance, OCA demonstrated robust antifibrotic efficacy across a range of histologic, noninvasive and biochemical parameters. This benefit has continued to be reaffirmed through ongoing analyses and we look forward to sharing important new supportive data at the upcoming virtual EASL conference next month as well as at subsequent scientific meetings.

In preparing for our Type A meeting with FDA, we've been focused on comprehensively addressing the issues FDA raised on both sides of benefit-risk, reframing the available core efficacy and safety data,

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

while demonstrating how effective risk management tools can ensure appropriate patient selection and even further enhance OCA's benefit-risk profile in the postmarketing setting. We believe this should prove helpful to ensure a productive Type A meeting, which we expect will take place by early fourth quarter and set the stage for any further steps we may need to take to gain alignment with FDA regarding the resubmission of our NDA.

In parallel, we are also gratified to have received strong support from external stakeholders, including NASH opinion-leading clinical experts and patient advocates who share our strong conviction in OCA's basis for approval and who are eager to express their views to the agency. As always, as we navigate through this process, we will remain committed to providing any material updates as we have them.

Regarding the anticipated time line, we expect that, on reaching agreement on the path forward and once we then resubmit our NDA, we anticipate receiving a 6-month review, during which we would anticipate an advisory committee meeting, where NASH clinical experts and patient advocates would have the opportunity to express their views publicly on the merits of OCA as the first potential treatment for fibrosis due to NASH. In the meantime, I'd like to remind you that our MAA for conditional approval of OCA in NASH in Europe continues to undergo EMA review, which remains on track.

As I mentioned earlier, we've undertaken an internal review of all of our investments. We are, of course, postponing our national launch preparation efforts and have identified other savings across the business. As a result, we announced today that we have lowered our 2020 non-GAAP adjusted operating expense guidance range by $100 million, while still retaining the critical resources needed to continue supporting our NASH clinical program, successfully resubmit our NDA and continue to drive growth in our foundational PBC business.

Now moving to our operating results. Our global PBC business continues to perform well. Our performance for the quarter was strong with reported net sales of $77.2 million, our biggest quarter since launch. While these results herald promising signs of recovery, we continue to closely monitor the COVID-19 situation and its impact to our business.

With respect to our global clinical development programs, as you know, our Phase III NASH trials, REGENERATE and REVERSE, have been fully enrolled for some time and I'm gratified to see that today, the pandemic has had little apparent impact on these ongoing trials. Meanwhile, while we previously announced the decision to temporarily pause enrollment in our other trials, I'm pleased to announce we have reinitiated screening and randomization of patients in our Phase IV COBALT outcomes trial in PBC, and we plan to soon restart enrollment in our combination study with OCA and bezafibrate. Given the positive previously reported clinical data we've seen supporting the development of this combination therapy, we continue to have strong conviction in the value of our long-term PBC business. We have not experienced any significant disruptions to our supply chain, and we continue to successfully supply product globally for our Ocaliva PBC business and investigational product for our ongoing trials.

Before I turn it over to Jerry, I wanted to take a moment to highlight what continues to inspire all of us at Intercept as we continue driving forward to bring OCA to patients with advanced fibrosis due to NASH. We've received an enormous outpouring of support from external stakeholders within the NASH and broader hepatology community. This support is the result of the conviction they have in the strength of our data supporting approval of OCA, coupled with the serious nature of this disease that has become a leading cause of liver failure with no available approved therapy. We truly value the strong relationships and support that we have within the community. And we'll remain focused on our mission to lead the way in supporting those living with progressive nonviral liver diseases.

Now I'd like to turn the call over to Jerry to provide an update on our global PBC business and commercial activities.

**Jerome B. Durso**
*Chief Operating Officer*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Thanks, Mark, and good morning, everyone. I'll start by discussing our Ocaliva results for the quarter and then provide you an update on the adjustments we've made to our commercial activities since we received the complete response letter.

In the first quarter, we reported $77.2 million in worldwide Ocaliva net sales, which represents growth of 17% versus the prior year quarter and is our highest quarterly sales to date. In the U.S., we achieved net sales of $59.6 million in the second quarter as our end-market demand was strong, and we continue to see good total prescription growth versus the prior year quarter. In the international region, we achieved ex U.S. Ocaliva net sales of $17.6 million in quarter 2. These results reflect the continued strong performance in our key international markets.

