# EXHIBIT 21

**S&P Global**
Market Intelligence

# Intercept Pharmaceuticals, Inc.
# NasdaqGS:ICPT
# Special Call
## Monday, June 29, 2020 1:30 PM GMT

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

**Contents**

# Table of Contents

Call Participants ................................................................................. 3

Presentation ..................................................................................... 4

Question and Answer .......................................................................... 6

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

**2**

# Call Participants

**EXECUTIVES**

**Lisa M. DeFrancesco**
*Vice President of Investor Relations*

**Mark Pruzanski**
*Founder, CEO, President & Director*

**ANALYSTS**

**Alethia Rene Young**
*Cantor Fitzgerald & Co., Research Division*

**Antonio Eduardo Arce**
*H.C. Wainwright & Co, LLC, Research Division*

**Aspen Mori**
*BofA Merrill Lynch, Research Division*

**Brian Corey Abrahams**
*RBC Capital Markets, Research Division*

**Brian Peter Skorney**
*Robert W. Baird & Co. Incorporated, Research Division*

**James William Birchenough**
*Wells Fargo Securities, LLC, Research Division*

**Jay Olson**
*Oppenheimer & Co. Inc., Research Division*

**Joel Lawrence Beatty**
*Citigroup Inc., Research Division*

**Jonathan Patrick Wolleben**
*JMP Securities LLC, Research Division*

**Mayank Mamtani**
*B. Riley FBR, Inc., Research Division*

**Michael Jonathan Yee**
*Jefferies LLC, Research Division*

**Michael Vincent Morabito**
*Chardan Capital Markets, LLC, Research Division*

**Navin Cyriac Jacob**
*UBS Investment Bank, Research Division*

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

**Ross Howard Weinreb**
*Goldman Sachs Group, Inc., Research Division*

**Steven James Seedhouse**
*Raymond James & Associates, Inc., Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Ladies and gentlemen, thank you for standing by, and welcome to the Intercept Pharmaceuticals conference call. [Operator Instructions] I would now like to introduce your host for this conference call, Ms. Lisa DeFrancesco. You may begin, ma'am.

**Lisa M. DeFrancesco**
*Vice President of Investor Relations*

Thank you, Kevin, and thank you for joining us today. This morning, we issued a press release announcing that we have completed -- we have received a Complete Response Letter from the FDA regarding our NDA submission for OCA for the treatment of liver fibrosis due to nonalcoholic steatohepatitis, or NASH. Before we begin, I'd like to note that during our call, we will be making forward-looking statements, including statements regarding our -- certain regulatory matters, including the Complete Response Letter and the potential approval of OCA for liver fibrosis due to NASH; our approved product and clinical programs; our strategy, prospects, financial guidance and future commercial and financial performance. Listeners are cautioned not to place undue reliance on these forward-looking statements, which speak only of the date of this call. And we will undertake no obligation to update such statements, except as required by law. These forward-looking statements are based on estimates and assumptions that, although believed to be reasonable, are inherently uncertain and subject to several risks and uncertainties. Some but not necessarily all of the risk factors that could cause our actual results to differ materially from our historical results or those anticipated or predicted by our forward-looking statements are discussed in this morning's press release and in our periodic filings with the SEC. On the call with prepared remarks is our CEO, Dr. Mark Pruzanski. Also available for Q&A are Jerry Durso, our Chief Operating Officer; and Sandip Kapadia, our CFO. Now I'll turn the call over to Mark.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Thanks, Lisa, and good morning, everyone. While we're still digesting the CRL and may not have answers beyond what we stated in our press release this morning, we thought it was important to hold this call. My prepared remarks will be brief, and then we'll open it up for Q&A. We've worked in lockstep with FDA for years on our NASH program. And together, we define the regulatory pathway for this indication. In our Phase III program, we committed to a large global outcomes trial at risk based on the understanding that if our drug OCA met the primary endpoint defined in FDA's own guidance in an interim analysis, this would support accelerated approval. Of course, as you know, OCA is the only investigational NASH drug that has demonstrated a robust reproducible ability to reverse liver fibrosis, the single most relevant predictor of clinical outcomes in patients with this disease in 2 well-controlled clinical trials that anchored our NDA. OCA remains the only FDA-designated breakthrough therapy drug for the treatment of NASH fibrosis and is the only drug to convincingly meet the prespecified bar for success on the complex composite histologic endpoint that FDA agreed would support initial approval for this indication.

Before I discuss the CRL, I'd like to remind you of some key dates in our regulatory time line. Our review to date has not been so straightforward. We submitted our NDA for OCA in September 2019, after which FDA granted it priority review. As the first-ever NASH drug under review, FDA informed us that it intended to hold an advisory committee meeting, an AdCom, to publicly provide an opportunity to medical experts and patient advocates to consider and opine on the relative benefits and risks of OCA as a treatment for NASH. After some delays in the review process, FDA informed us that it had tentatively scheduled an AdCom meeting for June 9, ahead of our June 26 PDUFA target action date. On May 22, we announced that FDA had notified us that it was postponing the AdCom to allow for the review of additional data they've requested which we submitted the following week. As a result of the time needed for FDA to complete its review and the further delay to the AdCom, we disclosed that we anticipated that the review of our NDA would extend beyond June 26. However, based on FDA's commitment to us at the time, we

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

expected that we would be hearing about an anticipated new date for the AdCom and overall target time line for completion of review.

