**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RICHARD RICE, AS TRUSTEE OF THE
RICHARD E. AND MELINDA RICE
REVOCABLE FAMILY TRUST 5/9/90,
and CHRISTIAN STANKEVITZ,
Individually and On Behalf of All Others
Similarly Situated,

    Plaintiff,

   v.

INTERCEPT PHARMACEUTICALS,
INC., MARK PRUZANSKI, and SANDIP
S. KAPADIA,

    Defendants.

Case No. 1:21-cv-00036-LJL

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   STATEMENT OF FACTS ............................................................................. 3

      A.    Intercept's Sole Drug Candidate (OCA) Targets The FXR Receptor ................... 3

      B.    The FDA Approves OCA For PBC But Misdosing Leads To Many Deaths ......... 4

      C.    The Company Seeks To Demonstrate OCA Can Also Treat NASH, Which Would
            Open Up A Massive New Market For OCA, And Which Enables Intercept To
            Raise $450 Million .......................................................................................... 5

      D.    OCA Related Safety Events For PBC Patients Necessarily Worsened OCA's
            Safety Profile for NASH Patients Since Intercept Was Seeking Approval For The
            Same Drug Targeting The Same Receptor In The Same Organ ............................ 6

      E.    The FDA Informed Defendants Of Serious Adverse Events Relating To OCA .... 7

      F.    Intercept Proceeds With Its NASH NDA Submission Without Disclosing To
            Investors The Adverse Events Or Even The NISS ............................................. 8

      G.    To Stem The Continued Onslaught Of Negative News, Intercept Attempts To
            Bury Disclosure Of The NISS, But When The Market Ultimately Learns Of The
            NISS, Intercept's Stock Plummets Again ......................................................... 9

III.  APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION......... 10

IV.   DEFENDANTS' MISREPRESENTATIONS ARE ACTIONABLE ........................... 11

      A.    Standards For Pleading Falsity ....................................................................... 11

      B.    Defendants Made Materially Misleading Statements And Omissions By Failing
            To Disclose The NISS Investigation ............................................................... 12

            1.    The NISS Investigation Based On PBC Patients Is Material To The NASH
                  NDA .................................................................................................... 12

            2.    Defendants Failed To Disclose The NISS Investigation Promptly .......... 14

            3.    Defendants Buried The NISS Investigation ........................................... 17

      C.    Defendants Made Materially Misleading Statements By Failing To Disclose SAEs
            With OCA Among PBC Patients ..................................................................... 19

      D.    Defendants' Remaining Arguments Fail .......................................................... 22

V.      THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER .................... 24

    A.      Standards For Pleading Scienter ......................................................................... 24

    B.      Defendants' Knowledge Of Facts And Access To Information Contradicting Their Public Statements Support A Strong Inference Of Scienter ....................... 25

    C.      Additional Factors Further Strengthen The Inference Of Scienter ....................... 29

        1.      The Core Operations Doctrine Strengthens The Inference Of Scienter ... 29

        2.      The Multiple Departures At Intercept Support A Strong Inference Of Scienter ....................................................................................................... 29

        3.      Plaintiffs' Motive Allegations Further Support Scienter ......................... 30

VI.     THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ........................... 33

VII.    CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

CASES

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) .................................................................................. 24

*Ashcraft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................................. 10

*Bartelt v. Affymax, Inc.*,
2014 WL 231551 (N.D. Cal. Jan. 21, 2014).............................................................................. 19

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)......................................................................................................... 11, 13

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008)........................................................................... 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................................. 10

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)............................................................................................ 10, 33

*Chipman v. Aspenbio Pharma, Inc.*,
2012 WL 4069353 (D. Colo. Sept. 17, 2012) ....................................................................... 18

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
2010 WL 3910265 (S.D.N.Y. Sept. 29, 2010)....................................................................... 20

*Dovitz v. Rare Medium Grp., Inc.*,
2002 WL 1225540 (S.D.N.Y. June 4, 2002) ......................................................................... 35

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................................. 33

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)............................................................................................ 10, 26

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................. 12, 31, 33, 34

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)................................................................................. 14, 22, 25, 31

*George v. China Auto. Sys., Inc.*,
  2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) .......................................................................... 31

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) .................................................................................... 30

*In re Acadia Pharms. Inc. Sec. Litig.*,
  2020 WL 2838686 (S.D. Cal. June 1, 2020) ................................................................ 20, 22, 28

*In re Alstom SA*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................................................................... 18

*In re Ancor Commc'ns., Inc. Sec. Litig.*,
  22 F. Supp. 2d 999 (D. Minn. 1998) ...................................................................................... 29

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013) .................................................................................... 22

*In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) .................................................................................... 34

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ................................................................... 11, 33

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .................................................................. 34, 35

*In re Delcath Sys., Inc. Sec. Litig.*,
  36 F. Supp. 3d 320 (S.D.N.Y. 2014) ...................................................................................... 20

*In re Elan Corp. Securities Litigation*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008) ................................................................................ 15, 16

*In re Facebook, Inc. IPO Sec. and Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) .................................................................................... 23

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) .................................................................................... 27

*In re Guilford Mills, Inc. Sec. Litig.*,
  1999 WL 33248953 (S.D.N.Y. July 21, 1999) ...................................................................... 32

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ......................................................................... 29

*In re Huffy Corp. Sec. Litig.*,
  577 F. Supp. 2d 968 (S.D. Ohio 2008) ................................................................... 29

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  251 F. Supp. 3d 596 (S.D.N.Y. 2017) .................................................................... 12

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010) .................................................................... 22

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ................................................................................... 33

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 2d 368 (S.D.N.Y. 2015) .................................................................... 34

*In re Sadia, S.A. Sec. Litig.*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009) .................................................................... 30

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) .................................................................... 30

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
  266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................................. 32

*In re St. Jude Med., Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011) .................................................................... 27

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) .............................................................. 33, 35

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. Dec. 13, 2005) ..................................................... 23

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009) .................................................................... 33

*In re Winstar Commc'ns*,
  2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .......................................................... 34

*In re: Cannavest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018) .................................................................... 32

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ........................................................................... *passim*

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
  708 F. Supp. 2d 334 (S.D.N.Y. 2010).................................................................. 33

*Lewy v. SkyPeople Fruit Juice, Inc.*,
  2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)...................................................... 18

*Liu v. Intercept Pharms., Inc.*,
  2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ...................................................... 21

*Liu v. Intercept Pharms., Inc.*,
  2020 WL 5441345 (S.D.N.Y. Sept. 9, 2020)........................................................ 28

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ............................................................................ 35

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) .............................................................................. 27

*Mateo v. Bristow*,
  2013 WL 3863865 (S.D.N.Y. July 16, 2013) ...................................................... 11

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)....................................................................................... *passim*

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)................................................................................ 12

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018)................................................................. 31

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)............................................................ 24, 26, 27, 31

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)............................................................................................ 23

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) .............................................................................. 35

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)............................................................................... 23

*Sharette v. Credit Suisse Int'l*,
  127 F. Supp. 3d 60 (S.D.N.Y. 2015).................................................................. 33

*Silverstrand Inv. v. AMAG Pharms., Inc.*,
707 F.3d 95 (1st Cir. 2013) .................................................................................... 20

*Singh v. Schikan*,
106 F. Supp. 3d 439 (S.D.N.Y. 2015) ..................................................................... 18

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015) ..................................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ................................................................................... 24, 25, 31

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) ................................................................................... 23

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ................................................................................................ 14

*Werner v. Werner*,
267 F.3d 288 (3d Cir. 2001) ................................................................................... 17

*White v. H&R Block, Inc.*,
2004 WL 1698628 (S.D.N.Y. July 28, 2004) ......................................................... 19

*Ziebron v. Metaldyne Corp.*,
2010 WL 11544989 (E.D. Mich. Sept. 28, 2010) ................................................... 17

STATUTES

15 U.S.C. § 78j ................................................................................................................. 11

15 U.S.C. § 78u-4(b)(1)(B) .............................................................................................. 11

15 U.S.C. § 78u-4(b)(2) .............................................................................................. 10, 24

RULES

Fed. R. Civ. P. 8(a)(2) ...................................................................................................... 33

Fed. R. Civ. P. 15(a)(2) .................................................................................................... 35

Fed. R. Civ. P 12(g) ......................................................................................................... 11

vi

vii

## REGULATIONS

17 C.F.R. § 240.10b-5.................................................................................................. 11

21 C.F.R. § 312.32 (c)(4)............................................................................................. 7

21 C.F.R. § 314.80 ...................................................................................................... 7

21 C.F.R. § 314.80 (a).................................................................................................. 6

## I.   PRELIMINARY STATEMENT

This is a straightforward case of securities fraud.  Even after the Defendants[1] had been notified by the U.S. Food and Drug Administration ("FDA") that there were serious adverse events with Intercept's only drug and the FDA was actively investigating its safety, the Company failed to disclose these facts to the public while Intercept was seeking approval of the same drug in the same dose for another liver disease.

