M2GNCHAO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RAKESH CHAUHAN, *et al.*,

                    Plaintiffs,

            v.                          21 Civ. 36 (LJL)

INTERCEPT PHARMACEUTICALS,
INC., *et al.*,

                    Defendants.         Oral Argument

------------------------------x

                                        New York, N.Y.
                                        February 16, 2022
                                        10:00 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                        District Judge

                         APPEARANCES

GLANCY, PRONGAY & MURRY LLP
      Attorneys for Plaintiffs
BY:  KEVIN F. RUF

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
      Attorneys for Defendants
BY:  SCOTT D. MUSOFF
      ALISHA QUINTANA NANDA

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

M2GNCHAO

(Case called)

MR. RUF:  Good morning, your Honor, Kevin Ruf for plaintiffs.

THE COURT:  Good morning, Mr. Ruf.

MR. MUSOFF:  Good morning, your Honor, Scott Musoff and Alisha Nanda, from Skadden Arps, for the defendants.

THE COURT:  Good morning, everybody.  We are here today on defendants' motion to dismiss for oral argument.

I will hear first from the defendants and then I will hear from the plaintiffs.  Just so you know, for scheduling purposes, I have limited this to no more than an hour.

Mr. Musoff, if you want time for rebuttal, I would encourage you to keep your opening remarks short and then leave yourself time for rebuttal.

I will hear first from defendants.  At the conclusion of argument today, I am going to ask you to stay around and order a copy of the transcript on an expedited basis.

MR. MUSOFF:  Thank you, Judge Liman, and understood.

Intercept develops and commercializes drugs to treat progressive nonviral liver diseases.  I just want to take a step back to level set, because I think it is important to understand that there are two different diseases at play here.  So intercept's FDA approved drug, Ocaliva, or known as OCA, that drug has been approved since 2016.  It's treated thousands of patients with a rare but devastating disease, a liver

M2GNCHAO

disease that causes cirrhosis, ultimately liver failure, death, and causes transplants.  That disease is known as PBC for the court reporter.  More recently Intercept also has been developing OCA to treat a more common but a very different disease.  It is a noncirrhotic, nonalcoholic disease known as NASH.  So we will call, one is PBC, the newer one is NASH.

In September of 2019, the FDA accepted the submission of the new drug application for approval of NASH.  Now I want to sort of go through the chronology of the class period here, the alleged class period, because it has a lot of peculiar features that I think highlights why the alleged fraudulent scheme of these defendants is inherently incoherent and illogical, and why they are not able to plead any false or misleading statements with particularity and certainly can't establish a cogent and compelling inference of scienter.

So the class period begins upon that application, the NDA, for using OCA for NASH.  November 25, Intercept discloses that they accepted the NDA for OCA.  And then month after month after month there's nothing until May of 2020.

So well over six, seven months later, Intercept receives what's known as a newly identified safety signal, a NISS, relating to OCA's use for PBM, having nothing to do with NASH, for a subset of people that have PBM, this very debilitating, rare disease.

THE COURT:  You said PBM.  I think you mean PBC.

M2GNCHAO

MR. MUSOFF: PBC. I apologize, your Honor. For PBC.

I'll get to the NISS in more detail, but I think it's worth highlighting that what is a NISS? It is a newly identified safety signal. So, just starting from there for a moment, how you can go back to September of the year before, because in May of 2020 the company receives an indication from the FDA that there is a NISS, but more fundamentally --

THE COURT: Have you found any cases, you or your colleagues found any cases regarding the failure to disclose a NISS or the disclosability of a NISS nationwide?

MR. MUSOFF: No. I don't think in particular for a NISS. But it's interesting that in *Elan*, for example, when Judge Holwell noted that there was time for them to disclose, that was the shutting down of an entire clinical trial, something far more severe than a NISS. And here the NISS was disclosed. It wasn't disclosed in May, but it was disclosed in their next quarterly filing.

THE COURT: I realize that. I don't mean to interrupt you with your argument. I just was interested in --

MR. MUSOFF: Your Honor, it raises I think a very strong point here, which is when you think about the NISS, which in and of itself does not mean that there is evidence of any causal link between the drug and safety at all, here it was classified as a potential risk. It was the lowest level of concern.

M2GNCHAO

The FDA said they'll take a year to decide whether there are any issues there.  They didn't pull the drug from the market or anything like that.  And, again, what they're investigating is for PBC.