In Europe, we did see a reversal of the trend from last quarter where some customers were -- proactively increased inventory levels in response to the uncertainty of the early COVID-19 period. Our global Ocaliva business has proven to be resilient through COVID-19, and we've been pleased with our ability to maintain patients on therapy despite the challenges of the pandemic. As you would expect, with the overall slowdown in patient visits, we did see an impact during the second quarter on new patient starts, which remained at a lower level than quarter 1 when COVID-19 began to emerge as a global issue.

Turning now to NASH. Our teams have made significant progress over the last 18 months and our overall efforts to educate stakeholders on the implications of advanced fibrosis due to NASH and the appropriate identification of these patients. Following our receipt of the complete response letter, we conducted a full review of our global commercial plan. We were able to take advantage of the flexibility we have built into our commercial strategy and lower our expected operating expenses going forward in 2020. For example, we have eliminated our contract sales organization. Additionally, we've made the difficult but necessary decision to postpone our NASH launch preparation activities for the immediate future and are refocusing commercially on the growth of our core PBC business.

I believe the progress we've made on education and awareness within the NASH community will have a lasting effect. Awareness of the devastation of this disease on patients with advanced fibrosis is evidenced by our market research results as well as the support that we're experiencing from the community. Once we have a better understanding of our regulatory path forward in the U.S., including our time lines for resubmission, we'll be well positioned to scale as necessary and reinitiate our NASH launch efforts based on our learnings to date.

In the meantime, we've acted quickly and have redeployed our field teams to focus on PBC. And that effort is timely, as customer interactions are rebounding. Our territory business managers have begun to interact with physicians again through multiple virtual channels and in person, where appropriate. For example, in June, our interactions doubled relative to the prior month, and our market research shows that health care providers are eager to hear from our PBC field teams again.

So overall, we refocused our commercial efforts towards PBC while reducing our expected 2020 operating expenses by a significant amount. I'm pleased with the steps that we've made to date to facilitate those reductions and we'll continue to evaluate sensible cost-saving opportunities as we move forward.

And now I'll turn the call over to our Chief Financial Officer, Sandip Kapadia, for a financial update. Sandip?

**Sandip S. Kapadia**
*CFO, Treasurer & Principal Accounting Officer*

Thank you, Jerry, and good morning, everyone. Please refer to our press release issued earlier this morning for a full summary of our financial results for the quarter ended June 30, 2020. I'd like to take the opportunity to share with you important updates on our strong Q2 commercial results for new 2020 Ocaliva net sales guidance and our updated 2020 non-GAAP adjusted operating expense guidance.

Starting with our Q2 commercial performance. In the second quarter, we recognized $77.2 million in Ocaliva net sales, our highest quarter to date, up from $65.9 million in the second quarter of 2019. Our second quarter Ocaliva net sales comprised of U.S. net sales of $59.6 million and ex U.S. net sales of $17.6 million. This represents a growth of approximately 18% and 16%, respectively, versus the prior year quarter.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Our GAAP operating expenses for the second quarter were $129.3 million, and our non-GAAP adjusted operating expenses were $112.4 million. As a reminder, our non-GAAP adjusted operating expenses exclude stock-based compensation and depreciation. Non-GAAP adjusted operating expense is a non-GAAP financial measure under SEC regulations. Please refer to our press release issued earlier this morning for a full explanation and reconciliation of this measure.

Our cost of sales for the second quarter were $1.9 million compared to $0.7 million in the prior year quarter. Our selling, general and administrative expenses for the second quarter were $93.4 million. This represents an increase of $23.7 million over the prior year quarter and was driven primarily by increased investment in our NASH prelaunch activities. Our research and development expenses for the second quarter were $34 million and include the anticipated $22 million offset related to the U.K. R&D tax credit. Absent the impact of this tax credit, R&D expense is generally consistent with the prior year quarter. As of June 30, 2020, we were well positioned with cash, cash equivalent, restricted cash and investment debt securities available for sale of approximately $540.6 million.

And now turning to our updated financial guidance for the year. As we focus our commercial efforts on PBC in the back half of this year, we have decided to provide Ocaliva net sales guidance and now expect full year 2020 Ocaliva net sales in the range of $300 million to $320 million. As Mark and Jerry mentioned, following the receipt of the complete response letter, we carefully reviewed our investment plan and have determined to postpone our NASH launch preparation activity and disease education efforts. In connection with this review, we have reduced our 2020 non-GAAP adjusted operating expense guidance range by $100 million. While Jerry covered some of the specific actions we have taken that factor into our updated guidance range, we expect to provide additional details as we move forward into the second half of this year.