FDA's decision to issue the CRL, which instead calls into question the overall benefit-risk profile of OCA in NASH based on the data review today and request additional data to support resubmission of the NDA, was therefore completely unexpected and disappointing, to say the least. As mentioned in our press release, at no point during review did FDA communicate that OCA was not approvable on an accelerated basis. In fact, during the course of our ongoing program, FDA has progressively increased the complexity of the histologic endpoints, creating a very high bar that only OCA has so far met in a pivotal Phase III study, which the agency has acknowledged. Given this, we very much disagree with the assessment provided in the CRL with respect to the benefit-risk profile of OCA in NASH, which we and external opinion-leading medical experts familiar with our program continue to believe, based on all the available efficacy and safety data, is clearly positive, even more so with the additional analyses we've generated over the course of review and therefore, should be supportive of our application for accelerated approval. We further strongly believe that FDA's determination in the CRL was premature and based on incomplete review of the available data, despite the agency's long-standing commitment to carefully consider the totality of data, combining the convincing highly statistically significant achievement of the primary fibrosis endpoint with the extensive supportive data, evidencing the full extent of OCA's antifibrotic benefit. It is also inexplicable to us that FDA decided to abandon its commitment to hold an AdCom, which would provide appropriate public transparency and opportunity for input from NASH clinical hepatology and other experts as well as, of course, from patient advocates who deserve to be heard.

So as we stated in the press release, on behalf of the hepatology community, we're very concerned that the agency's apparently still evolving expectations especially given the multiple failures of mid- to late-stage NASH programs, will make it exceedingly challenging to bring innovative new therapies to NASH patients with very high unmet medical need. We continue to review the CRL, and it's unclear what specific additional post-interim analysis efficacy data, in particular, FDA would like to receive from the ongoing outcomes portion of the REGENERATE study in support of the NDA resubmission for accelerated approval. To obtain further clarity, we intend to meet with FDA as soon as possible to discuss this in detail with the goal of aligning on an expeditious path going forward.

To repeat, we've long maintained that the most important benefit of OCA in NASH is its demonstrated robust ability to reverse or otherwise stabilize fibrosis, clearly demonstrated in REGENERATE, the largest and to date only positive global Phase III study in NASH. We therefore believe, provided that we and FDA align on an appropriate way forward, that OCA continues to have the potential to become a foundational medicine for NASH patients with advanced fibrosis, who currently have no approved therapeutic options available to them and should not have to wait much longer for one.

As we prepare to meet with FDA, we will simultaneously begin planning to ensure we remain well positioned financially. We also, of course, remain focused on continuing to deliver Ocaliva to appropriate PBC patients and will continue our commitment to driving our growing global PBC business.
Finally, I'd like to take a moment to thank the Intercept team that has worked tirelessly for many months on our NDA, preparing for an AdCom and the launch of OCA. I want to thank the patients and investigators around the world who continue to participate in our ongoing studies and, of course, all of our shareholders who continue to support us throughout this process. We remain fully committed to our NASH program and the 3,400 patients enrolled in our REGENERATE and our NASH cirrhosis REVERSE studies. With that, let me open it up for questions. Operator?

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from Brian Abrahams with RBC Capital Markets.

**Brian Corey Abrahams**
*RBC Capital Markets, Research Division*

Just a couple to start off for me. I guess, based on your comments, Mark, it sounds like there's some additional efficacy data that you may want to submit that the FDA would like to see. I'm curious if you could maybe describe -- help describe for us any additional interim cuts or efficacy or DSMB analyses from REGENERATE that could potentially provide this updated data and at what regular intervals? And then maybe on the safety side, if you could maybe help us understand whether -- I guess, was there anything specific that sort of you believe maybe had given the FDA pause on benefit risk and how the imbalances in pancreatitis and gallstones in the interim REGENERATE data look in the updated results that you've submitted? And then I'll hop back in the queue.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thanks, Brian. Thanks for your question. So first part on efficacy. As you know, there's one preplanned interim analysis at 18 months, which was the basis for our NDA. And then the study is ongoing through completion of outcomes for confirmation of benefit on a post-marketing basis. So there's no additional planned interim and efficacy analysis at this point in time. That said, obviously, the study is ongoing. It's fully enrolled. We continue to collect data from patients at 6 monthly visits. And that includes additional noninvasive data, includes a biopsy at year 4 and of course, liver enzyme data, other noninvasive lab testing data. So we continue to build a very rich data set. But I just want to caution, as I mentioned in our prepared remarks in our press release, we don't have clarity based on the letter we received what exactly the agency is looking for. So we'll have to sit down with them and really clarify what kind of efficacy data they're looking for. And of course, that said, I mean, again, we firmly believe that the data already submitted to date should fully, fully and convincingly support benefit risk, positive benefit-risk assessment and therefore, approval. So that's clearly a difference of opinion at this stage. On the safety side, the typical known profile of OCA that there's nothing substantively new in terms of a safety issue that's arisen or that the agency has pointed to. And so no, I don't think that there's anything there that's come up that figured into a fundamentally different view about benefit risk. I think that what's new here is the questioning without really substantiation as far as we can tell on the benefit side and what kind of benefit the result on the surrogate -- predefined surrogate that we went on, what kind of benefit that predicts.