Intercept is biopharmaceutical company that has commercialized a single drug, obeticholic acid or "OCA," which purportedly works by targeting a receptor in the liver called FXR.  While OCA had already been approved for the treatment of primary biliary cholangitis ("PBC"), a rare liver disease that leads to the progressive destruction of the bile ducts in the liver that afflicts a couple hundred thousand people worldwide, the Company was also seeking approval of OCA for the treatment of nonalcoholic steatohepatitis ("NASH"), a liver disease that impacts tens of millions of potential patients and has no approved drug treatments.

Prior to submitting the New Drug Application ("NDA") to the FDA for the treatment of NASH with OCA, Defendants became aware of several serious adverse events from OCA in PBC patients.  Even though the Company was seeking approval for the same drug (OCA) in the same amount (25mg) that impacted the same receptor (FXR) in the same organ (liver), Defendants failed to disclose these adverse events and that they presented a material risk to approval for the NASH NDA.  These adverse events resulted in the FDA itself informing the

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in Plaintiffs' Corrected First Amended Complaint for Violations of the Federal Securities Laws [Dkt. No. 64] (the "Complaint").   Unless otherwise indicated, citations in the form of "¶" or "¶¶" are to the Complaint, all references to "Mot." are to Defendants' Memorandum of in Support of Their Motion to Dismiss Plaintiffs' First Amended Complaint (Dkt. No. 68), citations in the form of "Ex. __" refer to exhibits to the Mot. (Dkt. No. 69), all emphasis has been added, and all internal citations, quotation marks, and alterations have been removed.

Company in May 2020 that it had identified a Newly Identified Safety Signal ("NISS")[2] with OCA related to liver disorder and was going to investigate the risk. Defendants still failed to disclose the serious adverse events and the NISS in public disclosures.

Ignoring that the well-pled allegations must be accepted as true, Defendants argue that safety issues with patients taking OCA for PBC were not a risk to approval of Intercept's NDA for use of OCA to treat NASH. This arguments ignores, however, that any information related to the safety of OCA in PBC patients was highly relevant to whether OCA's safety/benefit profile warranted approval for use by NASH patients, since it was for the same drug (OCA) in the same organ (the liver) targeting the same receptor (FXR). If OCA was associated with adverse safety events in patients with PBC, this safety risk was an important factor in determining whether OCA was safe for any patients, regardless of whether they were being treated for PBC, NASH, or any other disease. Indeed, the OCA safety results from PBC patients were even more important to Intercept's NASH NDA because they reflected safety issues arising from long-term use of OCA (up to multiple years), whereas the NASH-specific data were based on a short-term study of 18 months. Thus, the FDA would necessarily rely on this data to determine the possible long-term safety effects of OCA use in NASH patients.

Facing the reality that Plaintiffs have sufficiently alleged securities fraud, Defendants try to re-write the Complaint, ignoring its well-pled allegations and then arguing against these straw-men of their own creation. In order to do this, Defendants use thirty-two exhibits, including many that were not cited or referenced in the Complaint in any way, to tell their own purported version of the facts. As the Ninth Circuit has noted, this is a "concerning pattern in securities

---

[2] NISS are SAEs, medication errors or adverse events that suggest therapeutic inequivalence or quality issues that warrant further investigation. NISS also include quality issues that could negatively affect public health or the benefit-risk profile of a product; and cannot be resolved through existing routine processes.

cases" where defendants attempt to exploit judicial notice "procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Regardless, no matter how many documents Defendants bombard the Court with, Plaintiffs' allegations, which must be accepted as true, detail a clear case of securities fraud. As such, the motion should be denied in its entirety.

## II.    <u>STATEMENT OF FACTS</u>

Intercept is a biopharmaceutical company focused on developing and commercializing new drugs to treat progressive non-viral liver diseases, including primary biliary cholangitis ("PBC") and nonalcoholic steatohepatitis ("NASH"). ¶ 27. Its sole drug candidate is obeticholic acid or "OCA." *Id.*

### A.    <u>Intercept's Sole Drug Candidate (OCA) Targets The FXR Receptor</u>

The liver regulates bile acids, which are natural detergent-like emulsifying agents that aid the absorption of dietary cholesterol and other nutrients, through dedicated receptors. ¶ 28. The Company claims that the best understood receptor is FXR, which regulates bile acid synthesis and clearance from the liver, and prevents bile acid build-up in the liver from reaching damaging or toxic levels. ¶ 29. The Company claims that FXR is a target for the treatment of several liver diseases that involve impaired bile flow because of FXR's role in limiting bile acid build-up. *Id.* Intercept also claims that bile acid activation of FXR induces various processes that aid the normal functioning of the liver, such as counteracting fibrosis (scarring), inflammation, and steatosis (fat retention). *Id.* The Company claims that due to these properties FXR is also a target for the treatment of more common liver diseases such as NASH and alcoholic hepatitis, in addition to diseases involving impaired bile flow. *Id.*

OCA is a bile acid analog, a chemical substance that has a structure based on a naturally occurring human bile acid, that selectively binds to and activates FXR. ¶ 31. The Company believes that OCA may effectively counter a variety of chronic injuries to the liver that cause fibrosis, and that can eventually lead to cirrhosis, liver transplant and death. *Id.* Intercept believes that due to OCA's bile acid-like properties it activates FXR in the liver, which Intercept believes is critical to successfully treating injury due to progressive underlying disease. *Id.*

**B.      The FDA Approves OCA For PBC But Misdosing Leads To Many Deaths**

PBC is a rare liver disease that progressively damages the ducts that transport bile from the liver to the small intestine. ¶ 30. When the ducts are destroyed, bile builds up in the liver contributing to inflammation and fibrosis, which can lead to cirrhosis and its associated complications. *Id.* In May 2016, the Company obtained FDA approval to market OCA for the treatment of PBC in combination with ursodeoxycholic acid ("UDCA") in adults with an inadequate response to UDCA monotherapy, or on its own in adults unable to tolerate UDCA. ¶ 32. Since then, the European Union and several other jurisdictions, including Canada, Israel and Australia, have also approved certain indications of OCA, and the Company has commercialized OCA under the brand name Ocaliva®. *Id.*

Following FDA-approval, Intercept learned in the course of its post-marketing pharmacovigilance[3] activities that some PBC patients with moderate or severe liver function impairment taking OCA had died. ¶ 34. Intercept concluded that certain of these patients took daily doses of OCA, which is seven times higher than the recommended weekly dose. *Id.* As a

---

[3] "Pharmacovigilance" is the science and activities relating to the detection, assessment, understanding and prevention of adverse effects or any other drug related problem. It aims to enhance patient care and patient safety and to support public health programs by providing reliable, balanced information for the effective assessment of the benefit-risk profile of medicines and vaccines. ¶ 34 n.5.

result, Intercept issued a "Dear Health Care Provider" letter in September 2017. *Id.* And in February 2018 the FDA revised Ocaliva's label to include a "black box warning," and a dosing table that reiterated the existing dosing schedule for patients with certain diseases. ¶ 35. The FDA also issued an updated drug safety communication to accompany the revised label. *Id.*

C. **The Company Seeks To Demonstrate OCA Can Also Treat NASH, Which Would Open Up A Massive New Market For OCA, And Which Enables Intercept To Raise $450 Million**

NASH is a progressive liver disease caused by excessive fat accumulation in the liver (steatosis) that causes inflammation and fibrosis that can lead to cirrhosis, eventual liver failure, cancer and death. ¶ 38.[4] Intercept's commercialization of OCA for PBC was successful and lucrative. ¶ 36. However, NASH presented a vastly larger potential market: Intercept estimated that between 3% and 5% of the world's population (approximately 200 million or more people) has NASH while only approximately 290,000 people worldwide have PBC. ¶ 37. As such, Intercept made a strategic decision to pursue the massive NASH market for which no medications had yet been approved. *Id.*

In September 2015, the Company announced the initiation of its Phase 3 trial of OCA in patients with liver fibrosis due to NASH. ¶ 39. The study's goal was to evaluate the safety and efficacy of OCA, the same drug that Intercept marketed to treat PBC, to treat NASH. *Id.* In February 2019, the Company announced 18-month interim results from this trial that purported to show fibrosis improvement and only mild to moderate safety events consistent with the known profile of OCA. ¶ 52. Using these promising trial results to tout Intercept's future prospects, the Company raised approximately $450 million in May 2019 through the sale of common stock in a

---

[4] According to the Company, more than 20% of patients with NASH are estimated to progress to cirrhosis within a decade of diagnosis and, compared to the general population, have a ten-fold greater risk of liver-related mortality. *Id.*

public offering as well as concurrent sales of other securities. ¶ 53.