Under plaintiff's theory, just to jump ahead --

THE COURT:  Isn't it a plausible inference that if there was a NISS or SAEs in connection with PBC that that could present risk with respect to the approvability of the drug for NASH?

MR. MUSOFF:  Your Honor, no, for I think a couple of reasons in particular.

One is that the NISS was based upon a subcohort of people with PBC.  And the fact that you can have SAEs relating to a far more severe liver disease even suggests that there may not be a causal link there between the two.

THE COURT:  That may be right, but in anticipation of this argument I went back through *Matrixx*, as I'm sure you did. You'll note that some of the studies in *Matrixx* had to do with fish and not even humans.  And so isn't there some inference that one can draw from the population, at least at this preliminary stage, who experienced SAEs and who were suffering with PBC to the population with NASH?

MR. MUSOFF:  Your Honor, I respectfully hear -- the differences between that and *Matrixx* are stark for a couple of reasons.  One in particular is the NISS was based upon publicly

M2GNCHAO

available SAEs that were available at the time the FDA accepted the application for the NASH NDA, new drug application.  All of that information was out there.

In all of the discussions with the FDA, there's nothing to suggest that they indicated or believed, and we still don't believe that the NISS relating to the PBC would have an impact on the drug application for NASH.  There's pure speculation in one news article that perhaps there is a link, but that also doesn't answer the question as to how you go back to September of the year before, 2019.

THE COURT:  Is there information in the complaint about when the SAEs occurred?  I know there is that summary judgment, but I wasn't sure whether there's information as to when those SAEs occurred.

MR. MUSOFF:  Your Honor, I don't believe plaintiffs in their complaint -- what they do is they repeat that summary chart from Evaluate, and that's all they repeat essentially, and the data that somebody sliced and diced post class period. But it doesn't suggest or set up that you would have known at the time you submitted the NDA that either the NISS was upcoming or that the NISS related at all again to NASH.

And that's part of it.  It's filled with speculation, conjecture about the RORs.  Then, when we think about it from a scienter perspective, even if in hindsight somebody could suggest that, where is the clear duty that these individuals --

M2GNCHAO

there is not one confidential witness, not one internal document, not one fact about the individuals other than -- I'll get to the one, the stock sales -- that these folks believed or had any inclination that, one, the NISS was coming or, two, that it would have any implication on the NDA for NASH.

THE COURT:  There is one statement that your client made that I want to make sure you cover.  It is a statement that was made on the June 29, 2020, earnings call.  The statement is to the effect of that we have seen nothing new with respect to -- nothing new with respect to safety has arisen.  I want to make sure you cover that and whether that sufficiently pleads an affirmative misstatement that would be false as a result of the information that was received about the NISS in May.

MR. MUSOFF:  Your Honor, what's being referred to in the analyst call and in the statements disclosed on June 29 is in connection with NASH.  At that point there was not --

THE COURT:  I am not so sure.  I mean, the call was with respect to NASH, but the statement is on the safety side, the typical known profile of OCA, that there is nothing substantively new in terms of safety that's arisen or that the agency has pointed to.  "Or that the agency has pointed to" I understand your point.  But "substantively nothing new in terms of safety" doesn't seem like it's restricted to NASH or the communications with the FDA regarding NASH.

M2GNCHAO

MR. MUSOFF:  Your Honor, I think in the context of those statements, they are in connection with the NDA, and more broadly speaking at that point, a NISS alone doesn't suggest that there is a safety issue at that point.  It's very similar to the SAEs in *Matrixx* and *Philco* and the other cases of why you don't have to disclose SAEs until there is something more.  I understand that the something more doesn't have to be a statistical link, but there has to be something more than just conjecture, especially when you are dealing with these rare and debilitating diseases where you would expect to get SAEs.  So there's nothing to suggest that these were unexpected, but I believe in the context --

THE COURT:  Mr. Musoff, have you and your colleagues found any key Second Circuit cases on what's meant by justice Sotomayor when she talks about a plausible causal relationship in the *Matrixx* case?  In this circuit what is necessary to prove a plausible causal relationship?  I think that's the language of *Matrixx*.