Given that we no longer expect the launch in NASH this year, we believe the steps we've taken to reduce expenses, combined with our growing PBC business, will allow us to support our regulatory process with the FDA, continue to invest in our growing PBC business and fund our key ongoing clinical trials. We now expect 2020 non-GAAP adjusted operating expenses to be in the range of $460 million to $500 million, down from the previous range of between $560 million and $600 million.

In summary, I'm pleased with these initial steps we've taken to reduce our operating expenses and assure you that we will continue to be prudent as we assess our future investments. We remain in a strong financial position as we focus on bringing important therapies to patients with nonviral liver disease. With that, I'd like to turn the call over to the operator for any questions. Operator?

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question or comment comes from the line of Michael Yee from Jefferies.

**Michael Jonathan Yee**
*Jefferies LLC, Research Division*

Congrats on a good PBC quarter. Maybe for Mark or the team, obviously you made a comment about preparing for a Type A meeting ahead of a discussion on NASH. Maybe you could just shed some light on what you think the 2 or 3 scenarios you think, simplifying that, could be. Do you still think you could file this year or it would be next year? And would you wait to get your meeting minutes back to update us? Or if there was pretty good clarity, you would come back to us pretty quickly as soon as you meet with them?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thanks, Mike. So as you mentioned, we are very focused right now on preparing for the Type A meeting. And as I mentioned in my prepared remarks, we've been really working meticulously with a number of external experts, NASH experts, to ensure that we really reframe all aspects of benefit-risk here with the risk-benefit overlay and set the stage for our proposed resubmission of the NDA. I think it's difficult right now to speculate on what the time line could look like. But of course, if we were to come to alignment in the context of the single Type A meeting, then we would do everything possible to work toward an expeditious resubmission, which we'd hope would be prior to year-end. If additional clarification or steps will be required after the Type A meeting to reach adequate alignment to support resubmission, the time line could get pushed out a little further.

And since the last time we spoke about this on June 29, we've obviously taken a look at precedents. And while every case of the CR letter with additional data requested is unique, on average, we've seen from receipt of CLR (sic) [ CRL ] to approval in successful cases go somewhere in the range of a year or 14 months. And as I also mentioned in the call, upon resubmission, we would expect here a 6-month review clock, expecting, of course, to see an advisory committee occur. So -- and then the second part of your question, when -- we will update you the moment we have anything material to update you on and I can't speculate exactly when that will be.

**Operator**

Our next question or comment comes from the line of Yasmeen Rahimi from Piper Sandler.

**Yasmeen Rahimi**
*Piper Sandler & Co., Research Division*

Two quick questions. The first one is can you share with us how -- what your expectation is in terms of what -- how much feedback you're going to get from the FDA during the Type A meeting that could be informative for you. And then the second question is can you shed a little bit light into the upcoming late-breaker poster, which is -- you'll be sharing with us? Is it 24-month data of transaminases and noninvasive biomarkers?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Sure, yes. And congrats on your new role. I think with respect to the first part of the question, again, we are taking the time to really prepare well for this Type A meeting and set the stage, hopefully, for the most constructive interaction with the review division as possible such that we really maximize the chance that we are able to reach alignment on key issues to support resubmission. So while typically a Type A meeting following CRL letter is more meant to -- for the agency to communicate its view on deficiencies, here, we are really working to ensure that we provide them with a comprehensive reframing of the basis for the

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

resubmission. So hopefully, that will be productive. But as I mentioned in answer to the previous question, could very well be, and we'll be prepared for this, that additional interaction and steps might be required to reach alignment.

With respect to EASL, I mean, we're excited about the upcoming virtual EASL at the end of the month. We've got a number of abstracts in both the NASH and PBC programs. You mentioned a late breaker. I mean I believe that all of the abstracts, including the late breakers, are going to be made available by EASL or most of the late breakers in about 10 days from now. And in general, I would say we're excited that we'll be able to present data -- longer-term exposure data of 24-plus months that are highly suggestive, in our view, of continuing and further benefit that these patients on OCA are receiving with longer-term treatment.

**Operator**

Our next question or comment comes from the line of Alethia Young from Cantor.