**Operator**

Our next question comes from Michael Yee with Jefferies.

**Michael Jonathan Yee**
*Jefferies LLC, Research Division*

Mark, thanks for the call. Appreciate it. And sorry to hear about this today. But looking forward, 2 questions for you. One is can you just give us a better sense of when you think you could be back in front of the FDA, show that investors have some sense of when you could meet with them and when you could come back to the Street with some guidance around that meeting and what you think timing could be? So that's question one. And then question two, I guess, is sort of just thinking big picture. Do you just get any sense at all that some of this is COVID-related, some of it is extraneous factors, some of this is they can't delay things twice? Just maybe, just talk to that at all and when do you think that plays any part of it.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. Thanks, Mike. So with respect to the first question, we will do everything we can to get back with FDA as soon as possible. I mean, as I said, patients can't wait. And we are 100% committed to doing what it takes to come into alignment with FDA and get things back on track to an accelerated approval. But I would say, again, this is typically kind of a several week thing. And of course, it's dependent on FDA's when they can grant us a meeting. So -- and when that happens, of course, after that happens, to the extent there's anything that comes of it, we will, of course, come back to you with an update. With respect to your more general question, look, it's difficult to speculate. There have been public statements from FDA over the past weeks that have been somewhat contradictory, frankly. One recent guidance that suggested that during COVID, a number of PDUFA goal dates would likely get missed. Commissioner Hahn has stated that there is a commitment there to try to meet goal dates. But as you know, with respect to our specific NDA that this has been, as I mentioned, kind of a choppy time line. I mean, it's a large, complex, first time ever review of a NASH NDA. This has been a division, now the hepatology division, a division in transition, newly formed. And so it's difficult to know, Mike, what's going on here. All we do know and strongly believe is that we don't believe that this review was really fully completed based on all the available data. And we believe that the determination here clearly is premature. So it's unclear to -- yes, there was a PDUFA goal date. Yes, the default here in such an instance, if there's not enough -- there's not enough confidence in a determination to approve, but which we knew and anticipated given the desire to complete review and go to an AdCom. Nevertheless, we think that the action taken was just premature.

**Operator**

[Operator Instructions] Our next question comes from Alethia Young with Cantor.

**Alethia Rene Young**
*Cantor Fitzgerald & Co., Research Division*

I guess I just wanted to understand, like it seems like things kind of went a little bit off kilter with maybe with the panel. Was there any positive indication that they had a concern around efficacy with any of the conversations you had? Or was it always just a scheduling matter? I guess I'm just trying to get a feel there.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Well, I think they're 2 separate things. One is scheduling the panel, which Alethia, the last time we heard before getting the CRL, they were going to get back to us shortly with a new proposed date. So it's unclear between that and the CRL, where they sort of said, "Hey, at this time, we don't need an AdCom." It's unclear how that decision was arrived at. And of course, we think that that's just not right. We do think, as I mentioned, we do think that there should be a public hearing to vet the merits of OCA and that physician experts in this field and patient advocates really deserve that. So we'll continue to work with them and see if that's going to come back on track, meaning an AdCom. And sorry, the other part of your question? Alethia?

**Alethia Rene Young**
*Cantor Fitzgerald & Co., Research Division*

I was just trying to get a feel like whether there was some sort of like clue that would have -- a conversation that kind of led you to believe anything was [indiscernible] in that?

**Mark Pruzanski**
*Founder, CEO, President & Director*

No. As we mentioned, both in the press release and in my remarks just now, at no point during this review did FDA communicate to us that the drug wasn't approvable based on the assessed benefit or benefit risk. So again, I think what's new here and what -- what again, I mean, from us looking in from the outside, looks like sort of an evolving higher and higher bar and evolving expectations without necessarily substantiating that increasing bar on the benefit side. And what's so frustrating and confounding, frankly, is that we define the endpoint. The endpoint -- the bar and the endpoint, as you know, both of the

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

endpoints that are currently in the draft guidance have evolved in complexity. They're multi-pronged. They're very, very difficult to achieve. We're the only ones again, who have more than hit it out of the park on the fibrosis endpoint and so we met the predefined agreed criteria for success here. We met the guidance. And we clearly believe and so does everyone, all the experts familiar with our data believe that there's a very robust antifibrotic benefit here that clearly means a positive benefit-risk profile for the drug. So this is what we need to clarify with the agency.