> **D.        OCA Related Safety Events For PBC Patients Necessarily Worsened OCA's Safety Profile for NASH Patients Since Intercept Was Seeking Approval For The Same Drug Targeting The Same Receptor In The Same Organ**

Any information related to the safety of OCA in PBC patients was highly relevant to the FDA evaluating whether OCA warranted approval for use by NASH patients because Intercept now sought approval for use of the same drug (OCA) in the same organ (the liver) targeting the same receptor (FXR). ¶ 50. If OCA was causing adverse safety events in patients with PBC, this was an important factor in determining whether OCA was safe for any patients, regardless of whether they were being treated for PBC, NASH, or any other disease.[5]

In fact, the safety results from PBC patients were even more important to Intercept's NASH NDA because they reflected safety issues arising from long-term use of OCA (up to multiple years), whereas the NASH-specific data were based on a short-term study of 18 months. ¶ 51. Therefore, in assessing the possible long-term safety effects of OCA use in NASH patients the FDA would necessarily rely on the PBC patient results. And Intercept's study of PBC patients had already shown an increase in serious adverse events ("SAEs") for patients taking 25 mg per day of OCA, which was the same dosage Intercept sought to have approved to treat NASH patients. *Id*.; ¶ 33 n.4; 21 C.F.R. § 314.80 (a) (SAEs are any adverse experiences associated with use of a drug, whether or not considered drug-related, occurring at any dose that results in death, life-threatening experience, hospitalization, or disability).

While Defendants cite to various FDA guidance documents and papers to support their arguments, they simply ignore that the FDA necessarily deems the safety data for OCA in PBC

---

[5] The Company itself even acknowledged this link both before and during the Class Period by disclosing that "any safety concerns associated with Ocaliva, perceived or real, may adversely affect the successful development and commercialization of our product candidates and lead to a loss of revenues." ¶ 55.

patients as related to the OCA for NASH NDA. In fact, Intercept was specifically required to provide the safety data for OCA in PBC patients to the FDA as part of its safety submission for OCA in NASH patients.[6] This makes perfect sense because the FDA will certainly consider whether a drug has previously caused injuries or deaths when evaluating an application to approve a new indication of the same drug as part of its risk-benefit profile. Similarly, the FDA requires continual submission of safety data even after initial drug approval. *See, e.g.*, 21 C.F.R. § 314.80 (Postmarketing reporting of adverse drug experiences); *see also* 21 C.F.R. § 312.32 (c)(4) ("A sponsor of a clinical study of a drug marketed or approved in the United States that is conducted under an IND is required to submit IND safety reports for suspected adverse reactions that are observed in the clinical study, at domestic or foreign study sites. The sponsor must also submit safety information from the clinical study as prescribed by the postmarketing safety reporting requirements (e.g., §§ 310.305, 314.80, and 600.80 of this chapter)").

     **E.**     **The FDA Informed Defendants Of Serious Adverse Events Relating To OCA**

As Defendants admitted after the end of the Class Period, the FDA informed them in May 2020 of a Newly Identified Safety Signal relating to OCA:

> The FDA has notified us that, in the course of its routine safety surveillance, in May 2020 the FDA began to evaluate a newly identified safety signal, or NISS, regarding liver disorder for Ocaliva which the FDA classified as a potential risk. The FDA has informed us that its review of the NISS is focused on a subset of the cirrhotic, or more advanced, PBC patients who have taken Ocaliva.

¶ 48. Yet, Defendants knew of serious adverse safety events well before this notification from the FDA, due to their ongoing "routine pharmacovigilance" activities. Specifically, the Company knew of numerous such events through the FDA Adverse Event Reporting System ("FAERS"),

---

[6] FDA, *Safety Assessment in Clinical Trials and Beyond*, https://www.fda.gov/media/84954/download (safety information includes "[c]linical trial safety data for other indications" and "[p]ostmarketing experience").

and the high incidence of these events indicated high-levels of risk to patients from OCA.  ¶¶ 42-47.  In spite of this knowledge, Defendants did not disclose the FDA's NISS notification or these SAEs, even though this information was likely to negatively impact the market for OCA as a PBC treatment, as well as Intercept's OCA for NASH NDA.  Instead, Defendants attempted to hide these facts from investors and only released substantive details after they were caught attempting to bury this important news.  ¶ 49.

> **F.  Intercept Proceeds With Its NASH NDA Submission Without Disclosing To Investors The Adverse Events Or Even The NISS**

On September 27, 2019, the Company announced that it had submitted to the FDA its NDA for use of OCA in patients with fibrosis due to NASH.  ¶ 54.  On November 25, 2019, the Company disclosed that the FDA had accepted the NDA and had granted priority review.  ¶ 56.

On March 26, 2020, the Company disclosed that the FDA advisory committee ("AdCom") meeting in connection with the NASH NDA, which had previously been scheduled for April 22, 2020, had been postponed to June 9, 2020.  ¶ 59.  Intercept assured investors that it continued to work closely with the FDA on its application under the FDA's priority review protocols.  *Id.*  The Company and its executives repeatedly told investors that they were diligently preparing for the AdCom meeting, including by reviewing relevant safety information.  ¶ 60.

Yet, during this entire period, the Company failed to disclose the known SAEs associated with the safety profile of OCA. Even after the FDA notified Intercept of the NISS, which represented a material risk to the FDA's approval of the NASH NDA, Defendants failed to disclose this information to investors.  ¶ 64.  The Company vaguely disclosed on May 22, 2020 that the FDA had notified Defendants that it was postponing the AdCom meeting to allow for review of additional data requested by the FDA.  ¶ 65.  But nowhere in this May 22 disclosure,

or any related disclosure by Defendants, did Defendants reveal the FDA's NISS.  ¶ 66.

On June 29, 2020, the Company announced that the FDA had issued a Complete Response Letter ("CRL") regarding the NASH NDA indicating "that, based on the data the FDA has reviewed to date, the [FDA] has determined that the predicted benefit of OCA based on a surrogate histopathologic endpoint remains uncertain and does not sufficiently outweigh the *potential risks* to support accelerated approval for the treatment of patients with liver fibrosis due to NASH."  ¶ 118.  On this news, the Company's stock cratered almost 40 percent.  ¶ 119.  Even though the FDA specifically stated in the CRL that OCA's predicted benefit for NASH patients did not outweigh "potential risks," Defendants failed to disclose to investors in their June 29 announcement or the Company's corresponding investor calls and conferences, that the FDA had recently identified potential safety risks relating to OCA's use in PBC patients.  ¶ 67.

  **G.**  **To Stem The Continued Onslaught Of Negative News, Intercept Attempts To Bury Disclosure Of The NISS, But When The Market Ultimately Learns Of The NISS, Intercept's Stock Plummets Again**

Even after receiving the FDA's complete response letter denying accelerated approval of the NASH NDA due to potential safety risks, the Company did not come clean to investors about the FDA's identification of OCA related safety risks in the NISS.  ¶ 68.  In fact, prior to August 10, 2020, there was not a single mention of the NISS in Defendants' disclosures.  After concealing the NISS for months, Defendants then belatedly acknowledged it but attempted to bury this information by hiding language about the safety signal in the middle of boilerplate paragraphs addressing an unrelated subject, deep within the Company's voluminous August 10, 2020 quarterly report on pages 57 and 64.  ¶ 69.  Intercept did not address the NISS in its concurrently issued quarterly results press release or earnings call.  ¶ 70.  This concealment strategy was extremely successful because no one, not even professional financial analysts, noticed Intercept's comments buried deep in its boilerplate disclosures.  *Id.*

Months later, an eagle-eyed investor noticed Intercept's hidden disclosure change regarding the NISS and tweeted about it, which caused STAT, a news site focused on the healthcare industry, to publish an article on the subject.  ¶¶ 13, 71.  Only then did the market realize that the FDA was investigating the NISS and that the timing and subject matter of the investigation appeared to be related to the denial of Intercept's NASH NDA.  ¶ 71.  On this news, the Company's share price declined more than 8%.  ¶ 14.