MR. MUSOFF:  Your Honor, there is the summary affirmance in *Savient*, *Koncelik v. Savient*.  The Second Circuit affirmed a Judge Daniels opinion.  When you look at the Judge Daniels opinion, it does suggest you need to have a belief at least that there is this linkage, not just correlation or not just speculation.

You know, *Matrixx* itself had lawsuits already filed,

expert opinions out there drawing the linkage.  Even there, you know, the court went out of its way to say that, you know, it is not enough just to have SAEs.

Here, when you at the frequency, we point out in a footnote in our brief it is a little over 1 percent of all of the people taking the drug.  So there's nothing when you are dealing with these types of drugs that they can allege or have alleged to suggest that anybody at the company believed that there was cause for alarm at that point.

You know, a little bit incoherent about their class period then is how they go from May to September, and then why isn't the June, the corrective disclosure, although the NISS was not disclosed, that's when they say that NASH NDA is going to require a full submission.

So they take what is essentially two negative disclosures in the middle of the class period -- in a way this is sort of a paradigm disclosure by the company.  As soon as they find out that the NASH NDA is going to have a CRL, they disclose that.  Then they disclose shortly thereafter, in May they disclose the advisory committee postponement.  In June they disclose the CRL.  And in August in their next periodic filing they disclose the NISS.  Under plaintiff's theory you would have to 8-K a NISS essentially every time you received one.

And then, at the same time, plaintiffs allege in their

M2GNCHAO

brief that the defendants didn't disclose until after the class period that the NISS actually occurred in May.  We point out, no, that is in the 10-K in two different places under highlighted risk disclosures relating to unforeseen side effects, relating to the safety and the effect it might have on marketing.  Again, relating to PBC, it's prominently disclosed on August 10.  They still continue the class period until some article gets written in the fall of 2020.  So there are some inherent inconsistencies there.

Your Honor, in addition to the *Savient* case I mentioned, I think it is also important to note Judge Kaplan's decision in the prior Intercept case, the *Philco Investment* decision.  But, most importantly, the case that plaintiffs rely on the most, the only pharma case that they really rely on for SAEs is *In Re Acadia* in the Southern District of California.

Just last month, following briefing -- and I let my friend on the other side know last night we are going to rely on the subsequent history.  In January of this year, the judge on a third amended complaint reversed himself or herself -- himself -- and said, you know, I was wrong.  You don't need to disclose publicly filed SAEs, that you need something more.

It cites *Matrixx*.  It goes back and says I was wrong.  But it also indicates that the judge had actually done that in the decision that was issued before plaintiffs' opposition.  In fairness to plaintiffs and us, that decision was not published.

M2GNCHAO

We pulled it off of the docket after seeing the subsequent authority. But it is significant because I think that judge goes through the exact same analysis that the courts in this district do in following *Matrixx* and explained in sufficient detail why you don't need to disclose the SAEs and why you don't need to especially when they are publicly available.

I just want to take one more quick step back, because what they are really arguing is that we should have known from the SAEs that there would be a NISS. That alone, you know, is pure speculation. But that is just a backwards way of saying you should have disclosed the SAEs earlier. Again, those were all publicly available. And, you know, as cited in *In Re Acadia* and the other authority we cite, there is no duty to disclose that. Then you get to the NISS, and they still speculate --

THE COURT: There might be duty to disclose if there was an affirmative statement that was rendered missing by the failure to disclose, right? Unless the information is published with the same intensity.

MR. MUSOFF: Yes, your Honor. Under certain circumstances, but for SAEs, in all of those cases the company is announcing things about the development of its drug. That's why the question comes out as to whether you have to disclose the SAEs along with that. So I still think you need the something more, even if you are talking about -- here the two

M2GNCHAO

statements they point to are negative statements.  Other than the fact that they accepted the drug application, they start the class period on accepting the drug application, and then the two statements about NASH are the negative updates about it.  So, you know, again it creates a little bit of an illogical chronology here.

Your Honor, the recently published decision, just for the record is 2022 WL 34693 *In Re Acadia*.  If the Court, if it's more convenient, we have a hard copy of that decision.

THE COURT:  Maybe at the end of the argument today you will pass it up.

MR. MUSOFF:  Okay.

So I just want to also -- the premise of the complaint because I jumped ahead to the NISS, but if you look at what the real premise of their complaint is, if you look at paragraphs 81, 88, 90 and 96, they are all the same.  This is their attempt to plead with particularity why the company's statements were false and misleading.