**Alethia Rene Young**
*Cantor Fitzgerald & Co., Research Division*

And I just wanted to maybe just ask a little bit about, depending on what happens with the Type A, is there a way to potentially appeal and escalate further that could help kind of expedite the process?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thanks for the question, Alethia. So the first step here and what we are absolutely focused on is the Type A meeting. And as I mentioned in answer to the previous 2 questions, we hope to position ourselves to really have a highly constructive interaction with the review division. And we will absolutely be prepared to take additional steps in support of our view that the totality of data on both sides of benefit-risk very much do support the basis for accelerated approval. And we'll continue to make that case with the agency.

**Operator**

Our next question or comment comes from the line of Joel Beatty from Citi.

**Joel Lawrence Beatty**
*Citigroup Inc., Research Division*

Has FDA seen any unblinded outcomes data from the ongoing REGENERATE trial? And is it possible that they could see that in a future when you refile?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thanks, Joel. So the way the study is designed, again, as an outcomes trial, time-to-event analysis -- after the month 18 interim analysis, we, as a sponsor and the agency are to remain blinded to outcomes on data right until the end of the study. It is theoretically possible that FDA could access unblinded outcomes data along the way, but that's not currently provided for in the protocol or the statistical analysis plan.

**Operator**

Our next question or comment comes from the line of Jay Olson from Oppenheimer.

**Jay Olson**
*Oppenheimer & Co. Inc., Research Division*

Depending on how the Type A meeting goes with FDA, would Intercept consider a narrowed strategy to focus on rare liver diseases, including strengthening your leadership position in PBC by developing a combination of OCA with bezafibrate and possibly pursuing OCA for PSC based on the strength of your AESOP study and potentially walking away from NASH?

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Well, look, I mean, first, I would answer that we are confident in our data from REGENERATE and our entire NASH program in support of approval of OCA as the first treatment in NASH. And of course, a huge focus of the company right now is to -- starting with the Type A meeting that we're planning for, is to get the review back on track and work as hard as possible to ensure that we get the first NASH treatment to patients with advanced fibrosis who, as you know, currently have no available treatments to them.

But the thrust of your question is, and I think is important to point out, is the enormous value, I think, of our foundational business and PBC. We just reported, as you know, a record quarter since launch. Business continues to grow and we continue very much to be committed to patients with PBC who have a need and are eligible for Ocaliva treatment worldwide. So we will continue to drive to build that business. And in the unexpected eventuality that you're flagging, we certainly have a great foundational business to continue to build the company up on.

**Operator**

Our next question or comment comes from the line of Mayank Mamtani from B. Riley.

**Mayank Mamtani**
*B. Riley FBR, Inc., Research Division*

Appreciate this detailed update of the CRL. So very quickly on the -- could you maybe comment on the pre-outcome package that you are working on? And in context of that, what is incremental that you might be working towards this early October meeting for Type A? I think you said data set in context of both benefit and risk. But Mark, could you be more specific? What you may have had before for your AdCom versus what you might be thinking about for your Type A.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes, look, I [indiscernible] [ too many to fix here ] because as I've mentioned, our [indiscernible] with [indiscernible] and [indiscernible] data set [indiscernible] have from REGENERATE all along the course of review and specifically in the context of preparing for the advisory committee, we continue to generate additional data, additional analyses further -- lending further support to our conviction in benefit-risk of the drug. And now as, again, I mentioned in prepared remarks, in preparing for the Type A meeting, we have additional analyses that uphold benefit, and I will give you 1 recent example. I mentioned before the fact that the agency has become seized of the fact that in the pathologists' assessment of these semi-quantitative categorical end points, not surprisingly, well-known in the literature, there is a decent amount of variability on an intra- and inter-reader basis.

And actually, I would point you to a paper that's in press right now in the Journal of Hepatology by Davison et al. that looks at this quite comprehensively in the context of a Phase IIb study that read out last year called EMINENCE and they really did a deep dive on this intra- and inter-reader variability in the context of the NASH histology end points with really statistically-supported conclusion that what this variability does is lead to an underpowering of studies and, more importantly, an underestimation of treatment effect. And so in support of the robust results that we've reported now in 2 well-controlled studies, FLINT and then, of course, our pivotal study REGENERATE, it's important to note the fact that OCA in both of those trials overcame this noise of the variability and showed with high statistical significance the ability to reverse fibrosis, which again, is unprecedented. So that's just one example on the efficacy side.