**Operator**

Our next question comes from Ritu Baral with Cowen.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

Was there any mention of the safety side of this risk balance -- sorry, risk-benefit evaluation in the CRL? And then as you guys have implied, the questions have been on the efficacy side, the evolving question. Can you talk more about that time line of the evolution post submission? Were they focused on the magnitude of benefit? Or is this calling into question the meaningfulness of histopath fibrosis evaluation overall?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. So Ritu, on the safety side, as I mentioned a couple of minutes ago, the safety issues are consistent with the known profile of OCA. There's nothing substantively new in terms of the safety issues flagged. And frankly, from our point of view, nothing that stands out as a showstopper, right? So we're not talking about something new on the safety side. What we are talking about to your -- to the second part of your question, is an interpretation of efficacy. And look, I mean, we've long talked about the totality of data based on the firm commitment from the reviewers at the agency along the way that they're aware of the complexity of the primary endpoints. There's a very -- the fact of even meeting the endpoint with such high statistical significance, in and of itself, confirms the efficacy on a feature -- histopathologic feature of this disease fibrosis that stands apart from any other surrogate aspect of these endpoints, for all the reasons you know and frankly, are acknowledged in FDA's own guidance that fibrosis really stands alone in predicting outcomes, in predicting liver-related and all-cause mortality outcomes. So I do think that the gap here, the disconnect here is in how they're interpreting the benefit based on the endpoint reached. And frankly, how it is that there's not consideration of the additional very rich supporting data on fibrosis shift. I mean, obviously, from a clinician standpoint, while it's nice not to have, let's say, worsening of an assessed one point, and in fact in the liver, what really matters is, are you able to reverse or otherwise stop the progression of fibrosis, right? So we've always emphasized the fibrosis shift in the population which so clearly is in favor of OCA. And as we've also shown you, at least with noninvasive tests like FibroScan and other noninvasive fibrosis tests, we've shown a continued sustained benefit in patients on longer-term treatment that indicate further improvement over time, which, frankly, we would expect.
So we think that, that totality of data evidencing the very robust antifibrotic benefit has to be taken into consideration here in any assessment of benefit risk, and it doesn't appear that that's been done here.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

So it seems like it's the magnitude rather than calling into question fibrosis?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. No, I'm not suggesting that fibrosis is -- that there's a lack of acknowledgment that fibrosis itself is an important surrogate.

**Operator**

Our next question comes from Steven Seedhouse with Raymond James.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Steven James Seedhouse**
*Raymond James & Associates, Inc., Research Division*

How many events have accrued so far in the outcomes portion of REGENERATE? I think that would be helpful to know. And since that's a quick one, I wanted to ask about REVERSE as well, the cirrhotic study. I assume that the seemingly moving target in non-cirrhotic NASH might mean a reassessment of the F4 study design and the need to show outcomes there, given the different guidance for cirrhotic NASH and the fact that it already mentions outcomes. And so I just wanted to get your updated thoughts on your existing design in REVERSE and the way you see that playing out.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thanks, Steven. So with respect to the first question, we're blinded on 2 outcomes events that comprise the composite outcomes endpoint. What I can -- so I can't tell you exactly how many have accrued at this point. But what I can tell you is that we are generally on track with our original assumptions for completion of a sufficient number of outcomes to read out in the trial in about -- within 3 years or so. And the study continues. Obviously, by the way, I want to just say, I mentioned as I ended my remarks, our continued commitment to the NASH patient population and to all the 3,400 patients who have been enrolled -- agreed to enroll in multiyear Phase III studies around the world, and I'm proud of our efforts and the commitment of investigators and patients through, not just through this pandemic, the very trying time. And we continue to do a very, very good job in patient retention across both of our Phase III trials. With respect to REVERSE, which just for people less familiar on the call, is these are NASH patients with compensated cirrhosis, also testing the 10 and 25-milligram doses. And there -- that it's fully enrolled. It was fully enrolled earlier this year with a projected readout towards the end of next year on an 18-month endpoint, which is identical essentially to the REGENERATE fibrosis endpoint, fibrosis improvement 1 stage with no worsening of NASH. And you're right that there is a draft of NASH versus guidance, which indicates a preference for clinical outcomes. But as we stated last year, we have formal acknowledgment based on meeting with FDA that improvement in fibrosis 1 stage with no worsening of NASH would support application for accelerated approval in that population as well.

**Steven James Seedhouse**
*Raymond James & Associates, Inc., Research Division*

I guess the question is, does that acknowledgment, at this point, is it called into question, in your view, given the way that non-cirrhotic has played out? In other words, are you second guessing what the FDA has told you in REVERSE?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Look, we have no reason to believe that's the case.

**Operator**

Our next question comes from Navin Jacob with UBS.