## III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

Even in cases subject to the PSLRA, on a motion to dismiss a court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor."  *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).  While the pleading of scienter is subject to a "strong inference" standard,[7] every other element of a securities fraud claim is subject to the "plausibility" standard of *Twombly* and *Iqbal*.[8] *See Blanford*, 794 F.3d at 304, 307 (applying plausibility standard to falsity); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (applying plausibility standard to loss causation).

To state a claim under §10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  Here, Defendants contest falsity, scienter, and loss

---

[7] 15 U.S.C. § 78u-4(b)(2).

[8] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcraft v. Iqbal*, 556 U.S. 662, 678 (2009).

causation. As to these and all required elements, the Complaint is sufficient.[9]

## IV.    DEFENDANTS' MISREPRESENTATIONS ARE ACTIONABLE

### A.    Standards For Pleading Falsity

The "fundamental purpose" of the Exchange Act was to implement "a philosophy of full disclosure." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988).  Under Section 10(b) and SEC Rule 10b-5, defendants are liable for both material misstatements and omissions. 15 U.S.C. §78j; 17 C.F.R. §240.10b-5.  An omission is actionable if "a statute or regulation requir[es] disclosure," or if "a corporate statement … would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).  Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  *Matrixx*, 563 U.S. at 44.  "A statement or omission is materially misleading when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available to the market." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *6 (S.D.N.Y. May 24, 2018) (failure to disclose "multiple adverse conditions" that had been identified made statements about making "good progress" and being "very pleased with the milestone" misleading).

Under the PSLRA and Rule 9(b), falsity is alleged if the plaintiff "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  "A statement is misleading if a reasonable investor

---

[9] Defendants waived their right to challenge the other elements of §10(b), and these non-contested elements are not addressed herein. *See* Fed. R. Civ. P 12(g); *Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013).

would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).  To assess whether falsity is adequately alleged, the court must review defendants' statements in context and taken together.  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context.").  Whether a statement is materially false or misleading "is generally a question reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017).  It is inappropriate to resolve such disputes on a motion to dismiss, "unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that ***reasonable minds could not differ*** on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *Id.*

### B. Defendants Made Materially Misleading Statements And Omissions By Failing To Disclose The NISS Investigation

#### 1. The NISS Investigation Based On PBC Patients Is Material To The NASH NDA

Defendants knew, but did not disclose, the NISS investigation until months after the NASH NDA was rejected, which is a material omission that renders Defendants' statements about OCA and the NASH NDA misleading.  As such, Defendants had a duty to disclose. *Jinkosolar*, 761 F.3d at 250. ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

The FDA commenced the investigation into NISS observed among PBC patients and ***the same month*** postponed a meeting to review "additional data" for the NDA for ***the same drug*** to treat NASH, a much larger market than the one for PBC patients.  ¶¶ 63, 65.  It is reasonable to infer based on the timing of these events that the FDA had identified long-term safety events

12

associated with OCA, which could affect the approval of the NASH NDA.  Indeed, when the NISS investigation was later disclosed, the investing public theorized that "the FDA's liver safety evaluation of Ocaliva . . . contribute[d] to the agency's decision in June to reject the NASH" NDA.  ¶ 71; *see also* ¶ 72 ("[T]he fact that this [review] started in May fits chronologically with the Nash adcom postponement. Investors will now want to know whether the new toxicity signals were behind the June CRL[.]").  Therefore, the NISS investigation is material because it would have "altered the total mix of information" available in May 2020 about the NASH NDA and the likelihood of its approval.  *Basic*, 485 U.S. at 231–32 (Statements are material if there is "a substantial likelihood that the disclosure of the[se] omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

In issuing the CRL, the FDA itself specifically reasoned that the drug's "potential risks" (*i.e.*, safety concerns) were not outweighed by the drug's benefit, yet Intercept still failed to disclose the NISS investigation, even claiming that "there is nothing substantively new in terms of safety issue that's arisen or that the agency has pointed to."  ¶¶ 67, 106.  On this point, Defendants make much ado of the fact that the NDA was for noncirrhotic NASH while the NISS investigation assessed PBC patients with cirrhosis, Mot. at 23-24, but they conveniently ignore that both involve the **same drug** (OCA) affecting the **same organ** (liver) via the **same mechanism** (FXR, a nuclear receptor that regulates bile acid synthesis and clearance from the liver).  ¶¶ 27, 29, 31, 39.  Regardless of whether Defendants subjectively believed them to be unrelated, it is beyond dispute that the FDA was concerned with the full safety profile of OCA when reviewing the NASH NDA, which would undoubtedly include the safety risks observed from PBC patients because these events would depict the impact of long-term use of OCA

13

whereas the NASH NDA was supported by results observed over 18 months of use. *See e.g.*, ¶ 60 ("[T]he focus of interest at that ADCOM, it would ultimately go to – across the board to efficacy and safety and overall benefit/risk."); *see also* ¶¶ 50-51 (significance of PBC SAEs); ¶¶ 85-86, 93-94, 99-100 (conceding any safety risks are relevant).  And, investors plausibly considered the NISS investigation (when it was eventually revealed) to be related to the NASH NDA. ¶¶ 71-72.

If the complete picture—that the FDA was scrutinizing the long-term safety concerns associated with OCA at the same time that it was reviewing an NDA to commercialize OCA for another indication affecting a larger population—had been provided, it would have impacted a reasonable investor's investment decision.  Regardless, motions to dismiss are rarely appropriate on materiality because the determination "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  Thus, dismissal is improper "unless [the omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).  Here, it is difficult to see any factfinder viewing the omitted facts as immaterial; thus, the Complaint satisfies the pleading standard.

### 2.     Defendants Failed To Disclose The NISS Investigation Promptly

Defendants claim they need not have disclosed the NISS investigation promptly because they are permitted reasonable time to investigate an appropriate response and that the post-Class Period labeling change "cannot serve as the scaffolding" to give rise to a duty to disclose.  Mot. at 20.  As an initial matter, Defendants do not dispute that they were notified of the investigation in May 2020 and that it was stated in a filing three months later in August 2020. ¶ 69.

14

Moreover, Defendants' argument misses the mark. Plaintiffs do not lament that the NISS investigation is a material omission merely because it was a regulatory investigation with hypothetical, vague consequences for Intercept's operations. Rather, in context, the NISS investigation was a material risk to the approval of the NASH NDA. Specifically, the Company's future depended on the approval of the NASH NDA because it exponentially expanded OCA's total addressable market to NASH patients. ¶ 37 (290,000 PBC patients worldwide versus approximately 3% to 5% of world population affected by NASH). Intercept had repeatedly stated that "any safety concerns associated with Ocaliva, ***perceived or real***, may adversely affect the successful development and commercialization of [its] product candidates . . . ." ¶¶ 85-86, 93-94, 99-100; *see also* ¶ 69 (acknowledging the same risk when the NISS investigation was buried in the August 10, 2020 Form 10-Q). In this context, where even the ***perceived*** safety risks could impact the commercialization of the drug, the FDA's identification and investigation of the NISS was material, and it strains credulity to suggest that Intercept needed to ascertain the "category of concern" before disclosing the NISS investigation. *See* Mot. at 20-21.[10]

Defendants' reliance on *In re Elan Corp. Securities Litigation* is wholly misplaced. 543 F. Supp. 2d 187 (S.D.N.Y. 2008) (Mot. at 20). There, two patients participating in clinical trials for Tysabri, a drug developed to treat multiple sclerosis, exhibited symptoms of progressive multifocal leukoencephalopathy ("PML"): the first was admitted to the hospital on February 7, 2005, and the company was "immediately" notified. *Id.* at 197-98. On February 28, 2005, the

---

[10] Moreover, while Defendants point to their statements in November and December 2020 to claim that they were "prudently seeking to inform themselves" of the risks, Mot. at 20-21, they do not dispute that they were notified "in May 2020 [that] the FDA began to evaluate a newly identified safety signal regarding liver disorder for Ocaliva which the FDA classified as a potential risk," ¶ 69.

Company announced that it was halting all ongoing clinical trials and suspending Tysabri sales indefinitely. *Id.* at 198. The court found that there were no indications that defendants sought to conceal the PML diagnosis by waiting approximately three weeks to halt the trials and that defendants are permitted "a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises." *Id.* at 217.

Here, there was nothing for Intercept to investigate: the FDA notified the Company that *the agency* had identified and was investigating the NISS. Whereas in *Elan*, the company was plausibly investigating the relationship between the drug and the PML diagnosis, especially where some neurologists posited the symptoms were actually caused by the patient's multiple sclerosis,[11] 543 F. Supp. 2d at 197, here, there is no comparable inquiry for Defendants to make before their duty to disclose arises because Plaintiffs allege (and Defendants do not dispute) that they were notified of the NISS investigation by the FDA.