And what they say is the statements are false and misleading or omit facts necessary to make the statements not misleading because they failed to disclose that there were several serious adverse events from OCA in PBC patients that were not already cited on Ocaliva's label and that these serious adverse events in patients taking the same drug was a material risk to approval of the NASH NDA.  That is their

M2GNCHAO

theory.

First, we pointed out that those SAEs were on the label. The label shows that three of the five types of alleged SAEs, chronic hepatitic failure, hepatic failures, and portal hypertension, which account for 85 percent of the cases listed on plaintiffs' SAE table as not labeled, were in fact labeled. That is in our moving brief at pages 16 to 17 and Exhibit 7 to my declaration. That's 85 percent of the cases that they're pointing to as not labeled were labeled.

Their response? We're quibbling.

That is not a quibble. That shows documentary evidence that undermines the primary basis for their complaint. Without that, they are again left with this duty to disclose SAEs, some of which were disclosed and, for the reasons we talked about, weren't. So that undermines that.

Then the speculation they have, where are the facts to support that those SAEs which now were disclosed, but they're claiming that they weren't, indicated that there was a higher risk for NASH. That's where they speculate.

Your Honor, you know, even if the Court -- which I respectfully submit shouldn't -- determines that there is a close call as to materiality or should have been disclosed for scienter, they have no cogent and compelling reason to believe that the company or the individual defendants believed that to be the case.

M2GNCHAO

Very briefly I will touch upon the stock sales because --

THE COURT:  Please do.

MR. MUSOFF:  One, they were all made by a pre-existing Rule 10b5-1 plan.

THE COURT:  Is there any information of which I can take notice as to when that 10b5 plan was adopted?

MR. MUSOFF:  Your Honor, I do believe that the Form 4 filings attached to my Exhibit 12 indicate that it was a pre-existing plan, existing before the class period.  We will confirm that, your Honor, but I believe it does indicate that it was pre-existing.

And the *Glaser* case and the *Aratana* case in this district have held that undercuts any inference of scienter. My friend will get up and say it's typically an affirmative defense for insider trading, but that is not the analysis that's being done for scienter purposes.  Whether it is an affirmative defense or not, the question is have they created a cogent and compelling inference out of a stock sale that was done by a preexisting 10b5-1 plan.  That's why those cases say that it undercuts that inference dramatically.

In addition, he only sold 8 percent of his total holdings.  The Second Circuit in *Acito* and the court in *Glaser* have found -- you know, in *Acito* the sale was 11 percent.  The Second Circuit in its seminal decision said that is not what --

THE COURT:  Right.  But *Acito* is a very different case, because that is an outside director.  Here we are talking about the president and the CEO who actually is making the statements.

MR. MUSOFF:  Your Honor, I believe in *Acito* it was a former executive who then had retired and became a director.  But, yes, that is a distinction, but that is often cited for the percentages.  Eight percent doesn't suggest it, especially fundamentally when his shareholding increased during the class period.

THE COURT:  What is the relevance of that if he's getting the stock for free?

MR. MUSOFF:  Well, your Honor, I respectfully submit they're getting it as part of compensation.  But it is a question of an inference your Honor going to draw.  Somebody who knows they are getting compensated in stock, their holdings, their exposure to the company are going up.

It's a more cogent and compelling inference that their sale of 8 percent wasn't because of any purportedly bad news coming on the horizon.  Here we are two months into a 13-month class period, so the timing also doesn't suggest --

THE COURT:  I take it that the stock is freely tradeable?

MR. MUSOFF:  I believe so, your Honor.

THE COURT:  It is not restricted?

MR. MUSOFF:  I would have to check.  I actually believe there were cases we cited where, even if it's not, courts have still considered that in terms of the holders, but I would --

THE COURT:  If you look at the case that you cite which is the Judge Engelmayer decision, who then relies upon Judge Scheindlin, the point that Judge Engelmayer makes is that it is relevant whether it's freely tradeable.

MR. MUSOFF:  Right.

THE COURT:  Because if it is not freely tradeable, the significance there is somebody is holding on to it.

MR. MUSOFF:  That's true, your Honor.  I don't have the quote handy, but I think he says, regardless, when looking at percentages it wasn't -- he does do that whole analysis of which stocks, which options were freely tradeable and which ones weren't, but I believe there is also a line in there that suggests that, even without that, this may not be enough.  I would suggest here with only one of the defendants, that is another inference that cuts against sold anything.  We cite authority for that so we have a 10b5-1 plan, only 8 percent, holdings increased and only one of two defendants.