On the safety side, I mentioned in the call we had on June 29 that the -- there was an enormous piece of work that we did, doing a comprehensive assessment of liver health and safety across our entire NASH study population. This is really, I think, groundbreaking work in, of course, looking at OCA's safety profile, liver safety profile in that context. And that's really an important additional piece on the safety side. And most importantly, that they're very reassuring conclusions from this exercise, that perhaps, as expected, it's patients who have clearly strongly-suspected cirrhosis or confirmed cirrhosis with, in

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

any case, evidence of declining hepatic reserve, of hepatic impairment, of clinically significant portal hypertension, these are the patients who are at significantly greater risk from the liver safety standpoint and can relatively straightforwardly be identified non-invasively with routine lab parameters and other tests that are used every single day to assess the liver functional status of patients like these. So that's an important example on the safety side of something that we're framing up for the Type A meeting.

**Mayank Mamtani**
*B. Riley FBR, Inc., Research Division*

That's great. Very helpful color, Mark. And if I can quickly ask Sandip for a quick follow-up on the R&D tax credit you received, I believe, from the U.K. government, is that a onetime thing? Or should we be modeling something else in the coming quarters?

**Sandip S. Kapadia**
*CFO, Treasurer & Principal Accounting Officer*

Mayank, it's Sandip here. Yes, that's been a benefit that's offered by the U.K. government that -- they -- certain percentage of our R&D expenses, they provide as a credit back. We've applied for a few years, and we're pleased that we received some of the payment here. I mean I wouldn't say it's an annual thing that you would kind of model in, but as we make progress on our claims, we'll certainly continue to update you, but it's certainly -- we're very pleased with the effort and the support that we have on this, which allowed us obviously to reduce our operating expenses this quarter.

**Operator**

Our next question or comment comes from the line of Brian Abrahams from RBC Capital Markets.

**Brian Corey Abrahams**
*RBC Capital Markets, Research Division*

Can you share any thoughts in light of the CRL and some of the evolving data analyses as to whether there may be any more specifically appropriate NASH subpopulations that could maximally benefit from OCA and for whom FDA's overall view of benefit-risk may differ, how that overall relates to this idea of reframing? And then you also mentioned the expectations for an AdCom. Have you guys formally requested an AdCom as part of any sort of dispute resolution process? And if so, have you heard yet in writing?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thanks, Brian. I mean with respect to the first part of your question, as you know, the population studies, our breakthrough designation is in NASH patients with liver fibrosis, which stands the range potentially of everything from early F1 fibrosis to, well, to noncirrhotic F3 fibrosis in the initial indication. That said, as you well know, we had a NASH commercial day in December and we very clearly outlined our specific focus on patients with advanced fibrosis who are at greatest risk of progressing to cirrhosis and its complications because that's where the highest unmet need is, that's where the value proposition is highest. And that's where we think we, with OCA, can do the most good. So that already represents a subset of the potential indicated population. And I do think that's important to frame with the agency in bringing up their overall benefit-risk assessment.

With -- the second part of your question was with respect to requesting an advisory committee. And again, our sole focus right now is to prepare comprehensively for the Type A meeting. And again, assuming, whether in the wake of that meeting or subsequent steps that may be needed, our assumption right now is that upon resubmitting the NDA, that the agency will continue to wish to have an advisory committee. And we've repeatedly stated that what -- one key aspect of the incompleteness of the first-cycle review was the absence of opportunity for patients and for NASH clinical experts to publicly opine on the merits of OCA as a first treatment for patients with NASH and fibrosis.

**Operator**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Our next question or comment comes from the line of Jim Birchenough from Wells Fargo.

**James William Birchenough**
*Wells Fargo Securities, LLC, Research Division*

Congrats on the Ocaliva quarter. Maybe a tough question to answer, but you've mentioned a few times, looking to reach alignment with FDA and clearly off the CRL letter, there's not alignment yet. How do you avoid hearing what you want to hear and getting true alignment? And how do you communicate that to The Street that your view of alignment is FDA's view of alignment?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Thanks, Jim. Look, I think it starts with being meticulously prepared, both in terms of the bridging book that we expect to shortly submit and the lead up to and participation in the meeting, where, hopefully, we set up -- set the stage for a truly constructive, transparent exchange of views and something that we can base alignment on as a basis for resubmission. Of course, at the moment, whether it's at that meeting or any required follow-up interactions, where we feel that we have enough from the agency to base a resubmission on, we'll obviously be communicating that to you. But I think that it's difficult to speculate right now on exactly what that's going to look like.