**Navin Cyriac Jacob**
*UBS Investment Bank, Research Division*

Just can you help me understand what exactly is the pathway for submitting any additional data if you were able to find some data that the FDA might deem to be useful? And what are the time lines associated with that pathway? Is it a full resubmission and 12-month review? And just some clarity on the exact logistics associated with that.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thanks, Navin. So look, I mean, this is consistent with the CR Letter, right, calling for additional data. By the way, very typical, and we'd anticipate that in a CR situation that there would be a refresh

on safety data. As an update, that's typical. I think really, the -- your question in what would be gating on timing would be what, if any, additional efficacy data will need to be provided. And again, we believe we've provided more than adequate efficacy and safety data to support this approval. And we need to just get back in front of them and understand. In terms of time line, I mean, assuming we come to alignment in an upcoming meeting with them, we would then move this expeditiously as possible to satisfy the requirements in terms of providing whatever additional data in a resubmitted NDA. I can't speculate right now as to how long that would take. But again, we would make every effort to do so as rapidly as we could. We would anticipate, assuming the FDA -- the NDA has been accepted, again, priority review, I'll remind you, OCA remains a breakthrough therapy drug, the only one in this indication. And that again makes what the determination just reached all the more frustrating to us and to the hepatology community. But we would anticipate, in any case, on resubmission, a 6-month clock. That doesn't mean that they would require 6 months to review, but they would have 6 months.

**Navin Cyriac Jacob**
*UBS Investment Bank, Research Division*

That's clear.

**Operator**

Our next question comes from Salveen Richter with Goldman Sachs.

**Ross Howard Weinreb**
*Goldman Sachs Group, Inc., Research Division*

It's Ross on for Salveen. Do you guys think that REGENERATE, the long-term outcomes portion, will need to read out before you can actually file again? And then just lastly, is the CRL today in relation to insufficient data that was submitted following the May 22 request? Or is the FDA highlighting something completely new altogether?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thanks. So the answer to the first question is a definitive no. We have no reason to believe, based on the letter we've received, that we would need to go all the way to the end of the study. That's very clear. And that's if, of course, we remain committed to completing the study on a post-marketing basis to confirm benefit. With respect to -- no, I don't think that there's an insufficiency of data. In fact, in fact, the opposite, as I keep saying, we have submitted more than adequate data and analyses along the way, we believe, to support approval. The most recent data submitted, they didn't have a chance to complete a review of. And in fact, we believe, as I said in our prepared remarks and in the press release, that even based on the data available for quite some time, we don't think that there is an apparent complete review of what was available to the agency. So hopefully, as we align on the path forward, we'll be able to get a more fulsome review of the data.

**Operator**

Our next question comes from Brian Skorney with Baird.

**Brian Peter Skorney**
*Robert W. Baird & Co. Incorporated, Research Division*

Just in terms of the time line for your review, there's been a pretty significant shift in terms of the Office of New Drugs restructuring. I know there's a new division director, new office overseeing the review division. Can you just give any guidance as far as the meetings that you've had and who actually signed the CRL? I mean are the meetings primarily with the lead reviewer? Have you met with office director and division director in this process? And is the CRL signed by the office or the division? Or is it by a lead reviewer? And can you confirm is your lead reviewer here Lara Dimick-Santos?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. So Lara is well-known to people in the NASH community and has been involved from the get-go on this program. And in frankly, every NASH program out there has been a lead reviewer here. The new division director is a gentleman named Joe Turner, who's been at FDA a long time. He was formerly deputy division director in infectious disease. And he came over relatively recently to become division director in the newly formed hepatology and nutrition division. And in any case, yes, the CRs typically come from division directors, as far as I know, and that was the case here.

**Operator**

Our next question comes from Jim Birchenough with Wells Fargo.

**James William Birchenough**
*Wells Fargo Securities, LLC, Research Division*

It just strikes me that you'd like to get this, at a minimum...

**Mark Pruzanski**
*Founder, CEO, President & Director*

Sorry, you're a little in and out.

**James William Birchenough**
*Wells Fargo Securities, LLC, Research Division*

You hear me now, Mark?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes.

**James William Birchenough**
*Wells Fargo Securities, LLC, Research Division*

Yes. So it just seems like you feel very strongly if you could get this in front of an AdCom, the odds of success will be quite high based on KOL feedback. So is there anything the company can do to really force that outcome, number one? And then number two, just on these risk-benefit situations, this often comes down to a number needed to treat for benefit, a number needed to treat for harm. And have you seen such -- have you guys done that kind of analysis? Or have you seen that kind of analysis from FDA?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Jim, thank you for asking those questions. With respect to the first, yes, we intend to request the agency get back an AdCom on track because like I said, we do absolutely believe that our data and the relative merits of OCA as a treatment for NASH fibrosis deserve to be considered by clinical experts, deserve to -- for patient advocates to be able to provide their input. I mean, that's the whole purpose of an AdCom. It's public transparency. And just considering that the public health issue that NASH represents, as far as I can tell, one of only 2 chronic, highly prevalent diseases out there where there's no therapeutic options available. The other one being Alzheimer's disease. And these patients deserve a hearing here as do the clinicians who treat them. So yes, we do -- we are confident that in the context of an -- that an advisory committee would help clarify issues and come out in favor of benefit risk. With respect to your second question, quantifying an integrated benefit-risk assessment. Yes, we've done the analysis of that. We've done a lot of work on that, but with outside experts. On the efficacy side, the predicted benefit based on the antifibrotic efficacy of OCA is very, very substantial. And again, what's very frustrating is that it doesn't appear that FDA has considered that. There's no apparent context or support for their determination that the benefit predicted by the results that we have is uncertain. And so again, in the context of continuing review, that would be something that we would very much want to try to focus their attention on.