Moreover, in *Elan*, defendants promptly disclosed the negative information approximately three weeks after the first reported PML diagnosis, within ten days of when the company first learned of the case and while the other case was suspected but not confirmed. *Id.* at 217. Here, the Company waited nearly three ***months*** and buried it in a quarterly filing. *See* Section IV.B.3., *infra*. To the extent Defendants claim to have used this time to engage in an "ongoing dialogue with the FDA regarding the details" of the investigation, Mot. at 21, they raise a factual dispute as to when they learned of the purported additional details. Their position requires the Court to assume, at a minimum, that the FDA notified the Company of nothing other than that the agency had identified a NISS regarding liver disorder. *See* ¶ 74 ("FDA contacted us

---

[11] Defendants attempt to shield themselves by claiming that the NISS does not necessarily mean the FDA had concluded there was a causal relationship between the drug and the listed risk, Mot. at 21, but again, Defendants admit that ***any perceived safety risk*** threatened the Company's operations, ¶¶ 85-86, 93-94, 99-100.

earlier this year, in May of this year, and said they had identified a signal, which they qualified as a signal of liver disorder"). Even so, as Plaintiffs contend, this information itself was material, regardless of the level of concern assigned by the FDA or how the FDA identified it. ¶¶ 85-86, 93-94, 99-100 (any perceived safety risk could have adverse impact).

Furthermore, Defendants' claim of a purported dialogue to learn these details is undermined by their own actions because they did not discuss these details until conferences held after STAT published a piece highlighting the NISS investigation, suggesting that Defendants had sought to conceal the NISS investigation by burying it in an SEC filing. *See* ¶ 70 ("The NISS was not addressed in either the Company's press release announcing its quarterly results or the corresponding earnings call" in August 2020); Mot. at 21 (citing calls in November and December 2020, and February 2021—after October 2020 STAT article). In fact, when the FDA issued the CRL, Defendants claimed that "there is nothing substantively new in terms of safety issue that's arisen *or that the agency has pointed to*," which is plainly not true because the FDA had notified the Company of its NISS investigation. ¶ 106.

### 3. Defendants Buried The NISS Investigation

Defendants seek to avoid liability by claiming that they disclosed the NISS investigation "precisely where a reasonable investor . . . would expect." Mot. at 25. However, the statements appear on pages 57 and 63 of a 98-page quarterly report in the midst of a droning paragraph about general safety concerns and past FDA actions concerning OCA's safety. ¶ 69; *Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001) ("buried" where "fact in question is hidden in a voluminous document"). There are no distinguishing features from which an investor could identify that the statement contains information not included in earlier recitations of the risk factor. *See* ¶ 69 (33-line paragraph); *cf. Ziebron v. Metaldyne Corp.*, 2010 WL 11544989, at *3 (E.D. Mich. Sept. 28, 2010) ("Although the disclosure appeared near the end of the filings, it

17

appeared under a heading in a contiguous paragraph.") (Mot. at 26).[12]   The only heading demarcating the information is "Risk Factors," a section that spans 54 pages of the filing.   *See* Ex. 8; *cf. Singh v. Schikan*, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015) (studies described in "sections helpfully entitled 'Ongoing Clinical Development' (sub-headed 'Clinical Trials and Drisapersen') . . . with each study or type of study listed chronologically therein.") (Mot. at 26).

Contrary to Defendants' unsubstantiated claim that analysts "routinely" use redlining software and *could* have noticed the change to the risk disclosure, Mot. at 26 n.25, no one did at the time the 10-Q was filed.   It was so well-hidden that it was "missed by all the sellside" analysts, so the market did not notice and digest that the FDA was investigating the NISS.   ¶ 72; *see e.g.*, *In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (footnotes in annual report inadequate where "financial professionals were taken by surprise" by later revelation).   Lacking any basis to respond to this allegation, Defendants resort to claiming that analysts "routinely" use redlining software; this is not a "common sense" determination, as Defendants contend, but calls on the Court to draw on facts not alleged anywhere in the Complaint or the 32 exhibits Defendants attach to their motion.   If anything, common sense shows that the NISS investigation was not revealed until the STAT article was published when Intercept's stock price fell approximately 8% on high trading volume from the revelation.   ¶¶ 121-22; *see e.g., Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *17 (S.D.N.Y. Sept. 10, 2012) (18% decline following report of apparent discrepancies in company filings "sufficiently alleged that the misstatements concealed something from the market").   Plaintiffs' allegations do not contradict the "fraud-on-the-market" presumption, but are supported by it; Intercept's share price fell

---

[12] Defendants' other out-of-Circuit case fares no better. *Chipman v. Aspenbio Pharma, Inc.*, 2012 WL 4069353, at *6 (D. Colo. Sept. 17, 2012) (disclosed "prominently" in a Power Point presentation).

because the article disclosed new information. *White v. H&R Block, Inc.*, 2004 WL 1698628, at *6, 12 (S.D.N.Y. July 28, 2004) (underlying litigation was disclosed and, in any event, "inherently public") (Mot. at 26 n.25).

C.    **Defendants Made Materially Misleading Statements By Failing To Disclose SAEs With OCA Among PBC Patients**

Any dispute about the relevance of the SAEs is a red herring. Without question, the SAEs could impact the commercialization of OCA for PBC: Defendants conceded before and during the Class Period that "***any*** safety concerns associated with Ocaliva, ***perceived or real***, may adversely affect the successful development and commercialization of [Intercept's] product candidates . . . ." ¶¶ 85-86, 93-94, 99-100.

As the Supreme Court instructed in *Matrixx*, the materiality of SAEs is a contextual inquiry, which may show "in some cases that reasonable investors would have viewed reports of adverse events as ***material even though the reports did not provide statistically significant evidence of a causal link***." 563 U.S. at 44. Here, Intercept had already faced a major labeling change in the form of a "black box warning" in February 2018 due to the prevalence of deaths among PBC patients using OCA. ¶¶ 34-35. Whereas that change was precipitated by physicians prescribing seven times the recommended dose, *id.*, the SAEs at issue here were associated with the long-term use of the drug itself, ¶¶ 43-46. *See, e.g.*, *Bartelt v. Affymax, Inc.*, 2014 WL 231551, at *11-12 (N.D. Cal. Jan. 21, 2014) (two dozen adverse reactions material despite prior black box warning because drug was company's primary revenue-generating product). Defendants therefore had a duty to disclose these SAEs because a reasonable investor would have viewed the long-term safety of OCA, as reflected by SAEs, as material to the likelihood of approval of the NDA, which was supported by results following only 18 months of using the drug, especially since the frequency of SAEs culminated in the NISS investigation. ¶ 73 (FDA

identified NISS "based on a search of the FAERS database"); *Silverstrand Inv. v. AMAG Pharms., Inc.*, 707 F.3d 95, 105 (1st Cir. 2013) ("The question is . . . whether the 23 SAEs, in the context in which they occurred, created uncertainties or risks that [the company] needed to disclose . . . ."); *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *6 (S.D. Cal. June 1, 2020) ("failure to disclose reports of deaths of patients taking" drug is material, in part because "FDA decided to revaluate the drug's safety based on these reports").

Defendants overstate the significance of any causal relationship between SAEs and OCA because, as even *Matrixx* acknowledges, the FDA "sometimes acts on the basis of evidence that suggests, but does not prove, causation." 563 U.S. at 42; *see also City of Livonia Emps.' Ret. Sys. v. Wyeth*, 2010 WL 3910265, at *6 (S.D.N.Y. Sept. 29, 2010) (SAEs that "may have been caused" by drug were material omissions). Thus, the relevant question is "whether a *reasonable* investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 44 (emphasis in original). The FDA also specifically cited concerns with the "potential risks" with OCA in its CRL regarding the NASH NDA. ¶ 67; *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 332-33 (S.D.N.Y. 2014) ("relative toxicity of Defendants' product" was material omission where it was "critical to the FDA's conclusion that the risk of harm outweighed the potential benefit of the Company's product").

At bottom, Defendants contest the statistical significance of the SAEs, Mot. at 12-16, but statistical significance is a question of fact. *City of Livonia*, 2010 WL 3910265 at *6-7 (declining to find as a matter of law that plaintiffs' calculation was insignificant). Here, an unbiased third party has already made a determination that the risk odds ratio for these SAEs were staggering and warranted attention. ¶¶ 43-46. Defendants are asking the Court to ignore

20

this unbiased analysis and to instead use their completely biased ad hoc analysis that Defendants put forward in their brief.[13]  This is wholly improper on a motion to dismiss since the Court is to accept well-plead allegations as true.  Moreover, the Supreme Court explicitly rejected the adoption of a bright-line rule that adverse events are material only if they are statistically significant.  *Matrixx*, 563 U.S. at 39-43.