THE COURT:  Thank you Mr. Musoff.  I want to make sure you have time for your rebuttal.

Let me hear from the plaintiffs.

MR. RUF:  Thank you, your Honor.

M2GNCHAO

I am going to use the podium.

THE COURT:  Counsel, have you found any cases on disclosability or the requirement to disclose a NISS?

MR. RUF:  No, your Honor.

Your Honor, I am going to -- there's a lot here and I am I guess what I would like to do is just focus I guess on what I think is the sort of main narrative.

I do believe that plaintiff will have to amend this complaint if you allow it to go forward with respect to the class period and with respect to the false statements, because it is true that some of the SAEs, which we believed had not been labeled and had not been disclosed, appeared to have been labeled, and we have to obviously deal with that.

From the broad perspective, though, as the Court knows, the reason we are here, the way the ship was launched was over this newly identified safety signal, or NISS, that this company, Intercept, knew about and said nothing about, notwithstanding the fact that this new drug application was pending when they found out about it.

THE COURT:  Can you point me to a paragraph or an allegation in your complaint that supports the inference that the reason why the FDA issued the complete response letter was due to the NISS or delayed the approvability of OCA for NASH was due to the NISS more broadly?

MR. RUF:  I believe that the allegation is there.  I

believe we allege that as a result of the omission, that the omission gave rise to the -- I am blanking on the expression. The materialization of the risk is alleged here that the failure to disclose the NISS was certainly for people who had made purchases in the stock from the period of the NISS beyond, that was certainly information that they would have wanted to know, knowing that the NDA was pending.

THE COURT:  No.  I'm sorry.  Maybe I misspoke and maybe you mistook my question.  My question doesn't have to do with what the market perceived.  My question has to do with whether there is an allegation of fact from which an inference can be drawn that the FDA's actions with respect to OCA for NASH has anything to do with the NISS that was observed in patients taking the drug for PBC?

MR. RUF:  I don't believe that we have alleged affirmatively specific facts such as an insider or such as a report from the FDA that would say that the reason we are rejecting this new drug application is as a result of the issues that are raised by the NISS.

THE COURT:  Okay.

MR. RUF:  Nevertheless, your Honor, and I believe the Court is correct, that this whole area, any case like this needs to be analyzed in the context of *Matrixx*.  I mean, we just so happen to have this U.S. Supreme Court case that happens to be all about bad information about drugs and when

M2GNCHAO

that information needs to be disclosed.

With respect to the idea that the -- well, the SAEs, these severe adverse experiences, they don't need to be disclosed, that argument, I would make the argument that whether or not the SAEs are in real time and we know that they're not in real time, I think the Court is aware that they are published every quarter, but with respect to the SAEs, if they give rise to a NISS, that fact, the NISS is that additional thing, is that thing that Sotomayor I think was talking about.

THE COURT: It seems to me that that has to be the nub of your case, that the existence of NISS provides the plausible causal relationship that turns an SAE that is not required to be disclosed into something that is required to be disclosed. If I accept that proposition, doesn't that mean that every company effectively has to issue an 8-K as soon as they receive a NISS, even the lowest level of NISS, as your adversary argues?

MR. RUF: I think, your Honor, that *Matrixx* makes clear that every case is somewhat unique and every case has to be decided or those issues have to be determined in context. But this case has facts that I think make the NISS all the more important.

For example, and it hasn't been raised yet, in May the company concedes they haven't told us exactly when they learned

M2GNCHAO

about the NISS, but on May 22, the company learned that the advisory committee, which had been scheduled to meet with respect to this NASH, use of Ocaliva for NASH, was being delayed, very shortly thereafter or before the company had learned of the NISS. I mean, that's really a very significant connection between what appears to be some trepidation by the FDA or some concern by the FDA -- and they say it was because the FDA wanted to review additional information -- and this bad thing, the NISS.

THE COURT: I mean, isn't the inference that you are asking me to draw undermined by the very disclosures that you rely on that seem to indicate that the FDA's interest was in additional data that had to do with efficacy and not so much with respect to safety in the PBC population?