**James William Birchenough**
*Wells Fargo Securities, LLC, Research Division*

And Mark, is -- the data you'll present at EASL, is that data that would be new to FDA? And are you bringing that to the Type A meeting?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. I mean some of it will be new, at least with respect to the prior submission. FDA, I'm sure, will have an opportunity to see it presented at EASL. And yes, we intend to include really the core efficacy data with the primary focus on the fibrosis benefit in the Type A meeting.

**Operator**

Our next question or comment comes from the line of Salveen Richter from Goldman Sachs.

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

Can you guys just elaborate a little bit further on what you mean by reframing the risk-benefit profile? What does that really look like versus how you initially presented it to the agency?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Well, it's really a question of focusing on the submitted data. I mean as we mentioned on June 29, it's our clear belief, based on the complete response letter, that there was not a complete review of the data and appreciation of the magnitude of benefit. And I gave an example a couple of questions ago about recent developments in appreciation of the impact of pathologist variability and how that leads to an underestimation of treatment effects. And so part of the refraining of this is just really clarifying the magnitude of benefit, also clarifying additional safety and then pointing the way, and this is new work that, frankly, we're really proud of, how to quite straightforwardly -- how clinicians quite straightforwardly can identify patients appropriate for treatment versus patients with more advanced disease who should be excluded. So it's really bringing together and reframing the totality of data in that way, which includes incorporating it so [indiscernible] that the agency had a chance to review yet.

**Operator**

Our next question or comment comes from the line of Alan Carr from Needham & company.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Alan Carr**
*Needham & Company, LLC, Research Division*

Can you give us a little more detail on where things stand in the European review? Is that a decision that you expect this year? And then what's your latest estimates on penetration in the U.S. and Europe in the PBC market? Where do you think you can get?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Sure. I'll answer the first part and hand to Jerry for the second. So in Europe, as I mentioned in my prepared remarks, review remains on track. Yes, well, obviously it really just started in January, so we're at an earlier stage in the review. But as we've guided before, Alan, we do not expect approval or revenues from -- in Europe this year, that it's going to be a next-year completion of review.

With respect to penetration, Jerry, if you could take that?

**Jerome B. Durso**
*Chief Operating Officer*

Yes. Thanks, Alan. It's Jerry. We continue to believe and see that the PBC market has good remaining potential for us to access both in the U.S. and in Europe. I think if you look at the growth we posted in the first half and the sales guidance despite the disruption that's obviously out there with COVID, it's an indicator that there continues to be patients out there that need to be identified for appropriate therapy. And Ocaliva, within the indication, the confidence that the individual prescribing physicians have as they gain more experience over time leads us to that. So there are more patients. I think the opportunity now with the CRL to really refocus commercially back to PBC as we move in the next period is going to allow us to continue to grow. And we still, again, feel we have a significant opportunity yet in the PBC opportunity.

**Operator**

Our next question or comment comes from the line of Brian Skorney from Baird.

**Jack Kilgannon Allen**
*Robert W. Baird & Co. Incorporated, Research Division*

This is Jack dialing in for Brian. I know you mentioned a little bit on REGENERATE and that you plan to share some new data with the FDA from the EASL abstract, but I was wondering if you could also give us an update with respect to the long-term outcomes data from REGENERATE. Have you seen any of that data unblinded? Has FDA seen any of that data on an unblinded basis? And is there any, I guess, aspects of that data set that you would plan to use for a potential resubmission?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thanks for the question. So no, I mean, as I mentioned earlier in the call, I mean, REGENERATE is an ongoing blinded outcomes data. And it's powered [ based ] time-to-event with a target 291 events prior to unblinding. And as currently planned, both we and the agency will remain blinded to outcomes data until the completion of the study. It is theoretically possible that the agency -- we could make provisions for the agency to view a crude outcomes data along the way, but that's not -- currently not planned.

**Operator**

Our next question or comment comes from the line of Geoff Meacham from Bank of America.