**Operator**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Our next question comes from Joel Beatty with Citi.

**Joel Lawrence Beatty**
*Citigroup Inc., Research Division*

Did you have any labeling discussions with FDA or get any suggestion from FDA what indication that they were considering?

**Mark Pruzanski**
*Founder, CEO, President & Director*

We didn't get that far. I mean, as you know, finalization of labeling happens at the end of successful review cycle. And in this case, it's going to be predicated on getting through an Advisory Committee. That said, we had started labeling discussions with the agency. I mean, this was heading and has been heading in the right direction. They then ran out of time in terms of the review clock with the PDUFA goal date. But it's the reason why we want to reengage with them as soon as possible and get this going back on track to hope for accelerated approval.

**Operator**

Our next question comes from Geoff Meacham with Bank of America.

**Aspen Mori**
*BofA Merrill Lynch, Research Division*

It's Aspen on for Geoff. So just a couple of quick ones. Has the FDA explicitly requested that any additional studies would need to be connected? Or have they given any sort of indication that, that might be the case? And then could you remind us on what the additional data set was that you guys had wanted to have considered at the AdCom that caused the last delay?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Sure -- I'm sorry, the first part of the question?

**Aspen Mori**
*BofA Merrill Lynch, Research Division*

Yes. Is there any sense that the FDA might want to see additional studies versus additional data [indiscernible]?

**Mark Pruzanski**
*Founder, CEO, President & Director*

So -- no, no, no. The FDA is not -- yes. Thank you. I mean, FDA has not requested any new studies. They've only requested that additional data be provided from the ongoing fully enrolled outcome study.

**Aspen Mori**
*BofA Merrill Lynch, Research Division*

Okay. And then on the last delay, was -- can you let us know what the -- what was the additional data set that you had wanted to be considered at the AdCom that caused the last delay?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. No, the -- basically, what we undertook was a comp with FDA. It was a comprehensive assessment of liver health status and safety across the NASH population. And we've been doing this work for a long time with them and with experts. And it was interesting because this is the first time that anyone's reviewed the health status, the liver health status of patients in this population. What we've known for some time is that patients with advanced fibrosis can progress rapidly to cirrhosis and to liver-related events. Patients with NASH typically have multiple comorbidities so they're at risk of other disease flare-

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

ups that exacerbate their underlying liver disease. And they're also often on multiple medications to treat those comorbidities that can also negatively impact their liver health status. So we undertook a really comprehensive independent expert assessment of the overall liver-related safety in the population. And the results, frankly, were quite reassuring for us because they reaffirmed the known safety profile of our drug in the NASH fibrosis population and also pointed to very straightforward clinical and lab criteria that are used every day in clinical practice to assess the functional status of patients, irrespective of whatever treatment they're on and how to risk stratify patients in the population to ensure that appropriate patients get treated and that patients at risk get followed more carefully. So it was a comprehensive exercise, was submitted, as I mentioned. And unfortunately, FDA couldn't -- didn't complete a review of it just yet, but they have asked that in the context of resubmitting the NDA that it be submitted alongside.

**Operator**

Our next question comes from Jay Olson with Oppenheimer.

**Jay Olson**
*Oppenheimer & Co. Inc., Research Division*

I'm just trying to understand the series of events that transpired since May 22 when you disclosed that you had submitted some additional information and that the FDA had postponed the AdCom and would come back with a new proposed AdCom date. And yet today, we find out that there's a CRL, the AdCom is canceled, and the FDA didn't have time to review the information that was provided. So did something change between May 22 and now? Or did the FDA just run out of time?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes, Jay, I mean, frankly, your guess is as good as ours. We're not privy to the internal workings and deliberations. But all I can say in terms of connecting the dots, is that based on what we heard from them and put out on May 22, we were fully expecting that the next step here is that we would hear from them about tentative -- at least a tentative rescheduled AdCom date and kind of a ballpark overall projected time line for completion of review. It was very clear, and I mentioned this a few minutes ago, very clear that coming into a PDUFA goal date, that a CR Letter is entirely possible. That is the default mechanism in a case like this at FDA's discretion. So we fully understood that. And it's not really the fact of the CR, it's the determination reach, which is with this sort of new to us assessment of the uncertainty of the benefit predicted by our -- in our data. And that's what we find highly objectionable and want to address with the agency.