Defendants rely on an earlier case against the Company to claim that a 1% reporting rate of SAEs is infrequent and therefore immaterial, but that case dealt with an entirely different context.  *Liu v. Intercept Pharms., Inc.*, 2020 WL 1489831, at *8 (S.D.N.Y. Mar. 26, 2020).  There, succinctly stated, plaintiffs had essentially "compar[ed] the smaller number of deaths in the Phase 3 clinical trial to the slightly larger number of deaths in the post-trial period," which is "no different" than the "mere existence of adverse events."  *Id.*

But here, the SAEs are material because they changed the "total mix" of information available about the safety of OCA, which had just been submitted for approval to treat the same target organ in a broader population.  Specifically, the SAEs reflected the long-term impact of OCA in PBC patients.  ¶ 51.  As Intercept had already determined in a PBC study, 25 mg per day of OCA (i.e., the dosage in the NASH NDA) led to a proportional increase in SAEs.  *Id.*  Since the NASH NDA was supported by a Phase 3 study observing the clinical impact after 18 months of use, these SAEs signaled that long-term use of OCA could be associated with adverse reactions.[14]  The long-term safety of OCA was material to the approval of the NASH NDA, which Defendants even acknowledged.  *See e.g.*, ¶ 136 ("What FDA typically puts to a panel like

---

[13] Defendants quibble as to how many SAEs were, in fact, not included in the label, but nevertheless concede that there were "several" unlabelled SAEs. *See* Mot. at 16-18.

[14] The Company itself considers the safety among PBC patients to be related to the safety among NASH patients because the two indications appear to share the same Phase 1 study. *See* https://clinicaltrials.gov/ct2/results?intr=INT+747&spons=intercept&age_v=&gndr=&type=&rsl t=&phase=0&Search=Apply

this ***spans the range of what is required to inform an assessment of benefit-risk*** of any drug"). Defendants also conceded "the safety issues are consistent with the known profile of OCA," so any SAEs observed among PBC patients were part and parcel of the expected safety of OCA when treating NASH patients.  ¶¶ 106-07.

### D.      Defendants' Remaining Arguments Fail

Like their arguments regarding materiality, Defendants' remaining arguments about their duty to disclose and the falsity of their statements also fail.

***Public Access to FAERS Does Not Obviate Defendants' Duty to Disclose***.  Defendants claim that because the SAEs were available on the FDA's website, they had no duty to disclose these safety risks.  Mot. at 29.  Defendants assert the truth on the market defense, which is "intensely fact-specific and rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."  *Ganino*, 228 F.3d at 167.  Moreover, the access to FAERS data does not preclude a securities fraud claim because "the Second Circuit has stressed that such corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by alleged misstatements."  *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 581-84 (S.D.N.Y. 2010); *see also Acadia*, 2020 WL 2838686, at *6 (FAERS data was not referenced in public disclosure by defendants); *cf. In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576-77 (S.D.N.Y. 2013) (potential liability to AIG lawsuit was "republished, nationally and internationally, in publications like the *Houston Chronicle*, *Wall Street Journal*, and *Dow Jones Business News*") (Mot. at 29).

***Optimistic Statements and Opinions Are Actionable for Failure to Disclose Material Facts.***  Defendants claim that certain of their misleading statements were just optimistic

22

statements or opinions.  Mot. at 30-33.  However, even if that were true, they are still actionable due to the omission of material facts.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184-85 (2015) (opinion actionable for omission of material facts that renders the opinion "misleading to a reasonable person reading the statement fairly and in context").  Further, under *Omnicare* subjective disbelief is not required, as opinions "sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  As discussed at length, the SAEs and NISS investigation were material facts about the safety of OCA, and their omission renders statements about the likelihood of approval of the NASH NDA misleading.

   ***Risk Factors Are Actionable.***  It is well-established that a company's risk disclosures are actionable if they describe risks in hypothetical terms but fail to disclose that the risks (or conditions underlying those risks) have already come to pass, in whole or in substantial part.  *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. Dec. 13, 2005) (disclosures warning of possible legal consequences that could occur if company's employees violated NYSE rules were actionable because they failed to disclose that employees were in fact already violating those NYSE rules); *In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (warning that factors "may" negatively affect revenue actionable where factors already "had" negatively affected revenue).  Indeed, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).  While Intercept warned that "any safety concerns associated with Ocaliva, perceived or real, *may* adversely affect the successful development and commercialization of our product candidates," and that "*if*

23

new side effects are found, *if* known side effects are shown to be more severe than previously observed or *if* OCA is shown to have other unexpected characteristics, we *may* need to abandon our development of OCA," Defendants failed to disclose that new safety events had *already been identified*, rendering these purported risks misleading.

V.    **THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER**

A.    **Standards For Pleading Scienter**

In order to adequately plead scienter, a plaintiff must allege facts that give rise to a "strong inference" that the defendants acted with "the required state of mind."  15 U.S.C. § 78u–4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).  Plaintiffs may satisfy this standard "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  Recklessness is alleged if the conduct was "highly unreasonable" and an "extreme departure from the standards of ordinary care."  *Id.* at 308.  Recklessness can be shown by alleging that the defendants "knew facts or had access to information suggesting that their public statements were not accurate [or] failed to check information they had a duty to monitor."  *Id.* at 311.

Scienter is adequately alleged if the facts, taken as true, give rise to an inference that Defendants intentionally or recklessly misled the public which is at least as compelling as an inference that Defendants acted non-culpably.  *Tellabs*, 551 U.S. at 324.  "When the competing inferences rest in equipoise, the tie goes to the plaintiff."  *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009).  The proper inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual

24

allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S at 322-23 & 326 (allegations are to be read "holistically"). Moreover, scienter allegations "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Nor is a plaintiff required to plead scienter with "great specificity." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 169 (2d Cir. 2000).

As an initial matter, Defendants completely ignore the Supreme Court's mandate that all scienter allegations need to be considered holistically and ask the Court to consider each allegation in isolation. *See, e.g.*, Mot. at. 27 ("Courts in this Circuit routinely reject 'core operations' allegations, standing alone, as insufficient to support a strong inference of scienter"); *id.* ("Those back-and forth FDA conversations, without more, are insufficient to support a strong inference of scienter."). This is entirely improper. When viewed holistically, Defendants' scienter is overwhelming.

**B.  Defendants' Knowledge Of Facts And Access To Information Contradicting Their Public Statements Support A Strong Inference Of Scienter**

There is no dispute that Defendants had knowledge of the NISS for OCA in May 2020 as Defendants have repeatedly admitted that they were specifically informed of the NISS by the FDA then. ¶¶ 48, 73, 74. Faced with this undisputed fact, Defendants both claim that they did not have to disclose the NISS since it was not material (Mot. at 24) but that in any event they did promptly disclose it by placing a short and undetailed mention of it in in their risk warnings in a SEC filing three months later. Mot. at 25-26. Yet, as discussed above, this fact was certainly material since the stock declined after its disclosure, and Defendants' disclosure was not prompt as Defendants made numerous other public statements while waiting almost three months to

25

disclose any information about the NISS.  *See* Section IV.B., *supra*.[15]   Regardless, that

Defendants were actually aware of the NISS and intentionally delayed its disclosure is classic

evidence of scienter.  *Novak*, 216 F.3d at 308 (holding that recklessness is sufficiently pled

where the plaintiff specifically alleges that defendants knew facts or had access to information

contradicting their public statements).

In regards to the timing of their lack of disclosure, Defendants claim that since they were

in discussions with the FDA regarding the scope of the NISS, "no inference of recklessness can

therefore be inferred from Defendants' decision not to disclose the NISS investigation the

moment they learned of it."  Mot. at 21-22.  First, this, however, does not negate the fact that

material risks existed ***at that time***, which Defendants ***knowingly, intentionally or recklessly***

failed to disclose.  Second, Defendants made numerous public relevant statements between "the

moment they learned of it" and when it was actually disclosed.  As such, scienter is

demonstrated.

Moreover, Defendants tout that they disclosed the NISS in their next quarterly report.