MR. RUF: Your Honor, you know, we would love to be able to have discovery on the subject, but, you know, I think in criminal contexts all the time coincidences are some of the strongest reasons for investigations. And here you have, you know, again, the timing seems to be incredibly coincidental -- or not coincidental. The timing would seem to be suspect that right on top of this NISS, and you know, NISS, they say it's the lowest category of a NISS, but it is a NISS.

By the way, when they disclosed it in August in their SEC filings, they didn't use that acronym, that NISS. Instead, they wrote it out. As the Court knows, it's sort of buried in

a paragraph.  And we cited the *Alstom* case for an example where the Court said, well, when you bury something in an SEC filing, that doesn't necessarily give rise to giving notice.  And if the investment community, the investment professionals were taken by surprise that's sort of the proof of the pudding that the notice wasn't there.

Your Honor, I would like to raise an issue that you raised as well with respect to the scienter because I think it's really significant.  The CEO, Pruzanski, twice in the June 29, 2020 conference call, twice he was asked about safety.  To me the perhaps even more damning quote than the one we discussed earlier was -- this is at paragraph 106 of the complaint.  He's asked about safety and he says, "On the safety side, the typical known profile of OCA that there is nothing substantively new in terms of safety issue that's arisen or that the agency has pointed to."

This is after the --

THE COURT:  That's why I ask you whether there is any evidence that you plead, any facts that you plead that would support the notion that the agency pointed to the NISS in connection with the NASH application.

MR. RUF:  And we don't, your Honor.  At this point, in all candor, we do not have --

THE COURT:  How is that statement "that the agency has pointed to" false?

MR. RUF:  Well, it's false with respect to the NISS because the agency has pointed to issues with this drug. Again, this drug is the -- it's the drug, not the condition, that's being analyzed by the FDA.  Whether the drug is being used in a different context doesn't change the fact that it's the drug.  It's the drug, same drug, same area of the body that it is addressing, and it is the same dose.  So the NISS is clearly something that the FDA is pointing to that is dealing with the safety of OCA.

THE COURT:  So let me try to understand your theory. If I assume what would be for you, I understand, an unhappy assumption, and I will hear from you on it, but let's assume that I conclude that the fact of the NISS was adequately disclosed in the August SEC filing, that the NISS itself was disclosed and took care of any omissions with respect to whether there was a NISS that should have been disclosed in June.  Doesn't the complaint fail for loss causation?

I understand that there may be an issue that you've got in terms of the relationship between the NISS and NASH. But with respect to the NISS itself and the safety of the drug as it was then being marketed, if the August disclosure is sufficient, doesn't the complaint fail for failure to plead loss causation?

MR. RUF:  Your Honor, you brought the point up earlier that, with respect to disclosures, the disclosure needs to be

made with the same, and I can't think of the term.  Vigor.

THE COURT:  Intensity was the word.

MR. RUF:  I still think there is a period of time, and I think that period of time is from the receipt of the NISS certainly until the disclosure in August, there's a period of time that is actionable I believe as a result of the CEO's statement to investors that there was no new safety issue raised by the FDA.

That's what he's saying.  He's not making a fine point and saying, well, I just want to be clear we are talking about -- you mean any new safety thing that -- you know, he's saying categorically nothing new.  And there is a whole -- you know, we got into a lot of discussion about this statistical analysis, this ROR that this article talked about, which is sort of a means of calculating the degree to which an SAE or the number of SAEs is expected or outside the expected number and so the higher the number this ROR score.

So counsel for defense says, well, the FDA uses its own.  It has its own internal, you know, scrubber for identifying concerning trends.  Well, guess what?  That internal scrubber for identifying concerning trends found that there was a concerning trend here, and that is why there is a NISS.  So I believe that that is a really significant, significant fact.

THE COURT:  Are there any facts pled in your complaint

about when the SAEs occurred?

MR. RUF:  No.  I heard that question earlier, and I believe counsel's answer was correct.  We had the information that had been published that was just showing totals, but we don't know in real time which quarter in which each of the SAEs accrued.

THE COURT:  So let's assume that -- well, what is it that the CEO knew in August and September of 2019 when I think the sales took place that you say constituted inside information or made those stock sales suspicious?  You don't allege that there are SAEs that were undisclosed that were in existence in August and September of 2019.