**Aspen Mori**

It's Aspen on for Geoff. I guess first up on NASH, do any of today's updates, the lower OpEx guidance, Ocaliva revenue guidance, redeployed PBC field force, does any of that speak to maybe a strategic shift away from NASH, depending on how the Type A meeting and align with FDA goes? And then quickly on

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

PBC, I'd love to get your thoughts on -- latest thoughts on the competitive landscape given that some of your competitors are either already in Phase III or are starting to move into that phase.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. I'll sort of answer and maybe, Jerry or Sandip, if you have anything to add. But the short answer is no. There's no strategic pivot whatsoever from NASH. We are just being prudent given the delay right now that we face in getting to NASH approval. But as I mentioned in my prepared remarks and throughout this call, we are very, very focused on preparing for a Type A meeting with the agency, to start the process of getting our NASH NDA back on track and get OCA to NASH patients as the first-ever NASH drug. So you should not read into today's announcements as a pivot away but rather a prudent -- a pruning back of investments while we get things back on track with the NASH application.

I'll go to the PBC side, the competitive landscape. I mean again, there's really no major shift. I mean Ocaliva has now been 4 years in market. You can see that the business continues to grow. We have an entrenched position in second-line in multiple countries. We also, keep in mind, continue to generate data. So one of the abstracts EASL coming up is 6-year open-label data from our Phase III POISE trial. We actually now have clearance to go and communicate 5-year long-term durable safety efficacy data in the market, which we're preparing for. And we have -- we just reinitiated enrollment for COBALT, our Phase IV outcomes trial. So we will, irrespective of competing products that may or may not come in the next few years, we will continue to -- we believe we remain far ahead with data supporting the value of OCA.

And of course, with respect to long-term life cycle, we are committed to developing a combination, fixed-dose combination of OCA with bezafibrate. And we have reason to believe, based on available clinical data so far, looking at bezafibrate on its own, in patients on URSO or not responsive to URSO and also limited, but reassuring and supportive data sets of the combo of OCA with bezafibrate that have been presented at different scientific meetings that we will remain very, very strongly competitive in the PBC market.

Jerry -- Sandip on the -- I don't know if you have anything to add about refocusing investments.

**Sandip S. Kapadia**
*CFO, Treasurer & Principal Accounting Officer*

No. I guess just maybe one other point is that obviously the opportunity now to refocus the commercial efforts on PBC will continue to be, as Mark suggested, at the center of the scientific conversation with NASH. That won't change. I think the final point is that we have obviously learned a huge amount in terms of our efforts in market. And as I said in the prepared remarks, I believe strongly that the education we've already taken underway will have a lasting effect. And that as we progress and really have a better understanding of our path forward, we'll be well positioned to do the right things quickly in order to pivot back as and when it's appropriate.

**Operator**

Our next question or comment comes from the line of Steve Seedhouse from Raymond James.

**Steven James Seedhouse**
*Raymond James & Associates, Inc., Research Division*

Mark, I just have to drill down more on the discussion of patient selection and risk-benefit because you pretty nicely highlighted the rationale for focusing on the fibrosis subsets, bridging fibrosis, et cetera. You didn't really mention narrowing the focus on the potential risk side of the equation, which, of course, is ostensibly highest in patients on statins, diabetics, et cetera. So maybe could you clarify if part of the regulatory strategy is, in fact, narrowing the initial label with respect to comorbidities versus what you originally intended? That would be helpful.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. Thanks for the question. So there isn't that kind of broader intent. But let me just take a step back and point out that the way that the FDA and the EMA view the NASH population sort of 2 distinct populations. There are NASH patients with fibrosis who have not yet developed cirrhosis. And then there are patients who are already cirrhotic. And as you know, we have a fully enrolled Phase III trial reverse on studying on OCA 10 and 25 milligrams in NASH patients with compensated cirrhosis, which is expected to read out by the end of next year. But that's opened under a separate IND. And so what that means for us and for anyone developing a NASH drug with an initial focus on NASH fibrosis is that, that will define the population. And so on the risk side of it, on the risk side of the equation, obviously cirrhotics are at significantly stepped-up risk, particularly -- well, really exclusively, in our view, cirrhotics with evidence on some amount of hepatic impairment, of declining hepatic reserve and/or clinically significant portal hypertension.

And so when I talk about the -- managing the risk and identifying patients appropriate for treatment and to exclude from treatment, I'm really talking about identifying such patients at great risk, who will not be part of the initial indicated population. That's true for us. That's also true for anyone who follows us with an initial focus at least on the NASH fibrosis population. But actually, to be complete in response to your question, no, we don't intend -- we saw benefit in diabetics and nondiabetics. We've long maintained, with respect to patients who are dyslipidemic, and this is in the AASLD and EASL guidelines, that these patients can safely and effectively use statin therapy. And we generated a lot of data showing the safe use and effective use of statins in combination with OCA to manage LDL.