**Operator**

Our next question comes from Jonathan Wolleben with JMP Securities.

**Jonathan Patrick Wolleben**
*JMP Securities LLC, Research Division*

With no standardized procedure for evaluating biopsies in NASH studies, can you remind us of what you did in REGENERATE and any FDA commentary or views on that procedure? And then how are you going to integrate the analysis of the year 4 biopsies?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes, it's a good question. So -- and I've talked about this before. We -- when we designed the study, again, with FDA some 5 years ago, nobody -- there was no standardized approach to biopsy reading and nor is there to this day. What we did employ, and I think uniquely, in our Phase III trial was a gold standard approach. So we had 2 world-leading expert liver histopathologists. In fact, the same 2 who pretty much every company with a late-stage NASH trial is using now. And what we did uniquely that, again, I don't think anyone else is doing is -- and this goes back to the viral hepatitis studies some 15 years ago when they used to be done on liver biopsy endpoints that, by the by, supported full approval back then based on histologic improvement. But what we did was we blinded the pathologist not only

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

to treatment assignment, obviously, but also to the sequence. So when they were assessing at month 18, the efficacy, they had a new baseline slide in front of them, and they were blinded as to sequence, right? And that is thought to be very important for rigor in assessment of histopathologic endpoints. And again, I think we did that uniquely. So FDA has commented on this that the -- meaning that inevitably, as is well-known in the literature, as has been exemplified by study after study, no matter how you do it, whether you do it the way we did it, whether you do it with a single pathologist who's reading the same slide at 2 different time points, whether you do it with a committee of pathologists like the NASH Clinical Research Network, inevitably, you get variability when human beings do semi-quantitative assessments of these parameters, you're going to get discordance, you're going to get variability. FDA is very aware of this and is thinking hard about it. But thus far, there's no clear guidance or standardized approach. And frankly, at the end of the day, I don't think -- until and unless you go completely away from this way of assessing histology and you go to, let's say, an AI-based quantitative digital approach or you move away from histology altogether, it's unclear to me at least, that you're going to be able to get away from this kind of variability. And what's critical then is knowing that it exists is to have a placebo control and to power your study and to prespecify what it's going to take to convincingly show benefit to show efficacy. And that's precisely what we demonstrated with OCA in the interim analysis versus placebo. So -- and that was pre-agreed with the agency then. So again, it's an issue, but it should not confound in any way the credibility of or integrity of an efficacy result like the one that we demonstrated.

**Jonathan Patrick Wolleben**
*JMP Securities LLC, Research Division*

And then for the year 4 biopsies, the readers are going to get baseline 18 months in year 4 and analyze those sequentially or at the same time?

**Mark Pruzanski**
*Founder, CEO, President & Director*

I think we need, to your point -- look, I think that it's important that we come to agreement with the agency. And not just us, but anyone doing NASH trials now, is going to have to agree on a standardized approach to reading year 4 biopsies. And that could involve, let's say, consensus read amongst pathologists. But again, as I said, you can fine-tune it all you want, you're still going to get inevitably variability. So you just need to make sure you got the power and the sample size to -- for your active treatment to overcome the noise.

**Operator**

Our next question comes from Mayank Mamtani with B. Riley.

**Mayank Mamtani**
*B. Riley FBR, Inc., Research Division*

Sorry to hear the outcome. Mark, building on the previous question, could you maybe comment on how much of the recent developments in this space could have played a role in FDA determination? And then as you know, I'm talking about the placebo response noted in another late-stage study and also the safety consideration at baseline we learned about from an interface hepatitis standpoint in another mid-stage study. So just again going back to the complexity with some of these histological endpoints?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Look, it's a good question. And I think what you're referring to is the recent readouts from GENFIT and even Novo with respect to placebo response versus others reported by us, by Gilead. And then, of course, on the histopath side at baseline, the unfortunate situation with CymaBay. And I think it's all of a piece. I think it shows you the limitations of histopathologic assessment. And this is nothing new. It's been well-known and well described in the literature. It's not unique to liver histology. Anytime you're looking at semi-quantitative assessment of histopath in an organ based on a limited biopsy or an imaging type end point, this is what you're going to get. You're going to get intra and inter-observer differences in assessments. So it is an issue. It's an issue the agency is clearly aware of. It sees [ them ] and so does

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

the whole community. But I would say this, that the placebo responses here that we're seeing are not as inconsistent as people think. And we obviously have a lot of knowledge of this. And the pathologists, as I mentioned, there are 2, in particular, they're world-class and who everyone uses. And so we think that there is more consistency than is appreciated in terms of the results. And most importantly, what matters is, again, we're aware of the noise and in our case, OCA more than overcame that noise with a very highly statistically significant result that is convincing with respect to benefit and efficacy on a very complex primary endpoint despite all of this variability. So long answer to your question, but it's an important one, and it's something that the field is, in its entirety right now, is grappling with.