This argument again ignores that the Company made numerous statements in the interim three

months and that the Individual Defendants were specifically asked about potential safety factors

that may have impacted the CRL received for the NASH submission and completely ignored the

NISS.  Specifically, on the June 29, 2020 conference call, Defendant Pruzanski was asked "was

there any mention of the safety side of this risk balance – sorry, risk-benefit evaluation in the

CRL" and Defendant Pruzanski replied:

---

[15] Just because Defendants make arguments regarding materiality and duty to disclose, which are part of the falsity analysis, in a section addressing scienter does not mean that the heightened pleading standard as to scienter applies. *See Blanford*, 794 F.3d at 304, 307 (applying plausibility standard to falsity).

Yes. So, Ritu on the safety side, as I mentioned a couple of minutes ago, the safety issues are consistent with the known profile of OCA. There is nothing substantively new in terms of the safety issues flagged. And frankly, from our point of view, nothing that stands out as a showstopper, right? So we're not talking about something new on the safety side.

*See* Ex. 21, at 8; ¶ 107.  His failure to disclose the NISS demonstrates scienter.  *See, e.g., In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (actionable misrepresentations found where "[m]any of the statements at issue were provided in direct response to questions from financial analysts"); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th Cir. 2006) (specific statements to analyst "went well beyond puffery: it was a direct response to an analyst's inquiry about a possible decline" in sales), *vacated in part on other grounds*, 551 U.S. 308 (2007); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 397-98 (S.D.N.Y. 2012) (CEO's detailed responses to questions from investors at presentation bolstered inference of scienter).

Likewise, the Defendants were aware of the SAEs that resulted in the NISS.  As the Complaint explains, the Company's Pharmacovigilance department (led by Gail Cawkwell, Senior Vice President, Medical Affairs, Safety & Pharmacovigilance Operating Officer) was learning of SAEs in real-time through the monitoring of the FAERS system as well as maintaining its own internal safety database as part of its post-marketing regulatory requirements and through its continuous communications with the FDA.  ¶ 47 n.14.  This was in accordance with Defendant Pruzanski's pre-Class Period claim that "we'll continue our routine pharmacovigilance in the postmarking setting and continue to report and adjudicate cases as they come in to FDA and continue engaging with them."  ¶ 41.  And of course, the Company would be monitoring the FDA's database on top of maintaining its own database for adverse reactions to its sole drug candidate since anything else would be clearly reckless.  *Novak v. Kasaks*, 216 F. 3d 300, 308 (2d Cir. 2000) (scienter may arise where complaint alleges defendants "failed to

27

check information they had a duty to monitor"). This is particularly the case since the Company already had a situation with the ***same drug*** where misdosing led to many deaths and a revised label. *See* Section II.B., *supra*.[16]

Since the Company has admitted that the FDA only learned of the NISS "in the course of FDA's routine safety monitoring activities based on a search of the FAERS database and other available external sources," it is simply unbelievable that Defendants would have not been tracking these same databases and been aware of the SAEs. ¶ 73. In fact, the Company engaged in a massive undertaking in preparing for the AdCom. ¶¶ 130-137. As the Complaint explains, the Individual Defendants had emphasized that they were "prudently preparing" a range of topics in anticipation of the AdCom, including safety risks associated with OCA (*see, e.g,*, ¶ 134), and Pruzanski touted that "[W]e did not take any shortcuts in our extensive development program and have assembled a great amount of data supporting our breakthrough-designated drug safety and efficacy profile in NASH fibrosis." ¶ 61. Such a massive undertaking would have undoubtedly uncovered the SAEs that resulted in the NISS. ¶ 62.

Defendants do not dispute that they engaged in this massive review of data and that they were in constant communications during this process. Instead they simply allege that these facts "without more" do not alone support a strong inference of scienter. Mot. at 27. This is another example of Defendants' failure to adhere to the Supreme Court's mandate that scienter is to be

---

[16] Defendants actually cite the case about this prior set of deaths for its dicta that FAERS being public undermines scienter, while ignoring that these past issues with the drug have (or at least should have) only heightened the Company's monitoring of the database. Mot. at 19 (citing *Liu v. Intercept Pharms., Inc.*, 2020 WL 5441345, at *7 n.57 (S.D.N.Y. Sept. 9, 2020)). In actuality, and as Defendants concede (Mot. at 11-18), the "FAERS data files only contain raw data and '[a] simple search of FAERS data cannot be performed with these files by persons who are not familiar with creation of relational databases.'" *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *6 (S.D. Cal. June 1, 2020). As such, investors' access to FAERS does not preclude scienter. *Id.*

viewed holistically, and not by considering each allegation in complete isolation.

### C.    Additional Factors Further Strengthen The Inference Of Scienter

Beyond the facts indicating that Defendants had knowledge of facts and access to information contrary to their public statements, several additional factors substantially strengthen the inference of scienter in this case.

#### 1.    The Core Operations Doctrine Strengthens The Inference Of Scienter

Defendants do not dispute that the development of OCA is the Company's core operation since it is literally Intercept's only purpose.  ¶¶ 127-29.  Moreover, the Defendants cannot, and do not, dispute that Intercept was banking its future on its NASH NDA.  ¶ 129.  This strengthens the inference that the Individual Defendants were aware of the potential risks precluding FDA approval of the NASH NDA, including potential safety risks raised by long-term use of OCA as exhibited in PBC patients.  *See, e.g.*, *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) ("core operations doctrine" permits inference that a company and its senior executives have knowledge of information concerning the "core operations" of a business).[17]  At the very least, if the Company's CEO and CFO were unaware of these risks, this ignorance would constitute recklessness.  ¶ 129.[18]

#### 2.    The Multiple Departures At Intercept Support A Strong Inference Of Scienter

On December 10, 2020, Intercept announced that after 19 years as CEO, Pruzanski would

---

[17] *See also In re Ancor Commc'ns., Inc. Sec. Litig.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) ("[F]acts critical to a business's core operations *or an important transaction* generally are so apparent that their knowledge may be attributed to the company and its key officers."); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1000 (S.D. Ohio 2008) ("[T]he more central a fact is to a company's core operations the more likely its executive acted with scienter").

[18] Defendants ignore that scienter allegations must be looked at holistically and simply claim that "'core operations' allegations, standing alone, [are] insufficient to support a strong inference of scienter." Mot. at 26.  This argument is irrelevant since Plaintiffs' scienter allegations are not limited to the core operations doctrine "standing alone. "

resign the position. ¶ 141. Soon thereafter, on February 18, 2021, Intercept's Chief Medical Officer, Jason Campagna, tendered his resignation. ¶ 142. While he had only served in the role since December 2019, he was the NASH Program Leader at Intercept since 2016. ¶ 142. Thereafter, on March 8, 2021, defendant Kapadia also resigned as Intercept's CFO. ¶ 143. These facts support an inference that Intercept was engaged in a deliberate process of removing individuals responsible for overseeing the development of OCA including for both PBC and NASH, which further supports scienter. *See, e.g.*, *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (CEO's and auditor's resignations "add to the overall pleading of circumstantial evidence of fraud"); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523-24, 534 (S.D.N.Y. 2009) (resignations of chairman and vice chairman soon after revelation of fraud created strong inference of scienter).

Defendants argue that there is nothing suspicious about these three high-ranking executives all leaving concurrently soon after the NISS was disclosed and around the time the new labeling for the use of OCA for PBC came out. Mot. at 28. Plaintiffs disagree. It is highly unusual for a medical company to have its CEO, CFO and chief medical officer leave in a matter of months. In fact, a news article even noted that it did not appear that these resignations were mundane. ¶ 76. Such a complete removal of the three highest ranking members of the Company's management is not likely to have occurred "in the normal course," as Defendants' claim. *See* ¶ 142: *see In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) ("highly unusual and suspicious" resignations "although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud").

### 3.    Plaintiffs' Motive Allegations Further Support Scienter

The Supreme Court has clearly decided that "[t]he absence of a motive allegation . . . is

not fatal." *Tellabs*, 551 U.S. at 325. Under the PSLRA, "litigants and courts need not and should not employ or rely on magic words such as 'motive and opportunity'" with respect to intent. *Novak*, 216 F.3d at 311. Since Plaintiffs have established a strong inference of Defendants' scienter by alleging their conscious misbehavior or recklessness, it is not necessary to allege a motive and opportunity. *See Ganino*, 228 F.3d at 170.