MR. RUF:  Correct.  We don't parse them out.  You're right.  You know, again, at this pleading stage, we are alleging based on the total number of SAEs --

THE COURT:  I misspoke by the way.  I meant November and December.

MR. RUF:  Yes.  They were in the class period.

THE COURT:  Yes.

MR. RUF:  And the class period starts in September with the NDA submission.

THE COURT:  Right.

MR. RUF:  But --

THE COURT:  The question is, what is it that makes those sales in November and December of 2019 suspicious?  What

M2GNCHAO

was the information that he or the company had at that point in time that was not disclosed to the market?

MR. RUF:  That would be the SAEs.  We don't have the ability, we have not parsed out the number of SAEs in that period.

THE COURT:  Okay.

MR. RUF:  Your Honor, if you don't have any other questions, I will stand down.

THE COURT:  I may.

The same question I asked your adversary about key Second Circuit cases and what's meant by plausible causal relationship as used in the *Matrixx* case.

MR. RUF:  Your Honor, I don't have any that I can cite.

THE COURT:  You may have mentioned this earlier, but I take it you don't dispute that on the label that the two SAEs that were not included on the label were hepatic failure and portal hypertension, but the other three were on the label?

MR. RUF:  I believe the two you just mentioned are on the label.  I think the ones that weren't --

THE COURT:  In any event, I mean, I said that there were three of them that were on the label and that there were two that were not on the label.

MR. RUF:  Yes, your Honor.  Just for the record I believe the ones that were not on the label were autoimmune

M2GNCHAO

hepatitis and hepatorenal syndrome.

THE COURT:  Thank you very much.

Mr. Musoff, any final words.

MR. MUSOFF:  Yes, your Honor, very briefly.

In the CRL on June 29, 2020, there's no mention of PBC or the NISS.  And at the analyst call Dr. Pruzanski is asked do you believe -- it is a question about his belief, whether there was anything specific -- "do you believe maybe had, given the FDA pause on benefit risk" and then it goes on.  His question he's answering is there is nothing specific that we are aware of.  He said, you know, we're warning people.  They are asking for a CRL.  We think we are going to be able to get the data together and submit it to them.

But there's no suggestion at that point that he believed there was that linkage, which from a scienter perspective is important, especially when you are looking at their overall scheme.

They are trying to allege fraud here.  Why disclose the delay but not the cause of the delay and then disclose the NISS all within several months?  It's sort of the inevitable day of reckoning.

We disclosed twice in the 10-Q that we received it in May, both under specific risk warnings.  So it is just an incoherent fraud that you would promptly disclose the ad. comm. delay on May 22.  They are alleging that was caused by the

M2GNCHAO

NISS, pure speculation.  But we disclose the actual delay. Then we disclose the delay again.  And then in our next quarterly filing we disclose the NISS.  It is hard to come up with a cogent and compelling fraud based out of that, for that reason.

Then I will just very briefly, because I touched upon it, in Judge Engelmayer's decision in *Aratana*, he does say, after going through all of that complex math -- which I actually had trouble following myself, but he did a better job of it -- he says, "In any event, the overall circumstances surrounding the defendants' sales so clearly do not plausibly support an inference of scienter" and goes through a very similarly here the timing, the 10b5-1 plan, and the amount.  I just wanted to point that out as well, your Honor.

I think we will also rest on loss causation, but they do end the class period on an article that is based only on public information, and we cite authority for why that can't be the basis for loss causation if all it is doing is giving its opinion on already public information.

THE COURT:  Let me ask one more question of plaintiffs' counsel.

Is there any dispute that I can take judicial notice of the increase in the stock sales?  I'm sorry, not the increase in stock sales, in the increase in stock ownership.

Do you dispute that?

M2GNCHAO

MR. RUF:  I appreciated the colloquy over the question of free stock, but we don't dispute the numbers.

THE COURT:  Okay.

All right.  Thank you both very much.

Mr. Musoff, please order a copy of the transcript on an expedited basis.

Very well argued by both of you.  The Court will take it under advisement.

MR. MUSOFF:  Thank you, your Honor.  It is a pleasure to be here in person.  It is my first appearance in this courthouse since COVID.

THE COURT:  It's nice to have lawyers here.  It is nice to see plaintiffs' counsel also.  So, welcome.

MR. RUF:  Thank you, your Honor.

MR. MUSOFF:  Thank you, your Honor.

(Adjourned)