**Operator**

Our next question or comment comes from the line of Navin Jacob from UBS.

**Jonathan Lim**
*UBS Investment Bank, Research Division*

This is Jonathan on for Navin. Two quick ones, if I may. I wanted to ask first about the pushes and pulls behind this new OpEx guidance, if you could give us a sense of how that $100 million shakes up between R&D versus SG&A. And then our second question would just be how should we think about pricing going forward?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Sandip?

**Sandip S. Kapadia**
*CFO, Treasurer & Principal Accounting Officer*

Yes. Sandip. Thanks for the question. I think what -- I mean, since the letter, I mean, we're very much focused on having a plan in place to -- which allowed us today to give an updated -- to take down our operating expense range by $100 million. With regard to context further on that, I mean, Jerry did speak a little bit about discontinuing of our contract sales force, pulling back on our NASH prelaunch investments as well as we're looking at expenses across the rest of the organization as well. So I can't really provide like, if you want to call it, a breakout at this stage. But I can assure you that we'll continue to be prudent as we assess our future investments and continue to update you as we execute on our plan.

**Operator**

Our next question or comment will come from the line of Michael Morabito.

**Michael Vincent Morabito**
*Chardan Capital Markets, LLC, Research Division*

I wanted to ask you generally, the guidelines for the EMA are viewed as slightly more different -- difficult than FDA. And so considering the CRL and the submission that you have with EMA, what gives you hope about your submission there and how that regulatory process is going, that you would expect a more positive outcome?

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Well, I think you're referring to the EMA reflection paper, which is equivalent to a draft guidance on the development of NASH fibrosis drugs, which came out, I guess, 1.5 years ago now. And that does suggest that both of the primary end points, fibrosis improvement, there was no worsening of NASH; and NASH resolution, no worsening of fibrosis, needs to be demonstrated. There's also provision for drugs that are primarily antifibrotic to support the fibrosis benefit with demonstration of 2-fibrosis-stage improvement. And we've long maintained that based on the totality of our data with OCA and REGENERATE, that we have convincing efficacy as a basis for submission of our MAA. And we continue to feel that we have a constructive basis for continuing to proceed in the review with EMA.

I would also point out that while it's true that the 2 agencies interact with one another in general and specifically on NASH and certainly, they have an opportunity to exchange views through things like the Liver Forum, and maybe over time, there will be a harmonization of approach, EMA, of course, is an independent regulatory agency. And we would expect that their review of our NDA will be their own and of course, as is true on the U.S. side, we [ are able ] to support the fact that the data generated in the [ month 18 term analysis generate ] [indiscernible]. [ We support as a defender at risk of approval ] [indiscernible].

**Operator**

Thank you. At this time, we will need to end the Q&A session. I would like to turn the conference back over to Dr. Pruzanski for any closing remarks.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thanks, operator. [indiscernible] listening on [indiscernible] quarterly earnings call. As you can see, we just delivered our strongest [ quarter ever in our additional business with ] [indiscernible] continue to focus on [indiscernible] development globally, making sure that [ Ocaliva ] gets to [ patients ] in need. At the same time, we are very, very focused on getting to our [ regulatory ] review in the U.S. back on track with respect to NASH [indiscernible]. I mean [indiscernible] comprehensively preparing for what we hope will be a highly constructive exchange at the upcoming Type A meeting so that we get, as expeditiously as possible, in position to resubmit that [indiscernible]. And of course, as fiscal stewards of shareholder capital, we've taken appropriate steps to step back by $100 million in terms of our guidance range, our OpEx and preserve capital for an extended period of time as we navigate the delay on the NASH side.

We have the wind at our backs. We have enormous support from the KOL community and from patient advocates who are passionate, on our behalf, that OCA get to patients in need with NASH in advanced fibrosis as expeditiously as possible. So we will continue leading the way in NASH, in PBC and progressive nonviral liver disease on behalf of patients. Thanks very much and look forward to providing our next update.

**Operator**
Ladies and gentlemen, thank you for participating in today's conference. This concludes the program. You may now disconnect. Everyone, have a wonderful day.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence                                                                                                17