**Mayank Mamtani**
*B. Riley FBR, Inc., Research Division*

Just maybe a follow-up because it has implications for this space. Do you think FDA would want to do an endpoint workshop sort of bringing together the broader forum at some point? You think that, that could make sense?

**Mark Pruzanski**
*Founder, CEO, President & Director*

I think it absolutely makes sense. And whether they do it, whether they convene that on their own or you might be aware that there's something called The Liver Forum, which is a multi-stakeholder group, and they are, I think, [ seized ] of this. But yes, I think that there should be such a thing. What I don't think is that it's appropriate to retrospectively look back at what was already completely agreed would define success and change the goalposts. That, we believe, strongly is completely inappropriate and cannot stand.

**Operator**

Our next question comes from Ed Arce with H.C. Wainwright.

**Antonio Eduardo Arce**
*H.C. Wainwright & Co, LLC, Research Division*

My only question is, I appreciate that as you stated, the CRL had requested additional post-interim analysis data. And so far, it's quite unclear what they're looking for from that. However, the data that was requested back in late May, I don't think that's ever been disclosed. And I'm wondering, is that, at least in part, the comprehensive liver health assessment that you discussed? Or is that something else entirely?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. No, no. Just to be clear, it is the comprehensive liver health assessment, which, again, we think is very reassuring and very illuminating. It should be fully reviewed. FDA has requested that it be included in our resubmission of the NDA. And we think it should go to an advisory committee because it is a very important part of understanding the overall liver health status of this population.

**Antonio Eduardo Arce**
*H.C. Wainwright & Co, LLC, Research Division*

Great. And if I may...

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes, go ahead.

**Antonio Eduardo Arce**
*H.C. Wainwright & Co, LLC, Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Sorry, Mark. If I may, just a follow-up to that. I realize and appreciate that this is all very new and you're still waiting to just speak with the FDA about this very unusual, perhaps unprecedented move by them. But is there any sense at this point when you might be in a position to resubmit a new NDA?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. I mean look, I can only answer you that we will do everything in our power to get there as expeditiously as possible. And the first step is getting back in front of the agency. Both we and the agency, this division want to do so as soon as practicable. So that will be the next step. Assuming that we can come to agreement with them on an appropriate path forward, we would then move based on agreement of what exactly needs to be included in a resubmission, we would then move as quickly as possible to provide that. And as I mentioned in answer to an earlier question about what the time line could look like, we would expect, I mean, as a breakthrough therapy, having already been granted prior to review before to be granted prior to review on a new clock, which would be a 6-month clock at that point. And that doesn't mean at that point in time that the agency would need that duration of time to come to an action.

**Operator**

Our next question comes from Michael Morabito with Chardan Capital Markets.

**Michael Vincent Morabito**
*Chardan Capital Markets, LLC, Research Division*

Just wanted to clarify on your press release, you say that the agency is determined that the predicted benefit of OCA based on surrogate histopathological endpoints remains uncertain and does not sufficiently outweigh the potential risk. So are you saying that -- is this the goal post that you're talking about that has been moved that the fibrosis benefit is not sufficient, which would be apparent from the previous guidelines? Or is it more that it's not sufficient to outweigh any specific risk? And can you provide more clarity on that?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Well, yes, it is a determination of the balance of benefit risk. But again, what's new here is this and had not been previously communicated to us as a concern, is the interpretation of benefit. And it's unclear to us, as I've mentioned in answer to previous questions, it's unclear to us what went into that assessment. All we do know is that we think that the benefit is pretty convincing based, first and foremost, on the convincing achievement of the primary -- the complex primary endpoint. And then supported by a wealth of additional histologic and other noninvasive fibrosis marker data that put -- make it very, very clear what the benefit here is on fibrosis improvement.

**Michael Vincent Morabito**
*Chardan Capital Markets, LLC, Research Division*

Okay. And just a quick follow-up on the difficult side of this. You've been ramping up for a commercial launch. Is there anything that we should expect in the near term as far as cost control, reduction of expense, headcount, anything like that?

**Mark Pruzanski**
*Founder, CEO, President & Director*

Well, look, as I mentioned in my prepared remarks, we are -- we will ensure the financial health of the company, and we'll provide a further update at our upcoming earnings call.

**Operator**

Ladies and gentlemen, this concludes our call today. I'd like to turn the call back over to Mark for closing remarks.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Mark Pruzanski**
*Founder, CEO, President & Director*

Yes. Thank you, operator, and thanks, everyone, again for dialing in today. Today, I think represents a setback, first and foremost, for NASH patients with advanced fibrosis who have been waiting far too long for a therapy to treat their disease. As everyone knows who's listened in, has been following this space for some time, it has been an extraordinarily challenging program to get to this point. And we believe that we have convincing data that should support the initial approval of our drug to get it to patients in need. We will do everything in our power to get things back on track and move expeditiously to an approval so that we can help patients in need. So stay tuned. We will come back to you with an update as soon as we can. And thank you all for your support.

**Operator**
Ladies and gentlemen, this does conclude today's presentation. You may now disconnect, and have a wonderful day.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.