Plaintiffs, however, allege that Defendant Pruzanski sold more than five million dollars' worth of stock during the Class Period and these millions of dollars provided a very real incentive for Defendant Pruzanski to omit to disclose the material risks impacting approval of the NASH NDA. ¶ 140. Defendants counter that these allegations are "contradicted" because "the alleged stock sales were all made 'pursuant to a pre-existing Rule 10b5-1 trading plan." Mot. at 9. Yet, "[t]he existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (collecting cases). Despite submitting 32 separate exhibits, one of which included more than a half-dozen SEC Form 4s that reference Rule 10b5-1 trading plans in footnotes, Defendants do not submit the plans themselves. *See* Dkt. No. 69 (Declaration listing 32 exhibits and no plan). Defendants' effort to create a selective and incomplete factual record falls far short of satisfying their burden of proving this affirmative defense.[19]

Defendants further claim that the fact Pruzanski slightly increased his stock holdings

---

[19] Without the Rule 10b5-1 trading plan, it is not possible to determine when it was entered into. This is vital since if it was entered into during the Class Period, it would provide no defense to scienter allegations. *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 494 (S.D.N.Y. 2018) (when "'10b5-1 trading plans are entered into during the class period, they are not a cognizable defense to scienter allegations on a motion to dismiss'"); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at \*9 (S.D.N.Y. Aug. 8, 2012) (same); *Freudenberg*, 712 F. Supp. 2d at 201 (recognizing that "'a clever insider might "maximize" their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan")

during the Class Period negates scienter.  Mot. at 9.  Not so.  Defendants fail to disclose that while he was able to sell outright sell 50,517 shares for $5,064,635 during the Class Period, he was able to purchase 50,517 shares for $2,885,192.00, or $57.11 per share on average.  The fact that he was given his shares at such a massive discount to their trading value (the Company's stock was trading at around $120.00 in December 2019) and was also awarded an additional 10,800 shares for free during the Class Period,[20] certainly does nothing to negate scienter.

Defendants also argue that these sales are insufficient because Pruzanski sold only 8.85% of his holdings.  Mot. at 9.  This figure is understated since it includes shares owned indirectly in his holdings.  *See* Ex. 12.  In terms of shares directly owned, he actually sold 10.7% of his holdings.  Regardless, courts have held a strong of inference of scienter may be supported by comparable and even smaller percentages than the understated figure that Defendants' tout.  *See, e.g.*, *In re Guilford Mills, Inc. Sec. Litig.*, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) (10%); *see also Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14-15 (C.D. Cal. July 1, 2008) (7%); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (7.6%). [21]

Finally, even if the Court were to hold that the motive allegations against Pruzanski are insufficient by themselves, pursuant to *Tellabs*, it must consider these allegations holistically in

---

[20] Defendant Pruzanski's increase in total holdings is completely attributable to this free award of stock.  While he purchased and sold outright the same amount of shares (50,517), he was awarded 10,800 shares for free and disposed of 5,956 shares for taxes.  *See* Ex. 12.  His increase in shares that Defendants tout is simply the 4,844 remainder shares that he received for free.  *See* Mot. at 9 ("Pruzanski started with 570,673 shares and ended with 575,517," which is a difference of 4,844 shares).  As such, this willingness to accept free shares does not undercut scienter.

[21] Defendants also argue that any inference of scienter is undermined because the other Individual Defendants did not engage in suspicious sales. Mot. at 9-10. At most, this fact would undermine an inference of scienter as to Kapadia only, not Pruzanksi. *In re: Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 244-47 (S.D.N.Y. 2018) (strong inference of scienter with motive alleged only against CEO); *SeeBeyond*, 266 F. Supp. 2d at 1168-69 (strong inference of scienter where CEO was only defendant to sell stock during class period).

combination with all of the other evidence of scienter.[22]

## VI.      THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

Loss causation is subject to the notice pleading requirements of Fed. R. Civ. P. 8(a)(2). *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015) ("[C]ourts in this District have historically evaluated loss causation under the notice pleading standard of Rule 8."). A "short and plain statement" that provides notice of a "causal connection" between the material misrepresentation and the loss is sufficient. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). This causal connection can be pled by alleging (i) a corrective disclosure or (ii) "the loss was foreseeable and caused by a materialization of the risk concealed by the fraudulent statement." *Carpenters Pension*, 750 F.3d at 232-33 (2d Cir. 2014) (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010)). Under either theory, "loss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) ("For an event to qualify as a materialization of the risk, it need only disclose part of the truth that was previously concealed by the fraud."); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (corrective disclosure need not be a "'mirror image' tantamount to a confession of fraud").

Here, the Complaint identifies three disclosure events: (1) postponement of the AdCom meeting on May 22, 2020; (2) announcement of the CRL as to the NASH NDA on June 29,

---

[22] Because the Complaint adequately alleges scienter as to the Individual Defendants, Intercept's scienter is inferred from theirs. *See, e.g.*, *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018).

2020; and (3) revelation of the NISS investigation on October 8, 2020.  ¶¶ 115-123.  All three disclosures were immediately followed by statistically significant drops in Intercept's stock price.  *Id.*

As to the first two stock declines, Defendants simply rehash their arguments that the NISS identified among PBC patients has no bearing on the NDA for NASH.  But Plaintiffs have clearly alleged that the two are related because, among other things, the NISS reflected the long-term safety impact of OCA.  *See* Section IV.B., *supra*.  Plaintiffs have adequately alleged that Defendants concealed safety risks related to the approval of OCA to treat NASH, and Plaintiffs suffered harm when those risks materialized.  *See* Section IV, *supra*.  The precipitous drops in Intercept's stock price following the materialization of the concealed risks provides powerful evidence that Defendants' omissions were material and that they caused the Class's losses.  *See, e.g.*, *In re Petrobras Sec. Litig.*, 116 F. Supp. 2d 368, 380 (S.D.N.Y. 2015) ("dramatic[]" price drop following revelation of fraud demonstrated materiality); *In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*, 763 F. Supp. 2d 423, 483-84 (S.D.N.Y. 2011) ("precipitous declines" in stock once truth became known demonstrated loss causation).

As to the third stock decline, Defendants argue that the STAT article merely speculated whether the NISS investigation, which was purportedly already public, contributed to the CRL for the NASH NDA and thus cannot be a corrective disclosure.  Mot. at 34-35.  However, courts have repeatedly rejected the notion that "any third party's analysis of a company's already-public financial information cannot contribute new information to the marketplace."  *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7 (S.D.N.Y. Mar. 23, 2020); *In re Winstar Commc'ns*, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) (loss causation adequate from short seller report, even when findings "not attributed to any non-public information" and

34

"derived from an analysis of . . . published financials"); *Take-Two*, 551 F. Supp. 2d at 283 ("loss causation may be [based] upon . . . third party analyses of a company's financials"). Therefore, even if the NISS investigation is deemed public prior to the STAT article, that does not preclude a finding that loss causation has been adequately alleged.

Moreover, in cases involving partial disclosures, courts should not view each disclosure in a vacuum but instead should assess them together to see if a fraud was revealed over time. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-11 (9th Cir. 2016) (announcement of SEC investigation with subsequent disclosure confirming falsity of defendants' statements alleged loss causation); *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322-26 (5th Cir. 2014) (though several of five partial disclosures were not corrective alone, they "collectively constitute[d] and culminate[d] in a corrective disclosure that adequately pleads loss causation") (cited with approval by *Chicago Bridge*, 2020 WL 1329354, at *7). Here, the revelation of the NISS investigation in October 2020 confirmed that the AdCom postponement in May 2020 (when the FDA identified the NISS) and the NDA rejection in June 2020 were materializations of known risks of the long-term safety events associated with OCA.

## VII.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that Defendants' motion to dismiss be denied in its entirety.[23] Alternatively, if the Court is inclined to grant any part of the motion, Plaintiffs request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Dovitz v. Rare Medium Grp., Inc.*, 2002 WL 1225540, at *5 (S.D.N.Y. June 4, 2002) ("Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b).").

---

[23] Defendants' only argument concerning the Complaint's Section 20(a) claims is their contention that it fails to plead a primary violation under Section 10(b). Mot. at 35. As Plaintiffs alleged a primary violation of §10(b), Plaintiffs also stated a claim under §20(a).

Dated: May 26, 2021                              **GLANCY PRONGAY & MURRAY LLP**


                                                 By:  */s/ Casey E. Sadler*
                                                 Robert V. Prongay (*pro hac vice)*
                                                 Casey E. Sadler (*pro hac vice)*
                                                 1925 Century Park East, Suite 2100
                                                 Los Angeles, California 90067
                                                 Telephone: (310) 201-9150
                                                 Facsimile: (310) 201-9160
                                                 Email: rprongay@glancylaw.com
                                                         csadler@glancylaw.com

                                                 *Attorneys for Plaintiffs and Lead*
                                                 *Counsel for the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On May 26, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 26, 2021, at Los Angeles, California.


*/s/ Casey E. Sadler*
Casey E. Sadler